## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

WATERFRONT RENAISSANCE    :
ASSOCIATES,                    :       CIVIL ACTION
        Plaintiff           :
                        :
    v.                    :       NO. 07-1045
                        :
CITY OF PHILADELPHIA, et al.,   :
        Defendants      :

## M E M O R A N D U M

**STENGEL, J.**                              **March 31, 2008**

Waterfront Renaissance Associates ("WRA") is a Pennsylvania limited partnership seeking to develop a site located at 400-456 North Columbus Boulevard, Philadelphia, Pennsylvania (the "Site") as a "major World Trade Center." WRA brought this action for declaratory, injunctive and monetary relief against the City of Philadelphia, the City Council, and its Planning Commission (collectively, the "City"),[1] three Civic Associations

---

[1] In the joint motion to dismiss filed by the City of Philadelphia, the City Council, and its Planning Commission, these municipal defendants argue that only the City itself is a suable legal entity under 53 P.S. § 16257 (2007) (no separate corporate existence in component departments of the City). See, e.g., Gremo v. Karlin, 363 F. Supp. 2d 771, 781-82 (E.D. Pa. 2005) (dismissing claims against the City Police Department and its Northeast Detective Division because they are not legal entities separate from the City). The plaintiff does not object to removing the names of City Council and the Planning Commission from the caption, provided the City of Philadelphia assumes responsibility for any actionable conduct of City Council and the Planning Commission in this case. (See Pl.'s Resp. 2.) Section 16257 provides that "all suits growing out of [] transactions [by component departments], and all claims to be filed for removing nuisances, together with all bonds, contracts and obligations, hereafter to be entered into or received by the said departments, shall be in the name of the city of Philadelphia." 53 P.S. § 16257. The plain language of the statute dictates that the City assume responsibility for actionable conduct by its component departments. Accordingly, I will dismiss the City Council and the Planning Commission from this action with prejudice. Where necessary, the individual

1

("Civic Association Defendants"),[2] and a number of individuals ("Individual

Defendants"),[3] after changes to zoning laws rendered the construction of a mixed-use,

high-rise complex at the Site impossible.  The defendants have filed three separate

motions to dismiss,[4] which I will grant, in part, and deny, in part, in accordance with the

following discussion.

_____

acting department, either the City Council or the Planning Commission, will be referred to by name, though the City assumes legal responsibility for the actions described.

[2]The three Civic Association Defendants, all Pennsylvania non-profit corporations, are:
   (1)    Old City Civic Association
   (2)    River's Edge Civic Association
   (3)    Penn's Landing North Civic Association
Only Old City Civic Association and River's Edge Civic Association have filed motions to dismiss.

[3]The individuals named in the Complaint are:
   (1)    Andrew Sacksteder, President of River's Edge Civic Association
   (2)    Richard Horrow, President of Old City Civic Association
   (3)    Richard Thom, Vice President of Old City Civic Association
   (4)    Libby Whittaker, Vice President of Old City Civic Association
   (5)    Brian Abernathy, Legislative Aide to City Councilman Frank DiCicco
   (6)    John and Jane Does 1-10 (to be identified through discovery)
(See Compl. ¶ 33).

[4]The three pending motions to dismiss are:
   (1)    Document #4, Motion to Dismiss under Rule 12(b)(6) by Defendants the
          City of Philadelphia, City Council and City Planning Commission and
          Brian Abernathy
   (2)    Document #23, Motion to Dismiss Plaintiff's Complaint of Defendants,
          Old City Civic Association, Richard Horrow, Richard Thom and Elizabeth
          E. Whittaker, Pursuant to Federal Rule of Civil Procedure 12(b)(6)
   (3)    Document #41, Motion to Dismiss Plaintiff's Complaint of Defendants,
          Rivers Edge Civic Association, and Andrew Sacksteder Pursuant to
          Federal Rule of Civil Procedure 12(b)(6).

I.     **BACKGROUND**[5]

In 1982, the Planning Commission authored a Comprehensive Plan for the City of

Philadelphia's Central Riverfront District, entitled the "Central Riverfront District Plan"

(the "Riverfront Plan").  The Planning Commission sought to encourage and stimulate

new commercial and residential development in the area.  In response to and accordance

with the Riverfront Plan, WRA assembled four separate parcels to form a 5.3 acre site in

the Riverside District, encompassing an entire block.  WRA informed the Planning

Commission of its intention to create a major "World Trade Center" with high-rise

buildings in the Riverside District.  WRA completed its effort to assemble the site in

1987, then sought the Planning Commission's support to re-zone the site from industrial

to C-4, which would be necessary to permit modern commercial development consistent

with the Riverfront Plan.

At this time, the City Council was re-zoning large portions of the Riverfront

District at the recommendation of the Planning Commission in order to achieve the

development objectives of the Riverside Plan.  The Planning Commission recognized the

WRA site as apt for development as a business center owing to its position at the conflux

of major city streets and proposed on-and-off ramps for Interstates 95 and 676 (then under

construction).  Accordingly, the Planning Commission supported a re-zoning of the site to

C-4, as part of a "special use district," including no height restrictions on buildings and

---

[5]I have accepted as true all factual allegations of the Complaint.

unlimited structured parking.  In 1988, WRA obtained an exclusive license from the World Trade Centers Association[6] for the construction of a World Trade Center in Philadelphia.

Recognizing the scale of both time and capital needed to develop WRA's Riverfront District project (the "Project"), the Planning Commission directed WRA to meet with three civic associations, the Civic Association Defendants, holding an interest in the area around the site.  With the guidance of then Mayor W. Wilson Goode, the Planning Commission sought to broker an agreement between WRA and the Civic Association Defendants to ensure that the re-zoning process would proceed uninterrupted. The Planning Commission began overseeing negotiations between WRA and the Civic Association Defendants in 1989, leading to an agreement whereby the Civic Associations would support re-zoning the site to C-4 to enable the development of the WRA project in return for a twenty-year Zoning Covenant from WRA.  The Planning Commission prepared the Zoning Covenant, which was signed by WRA and the Civic Association Defendants and filed with the Planning Commission on December 19, 1989.

Under the Zoning Covenant, WRA agreed to certain design specifications to address concerns raised by the Civic Associations.  Specifically, WRA agreed to the following covenants:

---

[6] "The World Trade Centers Association is a worldwide organization currently licensing nearly 286 World Trade Centers in 85 countries. . . .The organization is dedicated to the enhancement and expansion of international commerce by assisting small to medium-size businesses in a region to increase international trade."  (Compl. ¶ 54.)

1)      A forty-foot setback from Callowhill Street to assure a view corridor for the community;

2)      Aesthetic treatment of any large-scale parking garage to "blend" it into the Project;

3)      Avoidance of off-street loading and parking on Columbus Boulevard by respecting a fifty-foot setback from Columbus Boulevard and providing for invisibility of these operations; and

4)      Installation of sidewalks on Columbus Boulevard.

(See Compl. ¶ 47.)  In return, the Civic Association Defendants agreed to "support and assist the Covenanter [WRA] in obtaining any and all permits and variances that may be necessary to use and/or develop said premises in accordance with the below listed restrictions and conditions."  (Id. at ¶ 48.)  As agreed, the Civic Associations supported the re-zoning of WRA's site from G-2 to G-4 in 1989.  WRA asserts that it has complied with the Zoning Covenant in every version of its designs for the project.  In its Complaint, WRA accuses the Civic Association Defendants of breaching their obligation under the Zoning Covenant by advocating that a 65' height restriction be extended to include WRA's site.[7]  (See Compl. ¶¶ 138-44 ("The net effect of the actions of the Civic Association Defendants has been to limit the Site to the development of row houses . . .").)  WRA claims the Civic Association Defendants worked secretly to undermine support for the Project and to divert public debate on the question of extending the 65' height restriction to the cover the Project site.  See id.

Developing the Riverside District World Trade Center would take decades of

_____

[7]The height restriction, imposed by a March 2006 Ordinance enacted by the City Council, will be discussed in more detail later in this section.

5

cooperation; this was clear to WRA, to the City, and to the Civic Associations even at the early planning stage of the Project.  In the late 1980s and early 1990s, once the Zoning Covenant was in place, no development of the site could commence until: (a) the Pennsylvania Department of Transportation (PennDOT) completed construction of Columbus Boulevard north of the Ben Franklin Bridge, (b) the municipal incinerator across from the site was demolished, and (c) the car impound lot adjacent to the incinerator was relocated.  (See Compl. ¶ 57.)  WRA focused its efforts on obtaining commitments from PennDOT and other State and City agencies to accommodate the Project.

One illustration of agency support for the Project at this time was the 1990 port unification effort involving the Philadelphia Regional Port Authority, the South Jersey Port Corporation, and the Delaware River Port Authority ("DRPA").  These entities sought to increase international trade, specifically by establishing a World Trade Center for the region.  The DRPA is a joint agency of Pennsylvania and New Jersey, focusing on the industrial and commercial revitalization of the Philadelphia and Camden Waterfronts. In the early to mid-1990s, DRPA evidenced its support for the Project as a catalyst to new business opportunities for the region by promoting a World Trade Center through several business-oriented civic entities.  In the mid-1990s, the DRPA joined the Southeastern Pennsylvania Export Consortium ("SEPEC") an ad hoc entity established by the Philadelphia Industrial Development Corporation ("PIDC") at the urging of then Mayor

Ed Rendell.  In September 1999, WRA and DRPA began discussing the establishment of a public/private partnership to facilitate the development of the Project.  At DRPA's request, WRA prepared and submitted a master plan for the Project.

In March 2001, after sustained cooperation between DRPA, WRA and the City, the Pennsylvania Department of Community and Economic Development granted Keystone Opportunity Zone ("KOZ") status to WRA's site, and eleven and a half (11.5) acres of City-owned property around it.  KOZ status confers tax abatements at the state and local levels for qualified businesses that lease real property in the KOZ.  Thus KOZ made the property more valuable and would attract new businesses to the site.  WRA bore the expense of the application process, including a presentation to then Mayor John Street, "who endorsed the Project with great enthusiasm and agreed to support an application for KOZ status." (Compl. ¶ 74.)

In October 2002, WRA and DRPA formed a public/private partnership, making DRPA's Export Development division an independent, non-profit entity known as the World Trade Center of Greater Philadelphia ("WTCGP").  Representatives of various City and Commonwealth agencies sit on the Board of Directors of WTCGP.  WRA transferred its exclusive World Trade Center license to WTCGP and received DRPA's financial backing for first stage financing of the Project in return.  WRA and DRPA entered into a Credit Support and Licensing Agreement (the "DRPA/WRA Agreement") to effectuate the terms of their partnership.  Under this agreement, DRPA would provide

WRA with eight million dollars ($8,000,000) in unconditional credit support to allow WRA to refinance the Project and obtain the necessary first-stage financing.  The DRPA would fund a further six million dollars ($6,000,000) to secure space for the WTCGP once WRA had a building ready for occupancy.  Under a Guarantee Agreement, DRPA pledged eight million dollars ($8,000,000) as collateral for an eight million dollar ($8,000,000) loan.  If the WRA site is made subject to a 65' height restriction, WRA will not be able to build the project as planned, preventing it from repaying the loan.  WRA argues that DRPA's financial support was solicited in reliance on the availability of C-4 zoning without height restrictions, and in reliance on the Zoning Covenant it entered into with the Civic Association Defendants.

In 2003, following the signing of the DRPA/WRA Agreement, WRA obtained a zoning permit for the first two towers: a forty-two (42) story high-rise residential building along Callowhill Street, and Tower One of the Greater Philadelphia World Trade Center. Before the Project could move forward, however, WRA worked out a joint plan with the City of Philadelphia Water Department to allow overbuilding of its underground sewer easements.  Throughout this period, City agencies universally cooperated with WRA to resolve any obstacles that arose and to aide in the expeditious construction of the Greater Philadelphia World Trade Center.  (See Compl. ¶¶ 97-103.)

Owing to various stalls in the process, WRA allowed its two zoning permits to lapse in 2004, obtaining instead a new permit for a twenty-six (26) story residential

building in May 2005.  WRA then began to obtain all of the precursor permits to receiving a building permit for the residential building.  By March 2006, all important permits for the residential building had been obtained except the building permit.

Then, in March 2006, the City Council enacted an Ordinance extending a sixty-five foot (65') height restriction (the "Overlay") to WRA's site.  The March 2006 Ordinance amended Section 14-1610 of the Philadelphia Code and was enacted via Bill Number 051200, which was passed by the City Council on March 2, 2006 and signed by the Mayor on March 16, 2006.  The Overlay's purported goal is to control land use in Old City, an area of Philadelphia that is clearly separate from the Project site.  The Overlay extension was also not applied to other C-4 sites in the area of the Project site, including the portion of the KOZ property that belonged to the City.

While WRA claims it was "completely unaware of any discussions to extend the Overlay to the Site," (Compl. ¶ 118.) the City avers that legal notice of a public hearing to be held by the Committee on Rules was published in local newspapers.  (City Def.'s Br. 12.)[8]  WRA claims that the newspaper advertisements were insufficient to put it on notice that 20 years of City support for the Project was about to be reversed, and that the articles made no reference to height restrictions.

Approximately one month after passing the March 2006 Ordinance, the City

---

[8]In its Response, WRA argues that considering the contents of the referenced newspaper articles notifying citizens of the upcoming public meeting requires the Court to look outside the pleadings.  I will exclude from consideration both the newspaper articles (Exhibit 1), and the public hearing transcripts (Exhibit 2) attached to the City's motion.

Council enacted the April 2006 Ordinance, amending Section 14-1610 and redefining the area included in the Overlay to exclude the area east of I-95.  Under the April 2006 Ordinance, then, the WRA site is *not* within the Overlay extension.  The lack of clarity regarding the exact area of the Overlay is compounded by the online version of Section 14-1610, which *does* include the WRA site within the Overlay extension, although the maps accompanying the online version do *not*.  According to WRA, "these inconsistencies expose WRA to misguided enforcement actions by the City and will deter investors, lenders, contractors, tenants, governmental agencies, and other relevant parties from participating in, or facilitating, the development of the Project."  (Compl. ¶ 130.)  WRA estimates incurred site acquisition costs, pre-development costs, interest charges, financing costs, and legal fees in connection with the Project in excess of $10 million up to September 1999.  After the DRPA/WRA Agreement was in place, WRA claims to have incurred over $9.8 million in further costs and fees.  The World Trade Center license to WTCGP had a surrender value of approximately $2 million at the time of transfer from WRA.

Despite the enormous stake it holds in seeing the Greater Philadelphia World Trade Center through to completion, WRA has not sought and been denied a building permit for the Project based on non-conformity with the height restriction.  WRA has also not requested a variance from the terms of the Overlay extension, assuming that it does apply to the Project site.  Instead, WRA commenced this suit, arguing, inter alia, that the

City's actions violate its previous representations of support, the United States

Constitution, and principles of fairness and equity.  WRA also claims that the Civic

Association Defendants breached the Zoning Covenant by supporting the Overlay

extension in the March 2006 Ordinance.  The Complaint contains additional counts of

tortious interference with contractual relations and civil conspiracy against the Individual

Defendants.

## II.    PROCEDURAL HISTORY

WRA first commenced this civil action by filing a fourteen-count complaint in the

Court of Common Pleas of Philadelphia County, against the City, the City Council and its

Planning Commission, three Civic Association Defendants, and a number of named

Individual Defendants.  The City removed the state court case to this Court.  See Docket

No. 1.

WRA's Complaint alleges or requests the following:[9]

(1)    A declaration that the March 2006 Ordinance is invalid and unenforceable
       and that WRA's site is not subject to the Overlay.

(2)    A declaration that the application of the Overlay to WRA's site is
       procedurally invalid and therefore illegal, null and void.

(3)    Estoppel to enforce the Overlay extension against WRA.

(4)    Damages for detrimental reliance on the representations of the City.

(5)    A declaration that any application of the Overlay extension to WRA's site is
       unconstitutional, illegal, null and void, in that it deprives WRA of its

---

[9]The number next to each count corresponds to the count number in the Complaint.

constitutional right to due process.

(6)     A declaration that any application of the Overlay extension to WRA's site is unconstitutional, illegal, null and void, in that it deprives WRA of its constitutional right equal protection.

(7)     Monetary damages, pursuant to 42 U.S.C. § 1983,[10] for unconstitutional deprivations of substantive due process and equal protection committed under color of law by City.

(8)     Restitution for the value of WRA's expenditures, efforts and contributions in furtherance of the Project which have allegedly unjustly enriched the City.

(9)     Breach of the Zoning Covenant by the Civic Association Defendants.

(10)   Tortious interference with existing and prospective business relations by the Civic Association Defendants.

(11)   Civil conspiracy by the Civic Association Defendants.

(12)   Estoppel from expiration of the Zoning Covenant against the Civic Association Defendants.

(13)   Tortious interference with existing and prospective business relations by the Individual Defendants.

(14)   Civil conspiracy by the Individual Defendants.

(See Compl. ¶¶ 148-252.)

---

[10]"To state a claim for relief in an action brought under § 1983, [claimants] must establish that they were deprived of a right secured by the Constitution or laws of the United States, and that the alleged deprivation was committed under color of state law." Am. Mfrs. Mut. Ins. Co. v. Sullivan, 526 U.S. 40, 49-50 (1999).  The defendants do not dispute that the actions that form the basis of the § 1983 claims were performed under the authority of state law.  Therefore, the issue for consideration is whether the complaint adequately alleges a constitutional deprivation of rights.  See Windsor Jewels of Pa., Inc. v. Bristol Twp., No. 01-0553, 2002 U.S. Dist. LEXIS 12163, at *20 (E.D. Pa. Mar. 28, 2002).

After filing their Notice of Removal, the City filed a motion to dismiss on behalf of the municipal entities, as well as Brian Abernathy, a legislative aide.  The Civic Association and Individual Defendants have also filed motions to dismiss.  Waterfront has filed responses in opposition to each motion.  Therefore, three motions to dismiss are pending before the Court.

## III.    RULE 12(B)(6) MOTION TO DISMISS STANDARD

When considering a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), the court must accept the complaint's allegations as true and draw all reasonable inferences in the plaintiff's favor.  Zimmerman v. HBO Affiliate Group, 834 F.2d 1163, 1164-65 (3d Cir. 1987).

Under Rule 12(b)(6), a defendant may move to dismiss a complaint for "failure to state a claim upon which relief can be granted."  The rule is designed to screen out cases where "a complaint states a claim based upon a wrong for which there is clearly no remedy, or a claim which the plaintiff is without right or power to assert and for which no relief could possibly be granted."  Port Auth. v. Arcadian Corp., 189 F.3d 305, 311-12 (3d Cir. 1999).  A complaint should not be dismissed on a 12(b)(6) motion if the claim is adequately stated and if the factual allegations raise a right to relief "above the speculative level."  Bell Atlantic Corp. V. Twombly, 127 S. Ct. 1955, 1965 (2007).  "A well-pleaded complaint may proceed even if it appears that a recovery is very remote and unlikely."  Id. (citing Scheuer v. Rhodes, 416 U.S. 232, 236 (1974) (internal quotations

omitted).  The issue, therefore, is not whether the plaintiff will ultimately prevail, but whether the plaintiff is entitled to offer further evidence to support its claims.  Scheuer, 416 U.S. at 236; see also Maio v. Aetna, Inc., 221 F.3d 472, 482 (3d Cir. 2000).

In a 12(b)(6) motion, courts generally consider the allegations contained in the complaint, exhibits attached to the complaint, and public records of which the court may take judicial notice.  Pension Benefit Guar. Corp. v. White Consol. Indus., 998 F.2d 1192, 1196 (3d Cir. 1993).

## IV.  DISCUSSION

### A.  The City

The City argues that WRA's failure to seek and obtain a final decision on the applicability of Section 14-1610 to the Greater Philadelphia World Trade Center Project, and if applicable, WRA's failure to seek a final decision on a request for a variance from its terms, was fatal to WRA's federal constitutional claims under the "finality rule" in Taylor Investment, Ltd., et al. v. Upper Darby Township, et al., 983 F.2d 1285, 1293-95 (3d Cir. 1993), and to its state law claims under Cherry v. City of Philadelphia, 692 A.2d 1082 (Pa. 1997).[11]  WRA characterizes its federal constitutional claims as facial challenges to the Ordinance, excepting them from the finality rule because the Third Circuit has since held that facial challenges to ordinances ripen at the time of enactment.

---

[11]I will discuss WRA's case against Brian Abernathy, a legislative aide to City Council member Frank DiCicco, *infra*, Section IV(C)(1)-(3), together with the other Individual Defendants in this case.

See County Concrete Corp., et al. v. Township of Roxbury, et al., 442 F.3d 159, 164 (3d

Cir. 2006).  I find WRA's substantive due process[12] and equal protection[13] challenges ripe

for adjudication based on County Concrete, to the extent they assert facial challenges to

the March 2006 Ordinance; however, I will dismiss the as-applied procedural due process

claim in Count Two.  After determining the ripeness of WRA's federal constitutional

claims, I address the remaining state law claims for declaratory and injunctive relief.

### 1.       Ripeness of WRA's Constitutional Claims against the City

"The ripeness doctrine serves to determine whether a party has brought an action

prematurely and counsels abstention until such time as a dispute is sufficiently concrete to

satisfy the constitutional and prudential requirements of the doctrine."  Khodara Envtl.,

Inc. v. Blakey, 376 F.3d 187, 196 (3d Cir. 2004) (quotations and citation omitted).  "The

doctrine seeks to avoid entangling courts in the hazards of premature adjudication."

Felmeister v. Office of Attorney Ethics, 856 F.2d 529, 535 (3d Cir. 1988).

"[I]n cases involving land-use decisions, a property owner does not have a ripe

constitutional claim until the zoning authorities have had an opportunity to arrive at a

final, definitive position regarding how they will apply the regulations at issue to the

particular land in question."  Sameric Corp. of DE v. City of Philadelphia, 142 F.3d 582

(3d Cir. 1998).  See also Acierno v. Mitchell, 6 F.3d 970, 974-75 (3d Cir. 1993); Taylor

---

[12]Counts One and Five for declaratory relief; Count Seven for monetary damages.

[13]Count Six for declaratory relief; Count Seven for monetary damages.

15

Investment, Ltd. v. Upper Darby Twp., 983 F.2d 1285 (3d Cir. 1993).  Under this

"finality rule," a plaintiff property owner must prove that a "final decision has been

reached by the agency before it may seek compensatory or injunctive relief in federal

court on federal constitutional grounds."  Acierno, 6 F.3d at 975.  The finality rule has

been applied to constitutional claims founded on due process and equal protection

violations.

In Cornell Cos. v. Borough of New Morgan, 512 F. Supp. 2d 238, 256 (E.D. Pa.

2007), this Court outlined the appropriate analysis for applying the finality rule to

constitutional claims in zoning cases:

> The ripeness of a claim alleging a constitutional violation in the
> land-use and zoning arena depends upon whether the plaintiff is raising (1)
> an "as-applied" challenge or (2) a facial attack on a zoning ordinance.  In an
> as-applied case, the plaintiff is contending that the defendant municipal
> agency violated his or her constitutional rights in the manner in which an
> ordinance was applied to his or her property.  The finality rule can bar an
> as-applied . . . claim.  That is because "only once a '[local] decision maker
> has arrived at a definitive position on the issue' has a property owner been
> inflicted with 'an actual, concrete injury.'" County Concrete Corp. v. Twp.
> of Roxbury, 442 F.3d 159 (3d Cir. 2006) (quoting Williamson County
> Regional Planning Com. v. Hamilton Bank, 473 U.S. 172, 192 (1985)).
> The Third Circuit has stressed the importance of the finality rule in the as-
> applied context because of its "reluctance to allow the courts to become
> super land-use boards of appeals.  Land-use decisions concern a variety of
> interests and persons, and local authorities are in a better position than the
> courts to assess the burdens and benefits of those varying interests."
> Sameric, 142 F.3d at 598.
>
> Facial attacks on a zoning ordinance, on the other hand, do not implicate
> ripeness concerns or the fear of a federal court overstepping its jurisdiction into
> local matters.  The finality rule does not apply "to *facial* attacks on a zoning
> ordinance, i.e., a claim that the mere enactment of a regulation either constitutes . .

16

> . a substantive violation of due process or equal protection.  A 'final decision' is not necessary in that context because when a landowner makes a facial challenge he or she argues that *any* application of the regulation is unconstitutional . . . ."  County Concrete, 442 F.3d at 164 (internal quotations and citations omitted).  In County Concrete, the Third Circuit held that when a plaintiff facially attacks an ordinance the cause of action is ripe, even if the plaintiff did not seek a variance from the zoning ordinance.

Id. at 256.

To the extent that plaintiff asserts facial constitutional challenges to the City's March 2006 Ordinance, its claims are ripe and must survive the City's motion to dismiss.[14]  Id.

> a.      *Substantive Due Process*

Plaintiff has stated a ripe claim that the March 2006 Ordinance violates substantive due process.  A valid facial challenge based on substantive due process must assert that the Ordinance "as a whole is arbitrary, capricious and unreasonable."  Id. at 166.  In Count One, WRA claims that the City did not intend the Overlay to include the Project, and that the extension was "based on a mistake and, accordingly, is unconstitutional, illegal, null and void, in that it constitutes an instance of arbitrary and unreasonable zoning bearing no substantial relationship to the public health, safety, and welfare of the City and its inhabitants."[15]  (See Compl. ¶ 150.)  True, the plaintiff cites 20 years of

---

[14]The City has not moved to dismiss on the merits.

[15]Count Five, on the other hand, articulates an as-applied challenge when it states "the March 2006 Ordinance has no rational basis *in its application to the WRA Site*, and accordingly is null and void as arbitrary and unreasonable."  (Compl. ¶ 198.)  Count Five otherwise repeats both the allegations and the relief requested in Count One, and must be dismissed as unripe under

support for its particular project as evidence that the March 2006 Ordinance was arbitrary and capricious, but it does not follow that the Complaint states an as-applied challenge to the validity of the Ordinance.  The fact that the City would reverse two decades of its own efforts to develop the Riverside District as a commercial center by imposing a 65' height restriction in the area supports a facial challenge to the rationality of the challenged action.  At this stage, accepting as true the facts pled therein, the Complaint states a viable substantive due process challenge to the March 2006 Ordinance as irrational and arbitrary on its face.

          *b.*    *Equal Protection*

WRA has also stated a valid facial equal protection challenge to the March 2006 Ordinance.  The gravamen of a facial equal protection challenge to land-use regulations is the arbitrary differential treatment of similarly situated property owners.  See County Concrete, 442 F.3d at 167.  Like claims based on substantive due process, facial equal protection challenges are not subject to the finality rule.  See id.  "A plaintiff landowner's [equal protection] land-use claim is ripe when it alleges that a municipality knew exactly how the plaintiff intended to use its land and the municipality passed the ordinance specifically tailored to prevent that use."  Cornell, 512 F. Supp. 2d at 258.

In Count Six, WRA alleges that the City arbitrarily treated its site differently from other similarly situated C-4 sites in the same area, including eleven (11) acres of the

---

Taylor.  See Taylor, 983 F.2d at 1293-94.

City's own property that formed part of the same KOZ tract.  (See Compl. ¶ 204.)  The City's argument that this is somehow an as-applied challenge to the Ordinance is unacceptable.  The plaintiff has stated a clear facial equal protection claim that is ripe for adjudication under County Concrete.  See County Concrete, 442 F.3d at 167.  The City's motion to dismiss is denied as to WRA's equal protection claims in Counts Six and Seven.

<em>c.    Procedural Due Process</em>

To prevail on a procedural due process claim, a plaintiff must demonstrate the deprivation of a protected property interest and that "procedures for challenging that deprivation do not comport with due process of law."  Taylor, 983 F.2d at 1293.  In Count Two of the Complaint, WRA seeks a declaration that the March 2006 Ordinance is "procedurally invalid and void ab initio because the notice thereof was insufficient to satisfy the requirements of procedural due process, *under the circumstances of this case*." (See Compl. ¶ 165 (emphasis added).)  Unlike its substantive due process and equal protection claims, WRA's procedural due process claim boils down to a demand for individualized notice of zoning decisions affecting the Project.  This type of claim is subject to the finality rule, and is not ripe for adjudication.  See Taylor, 983 F.2d at 1293-94; Cornell Cos. v. Borough of New Morgan, 512 F. Supp. 2d 238, 259 (E.D. Pa. 2007) (holding that the finality rule would apply to objections to the procedures followed in passing the challenged amendment).  Therefore I will dismiss the procedural due process

19

claim in Count Two.

### 2.     *State Law Claims*

Counts Three, Four and Eight assert state law causes of action against the City for estoppel (Count Three), detrimental reliance (Count Four) and unjust enrichment (Count Eight).  In a single paragraph citing one case, the City challenges these counts on ripeness grounds as well.  (See Def.'s Br. 16 (citing Cherry, 692 A.2d at 1085).)  WRA did not respond to the City's abbreviated argument that the state law claims should be dismissed, nor did the City include additional argument in its Reply.  Without adequate briefing on these counts, this Court is not in a position to rule on the City's motion.  The parties will therefore have an opportunity to provide additional briefing on the City's motion to dismiss the state law claims in Counts Three, Four and Eight.

### B.     Civic Associations

WRA asserts claims of (1) breach of contract, (2) tortious interference with existing and prospective business relations, (3) civil conspiracy, and (4) estoppel to claim expiration of the Zoning Covenant against the three civic associations that were party to the Zoning Covenant.[16]  Two of these associations filed nearly identical motions to dismiss on various grounds.  Based on the following, I will grant the motions, in part, and deny them, in part.

---

[16]These claims are set forth in Counts Nine (Breach of Contract), Ten (Tortious Interference), Eleven (Conspiracy), and Twelve (Estoppel).

### 1.    *Breach of the Zoning Covenant*

Under Pennsylvania law, WRA must plead the following elements to state a cause

of action for breach of contract:

> (1)    the existence of a contract, including its essential terms
> (2)    a breach of a duty imposed by the contract; and
> (3)    resultant damages

See, e.g., Chemtech International Inc. v. Chemical Injection Technologies, Inc., No.

06-3345, 2007 U.S. App. LEXIS 21697, at *4-*5 (3d Cir. Sept. 10, 2007), quoting Ware

v. Rodale Press, Inc., 322 F.3d 218, 225 (3d Cir. 2003) (quoting CoreStates Bank, N.A. v.

Cutillo, 723 A.2d 1053, 1058 (Pa. Super. Ct. 1999)).

WRA alleges that the Zoning Covenant imposed upon the Civic Associations a

duty to support and assist the Project in exchange for WRA's agreement to adhere to

certain design restrictions "by advocating for the extension and application of the Overlay

to the Project, notwithstanding that such extension would cripple or destroy the Project."

(See Compl. ¶ 223.)  WRA further states that it has suffered damages as a result of the

Civic Association Defendants' breaches of the Zoning Covenant.  (Id. ¶ 225.)  I am

satisfied that the Complaint states a cause of for breach of contract, and will deny the

Civic Associations' motions to dismiss Count Ten.

### 2.    *Tortious Interference with Existing and Prospective Contracts*

Pennsylvania has adopted the Restatement (Second) of Torts § 766 definition of

tortious interference with existing contractual relations, which provides:

> [O]ne who intentionally and improperly interferes with the performance of
> a contract (except a contract to marry) between another and a third person
> by inducing or otherwise causing the third person not to perform the
> contract, is subject to liability to the other for the pecuniary loss resulting to
> the other from the failure of the third person to perform the contract."

See REST. (SECOND) OF TORTS § 766; see Odyssey Waste Servs., LLC v. BFI Waste Sys.

of North America, Inc., No. 05-1929, 2005 U.S. Dist. LEXIS 28682, at *9-10 (E.D. Pa.

Nov. 17, 2005).  "In other words, the actor must act (1) for the purpose of causing this

specific type of harm to the plaintiff, (2) such act must be unprivileged, and (3) the harm

must actually result."  Adler, Barish, Daniels, Levin & Creskoff v. Epstein, 482 Pa. 416,

430 (Pa. 1978).  If the actor's conduct has the unintended result of harming prospective

relations, no liability attaches under § 766.  See REST. (SECOND) OF TORTS § 766 cmt. h.

The interference must be directed toward a third party business relation.  See Leopold

Graphics, Inc. v.  CIT Group/Equipment Fin., Inc., No. 01-6028, 2002 U.S. Dist. LEXIS

11633, at *13 (E.D. Pa. June 26, 2002).[17]  Pennsylvania has not adopted Restatement

---

[17]To the extent plaintiff relies on the court's holding in P.V.C. Realty ex rel. Zamias v.
Weis Markets, 56 Pa. D. & C. 4th 304, 355 (Comm. Pls. Ct. Cambria Co. 2000), this Court is
bound by the Third Circuit's opinions in Gemini and Windsor Secur. Inc. v. Hartford Life Ins.
Co., 986 F.2d 655, 661 (3d Cir. 1993), requiring interference to be directed toward a third party,
and holding that Pennsylvania has not adopted Section 766A.  See Gemini, 40 F.3d at 66;
Windsor, 986 F.2d at 660 ("Section 766 addresses disruptions caused by an act directed not at the
plaintiff, but at a third person: the defendant causes the promisor to breach its contract with the
plaintiff. Section 766A addresses disruptions caused by an act directed at the plaintiff: the
defendant prevents or impedes the plaintiff's own performance.")  In P.V.C. Realty, the Court of
Common Pleas for Cambria County did not read Section 766 to include a "technical
requirement" of conduct directed toward a third party, such as a customer or promisor, but rather
held Section 766 liability to extend to actions "otherwise causing" the third person not to perform
the contract.  P.V.C. Realty, 56 Pa. D. & C. 4th, at 355.  Given the prevailing Pennsylvania and
Third Circuit case law, the reading of Section 766 advocated in P.V.C. Realty states an
exceedingly broad definition of what other courts agree to be a narrow and selective adoption of

Section 766A, which contemplates a cause of action for interference directed at the plaintiff.  See REST. (SECOND) OF TORTS § 766A; Gemini Physical Therapy & Rehabilitation v. State Farm Mut. Auto. Ins. Co., 40 F.3d 63, 66 (3d Cir. 1994). Restatement (Second) Section 766B defines the tort of interference with prospective contractual relations, mirroring the language of Section 766.  See Leopold Graphics, 2002 U.S. Dist. LEXIS 11633, at *13.  As in the case of interference with existing contractual relations, Pennsylvania courts have not recognized the Restatement (Second) Section 766B(b), which contemplates a cause of action for conduct directed toward the plaintiff, rather than a third party.  See id.

> Count Ten states, in relevant part,
>
> Upon information and belief, the Civic Association Defendants advocated for the extension of the Overlay to include WRA's Site for the purpose of delaying or destroying the Project and interfering with WRA's present and future business relationships related to the Project, including, but not limited to, its relationships with DRPA, WTCGP, PIDC and Wilmington Trust.

(See Compl. ¶ 228.)  The alleged conduct does not reasonably suggest that the Civic Association Defendants directed their conduct toward third party contractors (e.g. DRPA, WTCGP, PIDC and Wilmington Trust) or prospective contractors.  The impugned actions involve advocacy of a height restriction before the City Council, which was not, nor reasonably could be, a party to any contract with WRA.  Count Ten (as well as Count

---

the Restatement (Second)'s definition of tortious interference.  See, e.g., Windsor, 986 F.2d at 661.  I therefore decline to follow this reading of the Restatement language as adopted and interpreted by the courts of Pennsylvania.

Thirteen as to the individual Civic Association members) attempts unsuccessfully to reformulate WRA's breach of contract claim as a tortious interference action.  The tortious interference claims against the Civic Association Defendants are dismissed.

### 3.     *Civil Conspiracy*

To state a cause of action for civil conspiracy under Pennsylvania law, WRA must show that "(1) a combination of two or more persons acting with a common purpose to do an unlawful act or to do a lawful act by unlawful means or for an unlawful purpose; (2) an overt act done in pursuance of the common purpose; and (3) actual legal damage." Gen. Refractories Co. v. Fireman's Fund Ins. Co., 337 F.3d 297, 313 (3d Cir. 2003). Civil conspiracy is a "means for establishing vicarious liability for the underlying tort." Boyanowski v. Capital Area Intermediate Unit, 215 F.3d 396, 407 (3d Cir. 2000).  In other words, no cause of action for civil conspiracy arises from the alleged breach of the Zoning Covenant; to succeed on its civil conspiracy claim, WRA must demonstrate that the Civic Association Defendants conspired to commit tortious interference with contractual relations.  Id.  As I have already dismissed the tortious interference claim in Count Ten, I will likewise dismiss Count Eleven for failure to allege an underlying tort in which to ground vicarious liability.  See id.

### 4.     *Estoppel*

In Count Twelve, WRA seeks an Order declaring the Civic Association Defendants estopped from asserting or relying on the expiration of the Zoning Covenant,

to prevent these defendants from "unjustly benefitting" from their breach of the Zoning

Covenant."  (See Compl. ¶ 237.)  Specifically, WRA requests that the Zoning Covenant

> . . . be extended by a period of time at least equal to the period from the
> enactment of the March 2006 Ordinance to the entry of a final and
> unappealable judgment in favor of WRA and against the Civic Association
> Defendants, or by such longer period of time as the Court may determine
> necessary to offset the delay the Civic Association Defendants have caused
> to the Project.

(Id.)  The particular cause of action pled by this language is unclear.  WRA appears to

assert either an equitable estoppel claim or a claim for "injunctive restitution" under an

unjust enrichment theory.  I am satisfied that neither the claim asserted, whichever it may

be, nor the relief sought, comports with Pennsylvania law in any cognizable way.[18]

If WRA asserts a claim of equitable estoppel, this avenue is inappropriate.  In

Pennsylvania equitable estoppel is an affirmative defense, not an independent cause of

action.  See Trianco LLC v. IBM, 466 F. Supp. 2d 600, 609 (E.D. Pa. 2006); Liebman v.

Prudential Fin., Inc., No 02-2566, 2002 U.S. Dist. LEXIS 25045 (E.D. Pa. Dec. 30, 2002)

("Pennsylvania recognizes equitable estoppel as an affirmative defense, but not as an

independent cause of action.")

If WRA means to advance a claim based on unjust enrichment, this doctrine is

inapplicable where, as here, the parties were bound by a written contract.  See Wilson

Area School District v. Skepton, 895 A.2d 1250, 1254 (Pa. 2006) ("[T]he doctrine of

---

[18]In its Response, WRA only argues that *under the Zoning Covenant* the Civic
Association Defendants remain bound indefinitely by their obligations.  This argument  fails to
address the substantive deficiencies in the cause of action pled in Count Twelve.

unjust enrichment is inapplicable when the relationship between parties is founded upon a written agreement or express contract.") See also Curley v. Allstate Insurance Co., 289 F. Supp. 2d 614, 620 (E.D. Pa. 2003) ("[P]arties in contractual privity . . . are not entitled to the remedies available under a judicially-imposed quasi contract.")

I will accordingly grant the Civic Associations' motions to dismiss as to the claims contained in Count Twelve of the Complaint.  The only remaining claims against the moving Civic Association Defendants are therefore the breach of contract claims contained in Count Ten.

## C.      Individual Defendants

### 1.      Brian Abernathy: Legislative Immunity

The City claims absolute legislative immunity on behalf of Brian Abernathy, legislative aide to Councilman Frank DiCicco.  Counts Thirteen and Fourteen allege that Mr. Abernathy (1) "encouraged and caused the Civic Association Defendants to breach the Zoning Covenant;" (2) "procured the enactment of the March 2006 Ordinance without fair and sufficient notice to WRA for the purpose of delaying or destroying the Project . . . including, but not limited to, its relationships with DRPA, WTCGP, PIDC, and its lenders;" and (3) committed civil conspiracy to accomplish these acts.  (See Compl. ¶¶ 242-43; 248-52.)

"Members of local legislative bodies . . . are entitled to absolute legislative immunity for actions taken in a purely legislative capacity."  County Concrete, 442 F.3d

at 172 (citing <u>Acierno v. Cloutier</u>, 40 F.3d 597, 610 & 610 n.10 (3d Cir. 1994) (en banc). The Third Circuit has established a two-part test for determining if absolute legislative immunity will attach: "(1) the action must be 'substantively' legislative, which requires that it involve a policy-making or line-drawing decision; and (2) the action must be 'procedurally' legislative, which requires that it be undertaken through established legislative procedures."   <u>Acierno v. Cloutier</u>, 40 F.3d at 610.

WRA makes no factual allegations specific to Mr. Abernathy besides stating his name, occupation and address.  (<u>See</u> Compl. ¶ 31.)  Presumably, Abernathy was involved in the passage of the March 2006 Ordinance in some capacity.  Even on a motion to dismiss, however, the factual allegations must raise a right to relief "above the speculative level."  <u>Bell Atlantic Corp. V. Twombly</u>, 127 S. Ct. 1955, 1965 (2007).  Essentially, WRA asks the Court to allow it to engage in discovery to establish that Mr. Abernathy committed the acts he is accused of in the Complaint *based on* the fact that he is a legislative aide, without the slightest factual support that his acts were anything but legislative in nature.

This case presents a clear example of why legislative immunity is necessary: Mr. Abernathy is alleged to have committed tortious acts based on nothing more than his position and possible involvement in passing the March 2006 Ordinance.  <u>See also</u> <u>Cornell</u>, 512 F. Supp. 2d at 273-74 (citing <u>County Concrete</u>, 442 F.3d at 172, to find the enactment of a zoning ordinance, as opposed to the enforcement of an already existing

zoning ordinance, was substantively legislative.)  Both prongs of the test articulated in

County Concrete are satisfied: (1) excepting WRA's speculative assertions, Mr.

Abernathy is alleged to have performed sheerly legislative actions associated with

passage of the March 2006 Ordinance, and (2) while WRA asserts insufficient notice of

the legislative action, it does not allege that the City Council failed to follow its

established procedures to enact the March 2006 Ordinance.[19]   I will therefore dismiss

Counts Thirteen and Fourteen as to Brian Abernathy.

### 2.    *Tortious Interference*

Count Thirteen asserts a claim of tortious interference with existing or prospective

contractual relations against the individually named Civic Association members (i.e.

Sacksteder, Horrow, Thom and Whittaker) and Mr. Abernathy.  The elements of a

tortious interference with contractual relations claim in Pennsylvania are discussed, supra,

Section IV(B)(2), and need not be repeated here.  In the case of the Individual

Defendants, WRA claims these persons caused the Civic Associations (of which they

were agents, with the exception of Mr. Abernathy) to breach the Zoning Covenant.

(See Compl. ¶ 241.)  As the defendants correctly point out, WRA cannot deem a

---

[19]Going outside the pleadings in its Response, WRA argues that
Section 2-201 of Philadelphia's Home Rule Charter requires newspaper
advertising as the default form of notice of proposed ordinances.
However, Section 2-201 also authorizes "other notice" where appropriate
to bring reported bills to the attention of interested parties.
(See Pl.'s Resp. 20.)  Even if WRA had included this allegation in its Complaint, the fact that the
City Council followed its "default for of notice" does not amount to a procedural irregularity for
the purposed of stripping Mr. Abernathy of his absolute legislative immunity.

contracting entity and its agents to be separate parties for the purposes of its tortious interference claim.  Center for Concept Dev., Ltd. v. Godfrey, No. 97-7910, 1999 U.S. Dist. LEXIS 3337, at *6-7 (E.D. Pa. Mar. 23, 1999).

To the extent WRA asserts a more generalized claim that the Individual Defendants sought passage of the March 2006 Ordinance in order to interfere with WRA's existing or prospective contractual relations outside the scope of their capacity as agents of the Civic Association Defendants, that claim would fail for the reasons discussed with respect to WRA's tortious interference claim against the Civic Association Defendants.  See supra, Section IV(B)(2).  WRA has not alleged any interfering conduct by the Individual Defendants directed toward a third party contractor or potential contractor.  The claims against the individual members of the Civic Association Defendants contained in Count Thirteen are therefore dismissed.

### 2.    Civil Conspiracy

Without an underlying tort for the purposes of establishing civil conspiracy, the claims asserted against the Individual Defendants in Count Fourteen must be dismissed as well.  See supra, Section IV(B)(3).

## VI.    CONCLUSION

Based on the foregoing, I will grant the pending motions to dismiss, in part, and deny them, in part.  An appropriate Order follows.

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **WATERFRONT RENAISSANCE** | : | |
| **ASSOCIATES,** | : | **CIVIL ACTION** |
| **Plaintiff** | : | |
| | : | |
| **v.** | : | **NO. 07-1045** |
| | : | |
| **CITY OF PHILADELPHIA, et al.,** | : | |
| **Defendants** | | |

**O R D E R**

**STENGEL, J.**

     **AND NOW**, this 31st day of March, 2008, upon consideration of the Motions to Dismiss by (1) the City of Philadelphia, City Council and City Planning Commission and Brian Abernathy (Document #4); (2) Old City Civic Association, Richard Horrow, Richard Thom and Elizabeth E. Whittaker (Document #23); and (3) Rivers Edge Civic Association and Andrew Sacksteder (Document #41), it is hereby **ORDERED** that the motions are **GRANTED**, in part, and **DENIED** in part, as follows:

    (1)    The motion by the City of Philadelphia, et al. (Document #4), is hereby **GRANTED** insofar as it moves for dismissal of the City Council and City Planning Commission from this action.  All counts of the Complaint against the City Council and City Planning Commission are hereby **DISMISSED WITH PREJUDICE** and these parties are to be removed from the caption.

    (2)    The motion by the City of Philadelphia, et al. (Document #4), is hereby **GRANTED** as to Counts Two and Five, and these claims are hereby

**DISMISSED WITH PREJUDICE**.

(3)     The City shall have **20 days** from the date of this Order to submit additional briefing to the Court on its motion as to Counts Three, Four and Eight.  The Plaintiff will have **10 days** to file a Response.  The City shall file a Reply, if necessary, within **7 days**.

(4)     The motion by the City of Philadelphia, et al. (Document #4) is **DENIED** as to Counts One, Six and Seven.

(5)     The motion by Old City Civic Association, et al. (Document #23) is **GRANTED** as to Counts Ten, Eleven, Twelve, Thirteen and Fourteen; and **DENIED** as to Count Nine.

(6)     The motion by Rivers Edge Civic Association, et al., (Document #41) is **GRANTED** as to Counts Ten, Eleven, Twelve, Thirteen and Fourteen, and **DENIED** as to Count Nine.

**IT IS FURTHER ORDERED** that:

Plaintiff's Motion for a Preservation Order (Document #48) is hereby **DENIED**. The oral order staying discovery in this case is hereby lifted.  A telephone conference has been scheduled for **Monday, April 7, 2008, at 12:30 p.m.**, to discuss a schedule for discovery and any further motions.  Plaintiff's counsel will initiate the call.

BY THE COURT:


 /s/ Lawrence F. Stengel
LAWRENCE F. STENGEL, J.