IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

CMR D.N. CORP. AND MARINA TOWERS LTD.
T/A WATERFRONT RENAISSANCE
ASSOCIATES

    Plaintiff

       v.

CITY OF PHILADELPHIA, et al.

    Defendants

NO. 2:07-cv-01045-LS

## ORDER

And now, this ____ day of _____ 2010, upon consideration of Plaintiff's Motion

for Leave to File a Motion for Leave to Supplement Complaint that Exceeds Twenty-Five Pages, it is hereby

**ORDERED:**

    1.  Plaintiff's Motion for Leave to File is **GRANTED,** and

    2.  Plaintiff's Motion for Leave to Supplement Complaint Shall be Considered Filed.

### BY THE COURT:

_____

**HONORABLE LAWRENCE F. STENGEL**

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| CMR D.N. CORP. AND MARINA TOWERS LTD. T/A WATERFRONT RENAISSANCE ASSOCIATES | |
| Plaintiff | NO. 2:07-cv-01045-LS |
| v. | |
| CITY OF PHILADELPHIA, et al. | |
| Defendants | |

**PLAINTIFF'S MOTION FOR LEAVE TO FILE A
MOTION FOR LEAVE TO SUPPLEMENT COMPLAINT THAT
EXCEEDS TWENTY-FIVE PAGES**

Plaintiff, Waterfront Renaissance Associates, through its counsel Obermayer Rebmann Maxwell &

Hippel LLP, requests permission to file a Motion for Leave to Supplement Complaint that exceeds twenty-

five pages.  Plaintiff's Motion for Leave to Amend Complaint is attached hereto as Exhibit 1 and is

incorporated herein in full.

Plaintiff asserts that good cause exists for exceeding twenty-five pages.  Plaintiff's Memorandum of

Law in Support of Motion for Leave to Supplement Complaint is twenty-three (23) pages in length.

Plaintiff's Motion exceeds twenty-five pages due to the attachment of the proposed supplemental claim.

Respectfully submitted,

OBERMAYER REBMANN MAXWELL & HIPPEL, LLP

_____/S/_____

Thomas A. Leonard, Esquire
Richard P. Limburg, Esquire
H. David Seidman, Esquire
One Penn Center, 19th Floor
1617 John F. Kennedy Blvd.
Philadelphia, PA 19103-1895

*Counsel for Plaintiff,
Waterfront Renaissance Associates*

June 25, 2010

4468745

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

CMR D.N. CORP. AND MARINA TOWERS
LTD. T/A WATERFRONT RENAISSANCE
ASSOCIATES

    Plaintiff

        v.

CITY OF PHILADELPHIA, et al.

    Defendants

NO. 2:07-cv-01045-LS

## ORDER

And now, this _____ day of _____ 2010, upon consideration of Plaintiff's Motion for Leave to Supplement Complaint, it is hereby **ORDERED:**

1.  Plaintiff's Motion for Leave to Supplement Complaint is **GRANTED,** and

2.  Plaintiff Shall File its Supplemental Complaint within twenty (20) days of the date of this Order.

**BY THE COURT:**

_____
**HONORABLE LAWRENCE F. STENGEL**

4479852

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

CMR D.N. CORP. AND MARINA TOWERS LTD.
T/A WATERFRONT RENAISSANCE ASSOCIATES

*Plaintiff*

v.                                                              NO. 2:07-cv-01045-LS

CITY OF PHILADELPHIA, et al.

*Defendants*

## PLAINTIFF'S MOTION FOR LEAVE TO SUPPLEMENT COMPLAINT

Pursuant to Federal Rule of Civil Procedure 15(d), plaintiff Waterfront Renaissance

Associates ("WRA"), by and through its counsel, Obermayer Rebmann Maxwell & Hippel LLP,

hereby moves this Court for leave to supplement its complaint by adding Count 16 substantially in

the form attached hereto as Exhibit 1.  For the reasons set forth in WRA's accompanying

Memorandum of Law, WRA's proposed Count 16 challenges the validity of the process for

approval of plans of development under the City's Central Delaware Riverfront District Overlay.

Rules implementing the process were first adopted on April 20, 2010.

In addition, WRA seeks leave to amend its prayers for relief in Counts 1 and 15 of its

Second Amended Complaint to include "damages, interest, costs, and attorney fees."

WHEREFORE, Plaintiff, Waterfront Renaissance Associates, respectfully requests that the Court grant its Motion for Leave to Supplement Complaint and enter the form of order attached hereto.

Respectfully submitted,

OBERMAYER REBMANN
    MAXWELL & HIPPEL, LLP

      /S/
_____
Thomas A. Leonard, Esquire
Richard P. Limburg, Esquire
John E. Ryan, Esquire
H. David Seidman, Esquire
One Penn Center, 19th Floor
1617 John F. Kennedy Blvd.
Philadelphia, PA 19103-1895

*Counsel for Plaintiff,*
*Waterfront Renaissance Associates*

Date: June 25, 2010

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

CMR D.N. CORP. AND MARINA TOWERS LTD.
T/A WATERFRONT RENAISSANCE ASSOCIATES

*Plaintiff*

v.

CITY OF PHILADELPHIA, et al.

*Defendants*

NO. 2:07-cv-01045-LS

**PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT OF
MOTION FOR LEAVE TO SUPPLEMENT COMPLAINT**

Fed.R.Civ.P. 15(d) provides that the Court may, on just terms, permit a party to serve a supplemental pleading setting out any transaction, occurrence or event that happened after the date of the pleading to be supplemented.

The reason for WRA's request for leave to supplement its complaint is that, notwithstanding the recent suspension of height regulations (including the March 2006 Ordinance) within the Central Delaware Riverfront District, the City has set up a plan of development process that abrogates "by right" zoning for commercial properties like WRA's World Trade Center site. Thus, the plan of development process replaces the height limit as a means to prevent the issuance of "over-the-counter" zoning permits for high-rise projects. WRA believes the ordinance and regulations governing the plan of development process suffer from facial constitutional defects warranting judicial relief. WRA seeks to supplement its claims with claims challenging the plan of development process as set forth in its proposed Count 16, attached hereto as Exhibit 1.

4478121

1

**Factual Background**

Councilman DiCicco introduced Bill 090170-A on March 5, 2009 to create a zoning overlay for the Central Delaware Riverfront District, defined as the area between I-95 and the Delaware River from Allegheny Avenue to Oregon Avenue. The Central Delaware Riverfront Overlay ("CRO") is codified as Section 14-1638 of the Philadelphia Code. A copy of the CRO is attached to proposed Count 16 as Exhibit J.

The CRO provides in part that, upon the adoption of regulations by the Philadelphia City Planning Commission ("Planning Commission"), no zoning permit shall issue for any commercial property without the approval by the Planning Commission of a Plan of Development ("POD"). The Planning Commission was given six months from August 17, 2009 (i.e., until mid-February, 2010) to prepare regulations containing objective standards for the approval or disapproval of PODs.

The CRO overlaps the Old City Overlay where it was extended east of I-95 by the March 2006 Ordinance that imposed the 65' height limit on WRA's property. WRA has alleged that the imposition of the 65' height limit east of I-95 was a mistake on the part of City Council and Councilman DiCicco, who sponsored the March 2006 Ordinance.

On January 28, 2010, Councilman DiCicco introduced Bill 100014 to amend the CRO "by establishing no height limit and by making technical changes." Bill 100014 added a new subsection 12 to the CRO, which provides that "no height regulations shall apply to any parcel within the boundaries of this District, including but not limited to the provisions of §14-1610 ('Old City Residential Area Special District Controls')." A copy of Bill 100014 is attached to proposed Count 16 as Exhibit K.

On information and belief, Bill 100014 suspended height limits within the CRO, because the imposition of the 65' height limit east of I-95 was a mistake. Councilman Frank DiCicco admitted in his deposition that imposing the height limit on the World Trade Center site was a mistake. Martin Gregorski, a Planning Commission staff member, indicated that the 65' height restriction conflicted with the dense development that was planned for the area where WRA's property is located. Speaking of the "encroachment" of the Old City Overlay on the Central Delaware Riverfront District, Mr. Gregorski stated:

> This area was meant to be a very dense area. You know, there was supposed to be dense development along the river and an overlay encroached on the area. [2/16/2010 Video at 50 sec. to 1:10 min.]

> The Old City Overlay encroached there. The Old City Overlay has a 65 foot height limit from any area within the Central Delaware Riverfront Overlay. What this Bill does is it removes this height limit. [2/16/2010 Video at 1:35 min. to 1:50 min.]

When asked about the timing of Bill 100014, Mr. Gregorski stated:

> You know, I'm not sure what the timing of it was. I see that there is a conflict between 65 feet, um, in Old City and this ... you know, the idea that this area is supposed to be a dense, you know, area, uh, supposed to be encouraging dense developments. Basically, you know, I suspect it's that we didn't notice. [2/16/2010 Video at 13:30 min. to 14:20 min.]

Video on PlanPhilly website at http://planphilly.com/pcpc-oks-overlay-height-controls (visited on June 24, 2010).

On information and belief, the CRO and Bill 100014 were prepared by Councilman DiCicco's office and passed by City Council on the strength of "councilmanic prerogative," similar to the March 2006 Ordinance, as alleged in Count 15. The Mayor signed Bill 100014 on March 17, 2010.

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| CMR D.N. CORP. AND MARINA TOWERS LTD. T/A WATERFRONT RENAISSANCE ASSOCIATES<br><br>     Plaintiff<br><br>       v.<br><br>CITY OF PHILADELPHIA, et al.<br><br>     Defendants | NO. 2:07-cv-01045-LS |

## ORDER

And now, this _____ day of _____ 2010, upon consideration of Plaintiff's Motion

for Leave to File a Motion for Leave to Supplement Complaint that Exceeds Twenty-Five Pages, it is hereby

**ORDERED:**

1. Plaintiff's Motion for Leave to File is **GRANTED,** and

2. Plaintiff's Motion for Leave to Supplement Complaint Shall be Considered Filed.

**BY THE COURT:**

_____

**HONORABLE LAWRENCE F. STENGEL**

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| CMR D.N. CORP. AND MARINA TOWERS LTD. T/A WATERFRONT RENAISSANCE ASSOCIATES | |
| Plaintiff | NO. 2:07-cv-01045-LS |
| v. | |
| CITY OF PHILADELPHIA, et al. | |
| Defendants | |

### PLAINTIFF'S MOTION FOR LEAVE TO FILE A MOTION FOR LEAVE TO SUPPLEMENT COMPLAINT THAT EXCEEDS TWENTY-FIVE PAGES

Plaintiff, Waterfront Renaissance Associates, through its counsel Obermayer Rebmann Maxwell &

Hippel LLP, requests permission to file a Motion for Leave to Supplement Complaint that exceeds twenty-

five pages. Plaintiff's Motion for Leave to Amend Complaint is attached hereto as Exhibit 1 and is

incorporated herein in full.

Plaintiff asserts that good cause exists for exceeding twenty-five pages. Plaintiff's Memorandum of

Law in Support of Motion for Leave to Supplement Complaint is twenty-three (23) pages in length.

Plaintiff's Motion exceeds twenty-five pages due to the attachment of the proposed supplemental claim.

Respectfully submitted,

OBERMAYER REBMANN MAXWELL & HIPPEL, LLP

_____/S/_____

Thomas A. Leonard, Esquire
Richard P. Limburg, Esquire
H. David Seidman, Esquire
One Penn Center, 19th Floor
1617 John F. Kennedy Blvd.
Philadelphia, PA 19103-1895

*Counsel for Plaintiff,*
*Waterfront Renaissance Associates*

June 25, 2010

4468745

# EXHIBIT 1

# EXHIBIT 1

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

CMR D.N. CORP. AND MARINA TOWERS
LTD. T/A WATERFRONT RENAISSANCE
ASSOCIATES

    Plaintiff

      v.

CITY OF PHILADELPHIA, et al.

    Defendants

NO. 2:07-cv-01045-LS

## ORDER

And now, this _____ day of _____ 2010, upon consideration of Plaintiff's Motion for Leave to Supplement Complaint, it is hereby **ORDERED:**

    1.  Plaintiff's Motion for Leave to Supplement Complaint is **GRANTED,** and

    2.  Plaintiff Shall File its Supplemental Complaint within twenty (20) days of the

date of this Order.

**BY THE COURT:**

_____
**HONORABLE LAWRENCE F. STENGEL**

4479852

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

CMR D.N. CORP. AND MARINA TOWERS LTD.
T/A WATERFRONT RENAISSANCE ASSOCIATES

*Plaintiff*

v.

CITY OF PHILADELPHIA, et al.

*Defendants*

NO. 2:07-cv-01045-LS

## PLAINTIFF'S MOTION FOR LEAVE TO SUPPLEMENT COMPLAINT

Pursuant to Federal Rule of Civil Procedure 15(d), plaintiff Waterfront Renaissance Associates ("WRA"), by and through its counsel, Obermayer Rebmann Maxwell & Hippel LLP, hereby moves this Court for leave to supplement its complaint by adding Count 16 substantially in the form attached hereto as Exhibit 1. For the reasons set forth in WRA's accompanying Memorandum of Law, WRA's proposed Count 16 challenges the validity of the process for approval of plans of development under the City's Central Delaware Riverfront District Overlay. Rules implementing the process were first adopted on April 20, 2010.

In addition, WRA seeks leave to amend its prayers for relief in Counts 1 and 15 of its Second Amended Complaint to include "damages, interest, costs, and attorney fees."

WHEREFORE, Plaintiff, Waterfront Renaissance Associates, respectfully requests that the Court grant its Motion for Leave to Supplement Complaint and enter the form of order attached hereto.

Respectfully submitted,

OBERMAYER REBMANN
    MAXWELL & HIPPEL, LLP

_____/S/_____

Thomas A. Leonard, Esquire
Richard P. Limburg, Esquire
John E. Ryan, Esquire
H. David Seidman, Esquire
One Penn Center, 19th Floor
1617 John F. Kennedy Blvd.
Philadelphia, PA 19103-1895

*Counsel for Plaintiff,*
*Waterfront Renaissance Associates*

Date: June 25, 2010

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

CMR D.N. CORP. AND MARINA TOWERS LTD.
T/A WATERFRONT RENAISSANCE ASSOCIATES

    *Plaintiff*

    v.

CITY OF PHILADELPHIA, et al.

    *Defendants*

NO. 2:07-cv-01045-LS

### PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT OF
### MOTION FOR LEAVE TO SUPPLEMENT COMPLAINT

Fed.R.Civ.P. 15(d) provides that the Court may, on just terms, permit a party to serve a supplemental pleading setting out any transaction, occurrence or event that happened after the date of the pleading to be supplemented.

The reason for WRA's request for leave to supplement its complaint is that, notwithstanding the recent suspension of height regulations (including the March 2006 Ordinance) within the Central Delaware Riverfront District, the City has set up a plan of development process that abrogates "by right" zoning for commercial properties like WRA's World Trade Center site. Thus, the plan of development process replaces the height limit as a means to prevent the issuance of "over-the-counter" zoning permits for high-rise projects. WRA believes the ordinance and regulations governing the plan of development process suffer from facial constitutional defects warranting judicial relief. WRA seeks to supplement its claims with claims challenging the plan of development process as set forth in its proposed Count 16, attached hereto as Exhibit 1.

4478121

1

**Factual Background**

Councilman DiCicco introduced Bill 090170-A on March 5, 2009 to create a zoning overlay for the Central Delaware Riverfront District, defined as the area between I-95 and the Delaware River from Allegheny Avenue to Oregon Avenue. The Central Delaware Riverfront Overlay ("CRO") is codified as Section 14-1638 of the Philadelphia Code. A copy of the CRO is attached to proposed Count 16 as Exhibit J.

The CRO provides in part that, upon the adoption of regulations by the Philadelphia City Planning Commission ("Planning Commission"), no zoning permit shall issue for any commercial property without the approval by the Planning Commission of a Plan of Development ("POD"). The Planning Commission was given six months from August 17, 2009 (i.e., until mid-February, 2010) to prepare regulations containing objective standards for the approval or disapproval of PODs.

The CRO overlaps the Old City Overlay where it was extended east of I-95 by the March 2006 Ordinance that imposed the 65' height limit on WRA's property. WRA has alleged that the imposition of the 65' height limit east of I-95 was a mistake on the part of City Council and Councilman DiCicco, who sponsored the March 2006 Ordinance.

On January 28, 2010, Councilman DiCicco introduced Bill 100014 to amend the CRO "by establishing no height limit and by making technical changes." Bill 100014 added a new subsection 12 to the CRO, which provides that "no height regulations shall apply to any parcel within the boundaries of this District, including but not limited to the provisions of §14-1610 ('Old City Residential Area Special District Controls')." A copy of Bill 100014 is attached to proposed Count 16 as Exhibit K.

On information and belief, Bill 100014 suspended height limits within the CRO, because the imposition of the 65' height limit east of I-95 was a mistake. Councilman Frank DiCicco admitted in his deposition that imposing the height limit on the World Trade Center site was a mistake. Martin Gregorski, a Planning Commission staff member, indicated that the 65' height restriction conflicted with the dense development that was planned for the area where WRA's property is located. Speaking of the "encroachment" of the Old City Overlay on the Central Delaware Riverfront District, Mr. Gregorski stated:

> This area was meant to be a very dense area. You know, there was supposed to be dense development along the river and an overlay encroached on the area. [2/16/2010 Video at 50 sec. to 1:10 min.]

> The Old City Overlay encroached there. The Old City Overlay has a 65 foot height limit from any area within the Central Delaware Riverfront Overlay. What this Bill does is it removes this height limit. [2/16/2010 Video at 1:35 min. to 1:50 min.]

When asked about the timing of Bill 100014, Mr. Gregorski stated:

> You know, I'm not sure what the timing of it was. I see that there is a conflict between 65 feet, um, in Old City and this ... you know, the idea that this area is supposed to be a dense, you know, area, uh, supposed to be encouraging dense developments. Basically, you know, I suspect it's that we didn't notice. [2/16/2010 Video at 13:30 min. to 14:20 min.]

Video on PlanPhilly website at http://planphilly.com/pcpc-oks-overlay-height-controls (visited on June 24, 2010).

On information and belief, the CRO and Bill 100014 were prepared by Councilman DiCicco's office and passed by City Council on the strength of "councilmanic prerogative," similar to the March 2006 Ordinance, as alleged in Count 15. The Mayor signed Bill 100014 on March 17, 2010.

However, Bill 100014 did not restore the status quo that prevailed before the enactment of the March 2006 Ordinance, due to the temporary nature of the relief from height restrictions and the simultaneous adoption of regulations to implement the POD process.

The Planning Commission published draft POD Regulations at its meeting on January 19, 2010. The Planning Commission adopted the POD Regulations at its meeting on April 20, 2010. A copy of the POD Regulations as adopted is attached to proposed Count 16 as Exhibit L.

Pursuant to Section 8-407 of the Philadelphia City Charter, the Planning Commission then filed the POD Regulations with the Department of Records, where they were subject to a 30-day period for review and comment. During the 30-day review period, objections to the POD Regulations were filed, and the Planning Commission held a special public hearing on the objections on June 8, 2010. The Planning Commission will issue a report of the hearing, reaffirming or modifying the POD Regulations, as required by the City Charter, § 8-407. The POD Regulations will become effective at midnight of the tenth day after the Planning Commission files its report with the Philadelphia Department of Records. Id. At this time, the Planning Commission has not yet filed a report of the hearing.

As detailed below, the CRO and the POD Regulations purport to institutionalize the participation of civic associations and neighbors in the POD process. The CRO and the POD Regulations purport to give the Planning Commission the discretion to disapprove a POD whenever the Planning Commission feels the proposed development is not appropriate for the surrounding community in scale, density, character and use (including height, massing, and unit count or composition), even if the POD conforms in every respect with the provisions of the base zoning classification for the parcel. The CRO and the POD Regulations contain no objective

4

standards for the approval or disapproval of PODs.  As a result, the CRO and POD Regulations

effectively eliminate "by right" zoning in the Central Riverfront District.

   The elimination of "by right" zoning and "over-the-counter" zoning permits impairs the

developability and thus the value of all commercially zoned parcels within the CRO, including

WRA's site, because developers, buyers, lenders and potential anchor tenants are unable to

determine from the CRO and POD Regulations what can and what cannot be built on a particular

parcel, or to plan a multi-phase project requiring multiple zoning permits.  The CRO and the

POD Regulations make it impossible for WRA to carry out a program of phased high-rise

development on its site, as planned by WRA and encouraged by the City for almost twenty years

before the enactment of the March 2006 Ordinance.

   Thus, WRA continues to suffer the arbitrary impairment of its unrestricted C-4

development rights by facially invalid zoning ordinances and regulations that subject WRA to

unlawful *ad hoc* zoning.

### Details of the CRO

   Section 14-1638(1)(h) of the CRO states:

> This District is established to protect the existing characteristics of
> the built and natural environment that are essential to achieving the
> working guidelines of the Civic Vision, adopted by the
> Philadelphia City Planning Commission on April 21, 2009, while a
> Master Plan for the area is developed.  This section of the City
> presents a diverse collection of uses, ranging from the working
> port and large retail establishments in the southern portion to high-
> rise residential communities in the north.  Special land use controls
> and design guidelines will help promote long-term economic
> viability and to provide a framework for future growth.

   Subsection 14 (formerly subsection 13) states that "the provisions of this Section [i.e.,

§14-1638 in its entirety] shall expire upon Council's adoption of an Ordinance enacting land use

and zoning controls that includes the boundaries of this District consistent with a Master Plan

adopted by the Philadelphia City Planning Commission." Section 14-1638 is attached to proposed Count 16 as Exhibit J at p. 6 (emphasis supplied).

Subsection 13 of Section 14-1638, as amended by Bill 100014, provides that no zoning permit may be issued for any commercially zoned property in the CRO district, unless the applicant submits, and the Planning Commission approves, a POD. §14-1638(13)(a). Subsection 13 states that the Planning Commission shall approve a POD, "only if the Commission has determined, in its discretion, that the Plan of Development provides for development appropriate in scale, density, character and use for the surrounding community." §14-1638(13)(a).

Subsection 13 provides that the Planning Commission's approval or disapproval of a POD may be appealed directly to the Court of Common Pleas, unless the applicant must apply to the Zoning Board of Adjustment for a variance. §14-1638(13)(b). Subsection 13 provides that a POD will be deemed approved, if the Planning Commission does not "approve, disapprove, conditionally approve or table a proposed POD within 75 days after submission." §14-1638(13)(a). Thus, the Planning Commission can table an application indefinitely and refuse to act on it, thereby rendering the "deemed approval" protection essentially meaningless.

Subsection 13 requires the Planning Commission to adopt regulations "providing objective standards for such design review as may be necessary prior to implementing the provisions of this subsection 12 [sic]." §14-1638(13)(a) (emphasis supplied).

The only legislative standards which the CRO provides for the adoption of regulations governing the review of PODs are: (a) that such regulations must be "objective," §14-1638(13)(a); (b) that the purpose of the POD review is to determine whether a POD "provides for development appropriate in scale, density, character and use for the surrounding community,"

§14-1638(13)(a); and (c) that the purpose of the CRO is "to protect the existing characteristics of the built and natural environment that are essential to achieving the working guidelines of the Civic Vision, adopted by the Philadelphia City Planning Commission on April 21, 2009, while a Master Plan for the area is developed." §14-1638(1(h).

The CRO does not define the phrase "development appropriate in scale, density, character and use for the surrounding community" and how it differs from the scale, density, character, and use permitted by a property's base zoning.  The CRO does not define the phrase "existing characteristics of the built and natural environment that are essential to achieving the working guidelines of the Civic Vision, adopted by the Philadelphia City Planning Commission on April 21, 2009."  The Civic Vision itself does not designate any "existing characteristics" as "essential" to the broad development goals it identifies.  Moreover, the Civic Vision is a planning document, not a zoning document, and for that reason it is not pertinent to the use of any particular parcel.  In addition, the Civic Vision is not the City's development plan for the Central Delaware Riverfront District.  Planning Commission Chairman Alan Greenberger has stated positively that the Planning Commission did not "adopt" the Civic Vision (as an official planning document), and only "accepted" the Civic Vision (as a working guideline for the development of a Master Plan).  Video Recording on PlanyPhilly Website at http://planphilly.com/pcpc-4 [53:15 to 54:10 min.] (visited on June 25, 2010).

### Details of the POD Regulations

Section 3 of the POD Regulations sets forth items which an applicant for POD approval will be required to submit, as follows:

> Every new development or redevelopment has impacts on the immediate surroundings, the neighborhood, and the larger urban context.  The responsibility of protecting this public realm falls on

the City Planning Commission. The Plan of Development is an extension of this already existing charge.

In reviewing a proposed POD, the City Planning Commission will consider any item that will have an effect or impact on this public realm. Such items subject to the POD review will include:

a) The base zoning;
b) The proposed uses;
c) The density of the development, including the scale, height and massing of the structures as well as the unit count/composition;
d) The amenities included in the project, including the landscaping;
e) Any connections to neighborhood at large;
f) Street life activity/continuity;
g) Any proposed streetscape improvements;
h) Parking and traffic impacts, including where the buildings will be serviced;
i) The appearance of the building, including its form and materials;
j) The site layout/design; and
k) Any issues relating to sustainability.

While such a list obviously cannot be all-inclusive, it should serve as notice to developers bound by the POD, on what to expect from this review process.

Exhibit L to proposed Count 16, at pp. 1-2.

Section 3 of the POD Regulations treats a property's base zoning classification merely as one of a number of items affecting the public realm which the Planning Commission will review in evaluating a POD. Even if a POD conforms in every respect with the provisions of the base zoning classification for the parcel, the Planning Commission has discretion to find that the POD is not "appropriate in scale, density, character and use for the surrounding community." POD Regulations, §6(a); and §14-1638(13)(a). In other words, the Planning Commission has discretion to down-zone a parcel, if it determines that the neighborhood is not appropriate for development of the scale, density, character, and use permitted by the base zoning.

The POD Regulations provide no quantitative or qualitative standards or guidelines for evaluating the various items listed in Section 3, including, without limitation, allowable scale, height, massing, unit count and composition, parking and traffic impacts, sustainability, connections to the neighborhood, and street life activity. Thus, the POD Regulations provide no guidance as to what commercial development will be approved and what will not be approved between I-95 and the Delaware River. As a result, no decision of the Planning Commission concerning a POD can be considered objective.

Furthermore, the list of items in Section 3 is not complete. Section 3 of the POD Regulations states that the list of items "cannot be all-inclusive" (emphasis supplied) and further provides that the Planning Commission "will consider any item that will have an effect or impact on this public realm," which includes "the immediate surroundings, the neighborhood, and the larger urban context." POD Regulations §3. Section 4 of the POD Regulations further states that a POD submission shall include, besides the listed items, "any other information that the Commission deems necessary for a decision." POD Regulations §4(p).

The POD Regulations place on the applicant the burden of proving that "the POD provides for development appropriate in scale, density, character and use for the surrounding community," without providing a complete list of submission requirements and without providing any objective standards by which an applicant may know what it is he must prove. POD Regulations §4 and §6(a).

### Constitutional Defects of the CRO and POD Regulations

The CRO and the POD Regulations violate the principle of separation of powers and the Philadelphia Home Rule Charter because they empower the Planning Commission to disregard base zoning classifications and in effect to down-zone commercial properties within the

boundaries of the CRO on a case-by-case basis in the absence of clear and definite legislative standards and thus constitute an improper delegation of legislative power to an executive body.

The CRO and POD Regulations, by placing full discretion in the Planning Commission as to how, or whether, land may be used, have impermissibly delegated the City's zoning power and the City's police power to the Planning Commission.

The CRO and the POD Regulations violate the principle of equal protection, because the standards for approval and disapproval of PODs are vague and indefinite. The question of appropriate development for the surrounding community is to be determined by the Planning Commission as each case is presented, inviting both *ad hoc*, inconsistent zoning regulation, as well as impermissible discrimination in favor of some owners at the expense of others.

The CRO and the POD Regulations violate the principle of substantive due process, because the POD review is (a) arbitrary and capricious, in that objective standards for evaluating PODs are lacking; (b) irrational, in that density of development (including scale, height, massing, and unit count) cannot reasonably be evaluated for consistency with a Civic Vision that the Planning Commission has not adopted as an official planning document, or with a Master Plan which the Planning Commission has not yet developed and translated into a new zoning map for enactment by City Council; and (c) unrelated to any legitimate planning purpose, in that the POD process derogates from existing zoning classifications on a parcel by parcel basis and does not constitute a comprehensive plan or an updated zoning map..

The statement in Section 3 of the POD Regulations that the criteria for consideration "<u>cannot</u> be all inclusive" is a repudiation of the constitutional principles of due process and equal protection that laws not be unduly vague, that they be understandable to the persons they purport to regulate, and that they be capable of uniform application.

### Impermissible Delegation of Land Use Control to Civic Associations

The CRO and the POD Regulations institutionalize the participation of neighborhood civic associations in the issuance of zoning permits for commercial projects within the boundaries of the CRO.

Section 4(b) of the POD Regulations requires an applicant for a zoning permit to discuss his proposal with "local residents at a meeting where a member of the Commission staff was also present." Exhibit L to proposed Count 16, at p. 2. Section 6(a) requires an applicant to prove that his proposal "provides for development appropriate in scale, density, character and use for the surrounding community." Exhibit L to proposed Count 16, at p. 3. Under Section 6(b) of the POD Regulations, the Planning Commission can significantly delay action on a POD by requesting additional items of information pursuant to Section 4(p), inasmuch as each request for an additional item renders the existing submission "incomplete" for purposes of Section 6(b) and re-starts the 75-day period for rendering a decision on the applicant's plan of development. Similarly, every modification of a POD at the Planning Commission's request restarts the 75-day period.

On information and belief, the Planning Commission included Section 4(b) and Section 6(a) and 6(b) in the POD Regulations to give civic associations and neighbors a large measure of control over commercial projects within the boundaries of the CRO, which can be enforced: (a) through the right to oppose and appeal the "appropriateness" of the proposed development, similar to the right of civic associations to oppose and appeal variances from the 65' height limit as alleged in Count 15; (b) through the ability of Councilman DiCicco's office to pass ordinances down-zoning or up-zoning particular parcels within the First Councilmanic District using "councilmanic prerogative," as alleged in Count 15; and (c) the Planning Commission's ability to delay a final decision on a POD indefinitely.

On information and belief, the CRO and the POD Regulations are designed and intended to pressure applicants to seek the consent of civic associations and not to build all that their base zoning classifications would otherwise allow in terms of scale, density, character, and use.

### The CRO and POD Regulations Continue the Pattern of *Ad Hoc* Land Use Regulation and Improper Delegation of Zoning Power in the First Councilmanic District, as Alleged in Count 15 of WRA's Second Amended Complaint

To the extent that the CRO and the POD give the Planning Commission power to reject a POD whose scale, density, character and use (including height, massing, and unit count or composition) conform to the provisions of the base zoning classification on the ground that the scale, density, character and use of the proposed development are not appropriate for the surrounding community, they continue the pattern of *ad hoc* land use regulation in the First Councilmanic District, whereby zoning proceeds on a parcel by parcel basis without a comprehensive plan. They also constitute an improper delegation of zoning power to the Planning Commission.

To the extent that the CRO and the POD Regulations are intended to give civic associations and neighbors a large measure of control over and input into high-rise construction within the Central Delaware Riverfront District, similar to the 65' height limit and the compulsory variance process described in Count 15 of WRA's Second Amended Complaint, they constitute an impermissible *de facto* delegation of zoning power to civic associations and neighbors. The control derives from the fact that the CRO forces a developer to seek a POD approval for any commercial development within the CRO. To maximize the chance of obtaining approval of a POD, the developer would have to bargain for the support of the civic associations, and the civic associations would be in a position to impose *ad hoc* changes and concessions on high-rise development projects as the price of their support.

## ARGUMENT

Federal Rule of Civil Procedure 15(d) gives the Court discretion to allow supplemental pleadings. Glenside West Corp. v. Exxon Co., U.S.A., 761 F.Supp. 1118, 1133 (D.N.J. 1991). Pursuant to Rule 15(d), "[o]n motion and reasonable notice, the court may, on just terms, permit a party to serve a supplemental pleading setting out any transaction, occurrence, or event that happened after the date of the pleading to be supplemented." In addition, supplemental pleadings may set forth new causes of action as long as they are based on transactions, occurrences, or events happening after the original pleading was filed. Coca-Cola Bottling Co. v. Coca-Cola Co., 668 F. Supp. 906, 922 (D. Del. 1987). The purposes of Rule 15(d) include promoting judicial economy, avoiding multiplicity of litigation, and promoting as complete an adjudication of the dispute between the parties as possible. Hassoun v. Cimmino, 126 F.Supp.2d 353, 360 (D.N.J. 2000) (quoting Glenside, 761 F.Supp. at 1134).

The standards for Rule 15(d) are generally the same as the liberal standards for amending a pleading under Rule 15(a). Franks v. Ross, 313 F.3d 184, 198 n.15 (4th Cir. 2002). "Leave to file a supplemental complaint should be freely permitted in the absence of undue delay, bad faith, dilatory tactics, undue prejudice to defendants, or futility, and when the supplemental facts are connected to the original pleading." Hassoun, 126 F.Supp.2d 360-361. For the reasons set forth below, WRA should be allowed to supplement its complaint.

### No Bad Faith and No Undue Delay

WRA has not acted in bad faith or with undue delay. WRA seeks to challenge the CRO and the POD Regulations that implement the POD approval process under the CRO. WRA promptly filed the instant motion following the adoption of the POD regulation on April 20, 2010. The POD approval process set forth in the CRO did not go into effect until the Planning

Commission adopted the POD Regulations.  Bill 100014, §13 ("the Commission shall adopt regulations providing objective standards for such design review as may be necessary, prior to implementing the provisions of this subsection 12 [sic].").  Thus, WRA was not in a position to supplement its claims to challenge the CRO and the POD Regulations until the POD Regulations were adopted.

Any purported delay caused by WRA's supplemental claims is of the City's own making in that the City chose to replace an unconstitutional height limit with an unconstitutional POD approval process.  Moreover, delay alone is not enough to deny a motion for leave to supplement a complaint.  Cureton v. NCAA, 252 F.3d 267, 273 (3rd Cir. 2001) (delay alone is an insufficient ground to deny leave to amend).

In Coca-Cola Bottling Co. v. Coca-Cola Co., 668 F. Supp. 906, 923 (D. Del. 1987), the plaintiffs sought to supplement their complaint six years after their original complaint.  The defendant argued that plaintiffs unduly delayed filing the supplemental pleading and that it would be prejudiced because of the extensive discovery necessary to address the supplemental claims.  Id.  Noting the purpose of Rule 15(d) to promote the complete adjudication of disputes between parties, the Delaware District Court held that the plaintiffs' supplemental claims were timely, as they were filed a little more than two months after the transaction at issue, and that the need for further discovery was not unduly prejudicial where there was no evidence of bad faith or dilatory tactics and the supplemental claims related to original claims.  Id. at 923 (citations omitted).  Cf. Bowser Cadillac, LLC v. General Motors Corporation, 2008 WL 2802523 (W.D. Pa. 2008) (The court permitted the plaintiff to file an amended complaint even though the plaintiff waited until the final day of discovery to seek leave to amend its complaint as a result of

newly discovered information that was not known to plaintiff when they filed their original complaint).

Like the plaintiffs in Cola Bottling Co., WRA filed the instant motion to supplement its claims a little more than two months following the adoption of the POD Regulations, WRA has not acted in bad faith, and WRA's supplemental claims are related to its claims alleged in this action. The POD process created by the CRO and the POD Regulations replaces the 65' height limit as a means to prevent the issuance of "over-the-counter" zoning permits for high-rise projects. The CRO and the POD Regulations continue to prevent the development of the World Trade Center project as effectively as the 65' height limit. The suspension of the height limit is tied to the POD process, in that (a) the height limit, which prevented WRA from obtaining "over-the-counter" zoning permits for high-rise buildings, was not suspended until after the CRO and the POD Regulations were in place, which prevent WRA from obtaining "over-the-counter" zoning permits for any building at all; and (b), unless further action is taken, the height limit will return when the CRO expires. The CRO and the POD Regulations also have the improper purpose of promoting *ad hoc* zoning in the First Councilmanic District by the Planning Commission, similar to the compulsory variance process for any development in excess of 65' as alleged in Count 15 of WRA's Second Amended Complaint. Dkt. No. 121. In other words, notwithstanding the suspension of the height limit, WRA continues to suffer the same fundamental disadvantage as before the enactment of Bill 100014, namely the arbitrary impairment of its unrestricted C-4 development rights by facially invalid zoning ordinances and regulations that subject WRA to unlawful *ad hoc* zoning.

**No Undue Prejudice**

The defendants will not suffer any undue prejudice if this motion is granted.  WRA's

supplemental claims do not add any claims against the civic associations and are confined to the

validity of the CRO and the POD Regulations.

The City has had notice of WRA's concerns over the CRO since May 26, 2009.  WRA

objected to Bill 090170-A (the CRO) and its companion Bill 090169 (to downzone C-4 properties

to C-3 in the River's Edge/Penn's Landing North area) before they were passed, as follows:

> Notwithstanding the pending federal lawsuit, yet another
> unconstitutional ordinance has been proposed to create a Central
> Riverfront District Overlay that does not permit any commercial
> development as-of-right and provides no standards for the approval
> of commercial development plans.  A companion ordinance seeks
> to down-zone numerous properties from C4 to C3 for no apparent
> reason, including the World Trade Center site.  There is no
> planning basis for the proposed Overlay and down-zoning.  In fact,
> the Bills in question have been referred to as a "placeholder."  In
> other words, Bills 090169 and 090170 amount to an impermissible,
> indefinite moratorium on development, disguised as a zoning
> ordinance.  As far as WRA knows, no one has calculated or
> considered the negative effect of these proposed ordinances on
> property values and property taxes which may result as a
> consequence of the potential diminution in land values.
>
> In fact, much of what has happened to the World Trade Center
> project is being repeated in the Bills in question, whose
> shortcomings are described in a letter of May 18, 2009 from the
> Developer's Workshop to Andrew Altman and the members of the
> Planning Commission, including possible use of the height
> restriction as a method of defeating the aims embodied in the
> Central Riverfront District Plan of 1982 to which the letter refers.
>
> If this legislation is passed it will be a tragedy for the Riverfront
> and for the City alike.  It will also be evidence of retaliation and
> bad faith towards Waterfront Renaissance Associates and will
> provide further support of its claims that the City encouraged
> Waterfront Renaissance Associates for twenty years only to
> reverse suddenly and without warning after Waterfront
> Renaissance Associates invested millions of dollars in the Project.
>
> .

May 26, 2009, Letter Objection to Bills 090169 and 090170.

At this time, no trial date is set. Deadlines for expert discovery and dispositive motions have been stayed due to the need for new expert reports now that the height limit has been suspended. Dkt. No. 160. Although fact discovery is currently closed, WRA has previously moved to reopen fact discovery for a period of 75 days to take discovery regarding (1) the City's Answer to WRA's Second Amended Complaint, (2) 412 North Front Street, and (3) Bill 100014. Dkt Nos. 151 and 164.

Discovery for WRA's supplemental claims will be focused on the enactment of the CRO and the adoption of the POD Regulations; however, WRA expects to identify a number of witnesses for deposition. For that reason, WRA anticipates requesting six months to complete the discovery related to the CRO and the POD Regulations plus the discovery outlined in its earlier motion to reopen discovery. Dkt Nos. 151 and 164.

The additional discovery related to WRA's supplemental claims is not unduly prejudicial, because WRA has not engaged in undue delay, bad faith, or dilatory tactics. In Dole v. Arco Chem. Co., 921 F.2d 484, 488 (3d Cir. 1990), the Third Circuit held that the need to redraft a motion for summary judgment, along with the possible need for additional discovery, did not create undue prejudice sufficient to justify the district court's denial of leave to amend. Similarly, in Amquip Corp. v. Admiral Ins. Co., 231 F.R.D. 197, 200-01 (E.D. Pa. 2005), the court granted leave to amend despite finding that the moving party had delayed in seeking amendment. The court reasoned that any prejudice to the non-moving party as a result of the delay could be remedied by allowing additional discovery. Id. See also United States v. Continental Ill. Nat'l Bank & Trust Co., 889 F.2d 1248, 1255 (2d Cir. 1989) (even if discovery were prolonged, "the adverse party's burden of undertaking discovery, standing alone, does not

suffice to warrant denial of a motion to amend a pleading."); Keith v. Volpe, 858 F.2d 467, 473-476 (9th Cir. Cal. 1988) (The court rejected the contention that prejudice resulted from delay or further discovery in light of overriding concern for the economical and speedy disposition of this entire controversy); Unique Sports Generation, Inc. v. LGH-III, LLC, 2005 U.S. Dist. LEXIS 22133 (S.D.N.Y. Sept. 29, 2005) (Allegations that an amendment will require the expenditure of additional time, effort, or money do not constitute undue prejudice.); A.V. by Versace, Inc. v. Gianni Versace, S.p.A., 87 F. Supp. 2d 281, 299 (S.D.N.Y. 2000) (same).  In this case, the need for further discovery related to WRA's supplemental claims is consistent with the purpose of Rule 15(d) to promote the economical and speedy disposition of this entire controversy between the parties, especially given that a trial date has not been set, expert discovery and dispositive motions are stayed, and WRA has already moved to reopen fact discovery.

### WRA's Supplemental Claims Are Not Futile and Will Facilitate Efficient Resolution of the Entire Dispute

WRA's proposed supplemental claims are not futile.  The CRO and POD Regulations are unconstitutional for a number of reasons.  They effectively delegate City Council's legislative function of zoning within the Central Delaware Riverfront District to the Planning Commission. See English v. Zoning Board of Adjustment, 148 A.2d 912, 914-915 (Pa. 1959); Michener Appeal, 382 Pa. 401, 115 A.2d 367, 371 (1955); CJS, "Zoning and Land Planning, §§2, 9 and 28. At the same time, the CRO and POD Regulations give civic associations and neighbors leverage to impose *ad hoc* changes on high-rise developments through a compulsory POD process, contrary to the master planning concept of Pennsylvania zoning law and the Philadelphia Zoning Code.  Under both Pennsylvania and federal law, zoning is an exercise of the police power and is not delegable to non-governmental entities, Hertrick Appeal, 391 Pa. 148, 137 A.2d 310 (1958) (zoning ordinances requiring the consent of neighbors raise serious constitutional concerns);

Saucony Mobil Oil Co. v. Zoning Board of Adjustment, 33 Pa. D&C2d 405, 413 (Allegheny 1964) (requiring the consent of neighbors is an unconstitutional delegation of legislative authority); State of Washington v. Roberge, 278 U.S. 116, 121-122 (a zoning provision requiring the consent of neighbors who are not bound by official duty or controlled by any standard or rule violates due process). See other authorities cited in WRA's February 27, 2009 Motion for Leave to Amend. Dkt No. 110.

The CRO and POD Regulations are also unconstitutional because they provide no objective standards for the approval or disapproval of PODs. Due process of law requires that zoning enactments be clear and certain. Taylor v. Moore, 303 Pa. 469, 479 (Pa. 1931). As explained in Taylor, a zoning ordinance that is vague and indefinite cannot be sustained as valid. Where a zoning ordinance permits officials to grant or refuse permits without the guidance of any standard, but according to their own ideas, it does not afford equal protection. While the exercise of discretion and judgment is to a certain extent necessary for the proper administration of zoning ordinances, this is so only where some standard or basis is fixed by which such discretion and judgment may be exercised by the board. Id.

WRA's claims should facilitate the efficient resolution of controversy with the City. The repeal of a challenged "statute, regulation or ordinance ..., followed by enactment of a new measure, is a typical situation calling for the filing of a supplemental pleading." Hjelle v. Brooks, 424 F. Supp. 595, 602 (D. Alaska 1976) (citing Griffin v. County School Board of Prince Edward County, 377 U.S. 218, 226-27, 84 S. Ct. 1226, 12 L. Ed. 2d 256 (1964).

In Schempp v. School District, 195 F. Supp. 518 (E.D. Pa. 1961), the plaintiffs successfully sued to enjoin statutorily mandated Bible reading in public schools. While the case was on appeal to the United States Supreme Court, the challenged statute was amended. The

Supreme Court remanded the case for further proceedings in light of the legislative change. The plaintiffs moved under F.R.Civ.P. 15(d) to supplement their complaint to reflect the amendment. In granting the motion, the court concluded that "a useful purpose would be served by permitting [the supplemental complaint] to be filed ... ." Id. at 519.

Rancourt v. Bangor, 400 A.2d 354, 356-357 (Me. 1979), is another case in which a legal challenge to a zoning ordinance was followed by the enactment of a new ordinance. The plaintiffs' neighborhood was originally classified as an Agricultural area in which large, multiple-unit apartment houses were forbidden. Id. The city council amended the ordinance to rezone certain portions of the neighborhood as Residential C, the highest density residential classification. Id. The residents then filed a complaint, claiming that the amendment was illegal in that the classification permitted a higher residential density than that sanctioned by the city comprehensive plan, in violation of Me. Rev. Stat. Ann. tit. 30, § 4962, and that it was enacted solely to accommodate defendant property owners and, as such, constituted illegal spot zoning. Id. The city council then enacted a new zoning ordinance. Id. The residents moved to file a supplemental complaint pursuant to Maine Rule of Civil Procedure 15(d), which follows Federal Rule 15(d), alleging that the new ordinance incorporated the earlier amendment and was illegal for the same reasons. Id. The trial court denied the motion. Id. On appeal, the Maine Supreme Court reversed the trial court. Id. at 356. Relying on Schempp v. School District, 195 F. Supp. 518 (E.D. Pa. 1961), the court reasoned:

> The[] cases reflect the sound view that litigation should not have to be recommenced merely because legislative or administrative action has to some degree altered the status of the lawsuit.
> ***
> [C]ommentators who have had occasion to deal with F.R.Civ.P. 15 or with its counterpart, M.R.Civ.P. 15, have properly stressed that the rule ought to be liberally applied to achieve the goal set forth in Rule 1: the "just, speedy and inexpensive determination of every

> action." <u>Bell v. United States Department of Defense</u>, 71 F.R.D.
> 349 (D. N.H. 1976); 1 R.Field, V. McKusick, & L. Wroth, Maine
> Civil Practice § 15.1 (1970); 3 Moore's Federal Practice § 15.02
> (1978); 6 C. Wright & A. Miller, Federal Practice and Procedure:
> Civil § 1471 (1971).  More specifically, the rationale underlying
> M.R.Civ.P. 15(d) is that a party should not be put to the expense
> and aggravation of commencing a new lawsuit when events
> bearing on, arising out of, or relating in some reasonable way to
> the matters originally pleaded occur after the complaint has been
> filed.  See 1 R. Field, V. McKusick, & L. Wroth, supra at §§ 15.1,
> 15.7.

<u>Rancourt v. Bangor</u>, 400 A.2d 354, 356 (Me. 1979).  <u>Accord</u> <u>Aaron v. McKinley</u>, 173 F. Supp.

944 (E.D.Ark.1959), *aff'd sub nom.* <u>Faubus v. Aaron</u>, 361 U.S. 197, 80 S. Ct. 291, 4 L. Ed. 2d

237 (1959) (the court permitted the plaintiffs to file a supplemental complaint attacking

legislation enacted while an appeal from a final order of the trial court was pending).

"Rule 15(d) ... is a useful device, enabling a court to award complete relief, or more

nearly complete relief, in one action, and to avoid the cost, delay and waste of separate actions

which must be separately tried and prosecuted.  So useful they are and of such service in the

efficient administration of justice that they ought to be allowed as of course, unless some

particular reason for disallowing them appears ... ."  <u>New Amsterdam Casualty Co. v. Waller</u>,

323 F.2d 20, 28-29 (4th Cir. 1963), cert. denied, 376 U.S. 963, 11 L. Ed. 2d 981, 84 S. Ct. 1124

(1964).  Thus, when a supplemental pleading facilitates the efficient administration of justice, a

court should allow it.  <u>Griffin v. County Sch. Bd. of Prince Edward County</u>, 377 U.S. 218, 226-

27, 84 S. Ct. 1226, 12 L. Ed. 2d 256 (1964).

In the present case, allowing the filing of the proposed Supplemental Complaint would

promote judicial efficiency by obviating the need for a second, separate action to resolve WRA's

constitutional challenges to the CRO and POD Regulations, and would facilitate a complete

adjudication of all issues in the present action.

### Amendment to Prayers for Relief to
### Include Damages, Interest, Costs and Attorney's Fees

WRA also seeks leave to amend its prayers for relief for its constitutional claims set forth in Counts 1 and 15 of WRA's Second Amended Complaint to include "damages, interest, costs, and attorney fees." The purpose of the amendment is to clarify that WRA's request for compensatory damages in Count 7 applies to all of WRA's facial constitutional claims. Defendants will not suffer any prejudice because WRA sought monetary damages for deprivation of its constitutional rights in Count 7, and WRA previously produced expert damage reports which will have to be revisited in light of the suspension of the height limit. Although Counts 1, 7, and 15 present different legal theories, they allege the same harm, i.e., the halting of the World Trade Center project. Heinold Commodities, Inc. v. New York Mercantile Exchange, 78 F.R.D. 190, 192 (S.D.N.Y. 1978) (a party "may amend its complaint for equitable relief to include a claim for damages."); Nucor Corp. v. Tennessee Forging Steel Service, Inc., 476 F.2d 386 (8th Cir. 1973) (same); A.L.B. Theatre Corp. v. Loew's Inc., 21 F.R.D. 584 (N.D. Ill. 1957) (same). See also Wright, Miller, and Kane, Federal Practice and Procedure, § 1474, pp. 628-629 (2010) (technically, amendments "electing a different remedy than the one originally requested ... are not necessary since Rule 54(c) provides that regardless of the formal demand for relief, 'the final judgment should grant the relief to which each party is entitled ... .'").

## Conclusion

For all the foregoing reasons, WRA respectfully requests leave to supplement its complaint by adding the proposed Count 16 attached as Exhibit 1.  In addition, WRA respectfully requests leave to amend its prayers for relief for its constitutional claims set forth in Counts 1 and 15 of WRA's Second Amended Complaint to include "damages, interest, costs, and attorney fees."

Respectfully submitted,

OBERMAYER REBMANN MAXWELL & HIPPEL, LLP

_____/S/_____

Thomas A. Leonard, Esquire
Richard P. Limburg, Esquire
John E. Ryan, Esquire
H. David Seidman, Esquire
One Penn Center, 19th Floor
1617 John F. Kennedy Blvd.
Philadelphia, PA 19103-1895

*Counsel for Plaintiff,*
*Waterfront Renaissance Associates*

Date: June 25, 2010

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

CMR D.N. CORP. AND MARINA TOWERS
LTD. T/A WATERFRONT RENAISSANCE
ASSOCIATES

Plaintiff

v.

CITY OF PHILADELPHIA, et al.

Defendants

NO. 2:07-cv-01045-LS

## CERTIFICATE OF SERVICE

I, H. David Seidman, Esquire, hereby certify that on this 25th day of June 2010, a true and

correct copy of the foregoing Motion for Leave to Supplement Complaint was filed

electronically, and made available for viewing and downloading from the ECF system, and

served as follows:

**VIA ECF**

Benjamin M. Mather , Esquire
Robert D. Aversa, Esquire
City Solicitor's Office
1515 Arch Street, 17th Floor
Philadelphia, Pa 19102

*Counsel for Defendants, City of Philadelphia,*
*City Council of the City Of Philadelphia, and*
*Philadelphia City Planning Commission*

**VIA ECF**

Aaron E. Moore, Esquire
Arthur W. Lefco, Esquire
Marshall Dennehey Warner Coleman & Goggin
1845 Walnut Street, 17th Floor
Philadelphia, Pa 19103

*Counsel for Defendants,*
*River's Edge Civic Association, Old City Civic*
*Association, Andrew Sacksteder, Richard Thom,*
*Richard Horrow, and Elizabeth Whitaker*

_____/S/_____
H. David Seidman

4357416

# EXHIBIT 1

# EXHIBIT 1

**EXHIBIT 1**

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

CMR D.N. CORP. AND MARINA TOWERS
LTD. T/A WATERFRONT RENAISSANCE
ASSOCIATES

*Plaintiff*

v.

CITY OF PHILADELPHIA, et al.

*Defendants*

NO. 2:07-cv-01045-LS

**COUNT SIXTEEN**

**VIOLATION OF SUBSTANTIVE DUE PROCESS,
EQUAL PROTECTION, AND SEPARATION OF POWERS**

***WRA v. The City of Philadelphia***

290.    WRA incorporates by reference the previous averments as if fully set forth

herein.

291.    The Philadelphia City Planning Commission ("Planning Commission")

has recently adopted zoning regulations for commercial development in the Central

Delaware Riverfront District which abrogate WRA's "by right" C-4 zoning.  On their

face, the regulations and the ordinance they implement violate the constitutional

principles of separation of powers, due process, and equal protection of the laws.

4472835

**Provisions of the CRO**

292.    The Planning Commission promulgated the regulations pursuant to

Section 14-1638 of the Philadelphia Code, which created a zoning overlay called the

"Central Delaware Riverfront Overlay" (the "CRO").

293.    Section 14-1638 was introduced by Councilman DiCicco as Bill 090170-

A.  It was passed by City Council on June 18, 2009 and signed by the Mayor on August

17, 2009.  A copy of Section 14-1638 as published in the Philadelphia Code is attached as

Exhibit J.

294.    The CRO covers the area between I-95 and the Delaware River from

Oregon Avenue to Allegheny Avenue, which includes WRA's property.

295.    Section 14-1638(h)of the CRO states:

> This District is established to protect the existing characteristics of the
> built and natural environment that are essential to achieving the
> working guidelines of the Civic Vision, adopted by the Philadelphia
> City Planning Commission on April 21, 2009, while a Master Plan for
> the area is developed.  This section of the City presents a diverse
> collection of uses, ranging from the working port and large retail
> establishments in the southern portion to high-rise residential
> communities in the north.  Special land use controls and design
> guidelines will help promote long-term economic viability and to
> provide a framework for future growth.

Exhibit J at p. 1-2.

296.    Subsection 4 of the CRO prohibits certain uses.

297.    Subsection 5 of the CRO regulates the construction and use of the ground

floors of commercial buildings: 75% of the street frontage must be constructed of glass,

and certain uses must be included on the ground floor, either individually or in any

combination.

298.    Subsection 6 of the CRO mandates a 100-foot setback from the edge of the Delaware River.  Subsection 7 mandates the private construction of a recreational trail within the waterfront setback.  Subsection 8 mandates public access to the waterfront setback on all commercially zoned property.  Subsections 6, 7, and 8 do not apply to WRA's property.

299.    Subsection 9 of the CRO concerns the front yards of properties fronting on Delaware Avenue.  Subsections 10 and 11 concern off-street parking requirements.

300.    On January 28, 2010, Councilman DiCicco introduced Bill 100014 to amend the CRO.  Bill 100014 inserted a new subsection 12 in the CRO, which provides that "no height regulations shall apply to any parcel within the boundaries of this District, including but not limited to the provisions of §14-1610 ('Old City Residential Area Special District Controls')."  The Mayor signed Bill 100014 on March 17, 2010.  A certified copy of Bill 100014 is attached as Exhibit K.

301.    Subsection 13 (formerly section 12) of the CRO provides that no zoning permit may be issued for any commercially zoned property in the CRO district, unless the applicant submits, and the Planning Commission approves, a Plan of Development.  §14-1638(13)(a), Exhibit J at pp. 5-6.

302.    Originally, subsection 13 allowed the Planning Commission 180 days from August 17, 2009 to adopt objective standards for the review of PODs.  Bill 100014 extended the time for the Planning Commission to adopt regulations for the review of PODs from mid-February to mid-April, 2010.

303.    The Planning Commission published draft POD Regulations on January 19, 2010 and adopted final POD regulations on April 20, 2010.  A copy of the POD

Regulations as published on the Planning Commission's website at

www.philaplanning.org (visited on May 6, 2010) is attached as Exhibit L.

304.    On information and belief, Bill 100014 suspended height limits within the

CRO because the imposition of a 65' height limit east of I-95 as part of the extension of

the Old City Overlay by the March 2006 Ordinance was a mistake.

305.    Councilman Frank DiCicco admitted in his deposition that imposing the

65' height limit on the World Trade Center site was a mistake.

306.    At the February 16, 2010 Planning Commission meeting, Martin

Gregorski, a Planning Commission staff member, indicated that the 65' height restriction

conflicted with the dense development that was planned for the area where WRA's

property is located.  Speaking of the "encroachment" of the Old City Overlay on the

Central Delaware Riverfront District, Mr. Gregorski stated:

> This area was meant to be a very dense area.  You know,
> there was supposed to be dense development along the
> river and an overlay encroached on the area.  [2/16/2010
> Video at 50 sec. to 1:10 min.]
>
> The Old City Overlay encroached there.  The Old City
> Overlay has a 65 foot height limit from any area within the
> Central Delaware Riverfront Overlay.  What this Bill does
> is it removes this height limit.  [2/16/2010 Video at 1:35
> min. to 1:50 min.]

307.    When asked about the timing of Bill 100014, Mr. Gregorski stated:

> You know, I'm not sure what the timing of it was.  I see
> that there is a conflict between 65 feet, um, in Old City and
> this ... you know, the idea that this area is supposed to be a
> dense, you know, area, uh, supposed to be encouraging
> dense developments.  Basically, you know, I suspect it's
> that we didn't notice.  [2/16/2010 Video at 13:30 min. to
> 14:20 min.]

4472835

Video on PlanPhilly website at http://planphilly.com/pcpc-oks-overlay-height-controls
(visited on June 24, 2010).

308.    On information and belief, the CRO and Bill 100014 were prepared by
Councilman DiCicco's office and passed by City Council in accordance with the custom of
"councilmanic prerogative," similar to the March 2006 Ordinance as alleged in Count 15.

### CRO Provisions Concerning the POD Process

309.    The CRO and the POD Regulations effectively eliminate "by right"
zoning and "over-the-counter" zoning permits in every commercial district between I-95
and the Delaware River, including but not limited to the C-4 District.

310.    Subsection 13 states that the Planning Commission shall approve a POD
"only if the Commission has determined, in its discretion, that the Plan of Development
provides for development appropriate in scale, density, character and use for the
surrounding community." §14-1638(13)(a), Exhibit J at pp. 5-6.

311.    Subsection 13 provides that the Planning Commission's approval or
disapproval of a POD may be appealed directly to the Court of Common Pleas, unless the
applicant must apply to the Zoning Board of Adjustment for a variance.  §14-
1638(13)(b), Exhibit J at pp. 5-6.

312.    Subsection 13 provides that a POD will be deemed approved, if the
Planning Commission does not "approve, disapprove, conditionally approve or table a
proposed POD within 75 days after submission." §14-1638(13)(a), Exhibit J at pp. 5-6.
Thus, the Planning Commission can table an application indefinitely and refuse to act on
it, thereby rendering the "deemed approval" protection essentially meaningless.

313.    Subsection 13 requires the Planning Commission to adopt regulations "providing objective standards for such design review as may be necessary prior to implementing the provisions of this subsection 12 [sic]." §14-1638(13)(a), Exhibit J at p. 6 (emphasis supplied).

314.    The only legislative standards which the CRO provides concerning the adoption of regulations for the review of PODs are: (a) that such regulations must be "objective," §14-1638(13)(a); that the Planning Commission shall approve a POD only if it determines that the POD "provides for development appropriate in scale, density, character and use for the surrounding community," §14-1638(13)(a); and (c) the statement that "the District is established to protect the existing characteristics of the built and natural environment that are essential to achieving the working guidelines of the Civic Vision, adopted by the Philadelphia City Planning Commission on April 21, 2009, while a Master Plan for the area is developed," §14-1638(1)(h).

315.    The CRO does not define the phrase "development appropriate in scale, density, character and use for the surrounding community," and how it differs from the scale, density, character and use permitted by a property's base zoning.

316.    The CRO does not define the phrase "existing characteristics of the built and natural environment that are essential to achieving the working guidelines of the Civic Vision, adopted by the Philadelphia City Planning Commission on April 21, 2009."

317.    The Civic Vision itself does not designate any "existing characteristics" as "essential" to the broad development goals it identifies.  Moreover, the Civic Vision is a planning document, not a zoning document, and for that reason it is not pertinent to the use of any particular parcel.

318.    In addition, the Civic Vision is not the City's development plan for the Central Delaware Riverfront District.  Planning Commission Chairman Alan Greenberger has stated that the Planning Commission did not "adopt" the Civic Vision and only "accepted" the Civic Vision as a guideline for the development of a Master Plan.  Video Recording on PlanyPhilly Website at http://planphilly.com/pcpc-4 [53:15 to 54:10 min.] (visited on June 25, 2010).

319.    Section 1 of the POD Regulations states that the goals of the Civic Vision "were accepted by the Planning Commission on April 21, 2009 as the working guidelines for development and public policy planning in the area, now being developed in the master plan."  Exhibit L at p. 1.

### Provisions of the POD Regulations

320.    Section 3 of the POD Regulations sets forth items which an applicant for POD approval will be required to submit, as follows:

> Every new development or redevelopment has impacts on the immediate surroundings, the neighborhood, and the larger urban context.  The responsibility of protecting this public realm falls on the City Planning Commission.  The Plan of Development is an extension of this already existing charge.
>
> In reviewing a proposed POD, the City Planning Commission will consider any item that will have an effect or impact on this public realm.  Such items subject to the POD review will include:
>
> a)  The base zoning;
> b)  The proposed uses;
> c)  The density of the development, including the scale, height and massing of the structures as well as the unit count/composition;
> d)  The amenities included in the project, including the landscaping;
> e)  Any connections to neighborhood at large;

f) Street life activity/continuity;
g) Any proposed streetscape improvements;
h) Parking and traffic impacts, including where the buildings will be serviced;
i) The appearance of the building, including its form and materials;
j) The site layout/design; and
k) Any issues relating to sustainability.

While such a list obviously cannot be all-inclusive, it should serve as notice to developers bound by the POD, on what to expect from this review process.

Exhibit L at pp. 1-2.

321.   Section 3 of the POD Regulations makes a property's base zoning classification merely one of a number of items affecting the public realm which the Planning Commission will review in evaluating a POD.

322.   Even if a POD conforms in every respect with the provisions of the base zoning classification for the parcel, the Planning Commission must review the POD. POD Regulations, §1, second paragraph, Exhibit L at p. 1; and §14-1638(13)(a), Exhibit J at p. 5.

323.   Even if a POD conforms in every respect with the provisions of the base zoning classification for the parcel, the Planning Commission has discretion to find that the POD is not "appropriate in scale, density, character, and use for the surrounding community." POD Regulations, §6(a), Exhibit L at p. 3; and §14-1638(13)(a), Exhibit J at p. 5. In other words, the Planning Commission has discretion to down-zone a parcel, if it determines that the neighborhood is not appropriate for development of the scale, density, character, and use permitted by the base zoning.

324.   The POD Regulations contain no quantitative or qualitative standards or guidelines for evaluating the various items listed in Section 3, including, without

limitation, allowable scale, height, massing, unit count and composition, parking and traffic impacts, sustainability, connections to the neighborhood, and street life activity.

325.    The POD Regulations provide no guidance as to what commercial development will be approved and what will not be approved between I-95 and the Delaware River.  As a result, no decision of the Planning Commission concerning a POD can be considered objective.

326.    The list of items in Section 3 is not complete.  Section 3 of the POD Regulations states that the list of items "cannot be all-inclusive" (emphasis supplied) and further provides that the Planning Commission "will consider any item that will have an effect or impact on this public realm," which includes "the immediate surroundings, the neighborhood, and the larger urban context."  POD Regulations §3, second and last full paragraphs, Exhibit L at pp. 1-2.

327.    Section 4 of the POD Regulations further states that a POD submission shall include, besides the listed items, "any other information that the Commission deems necessary for a decision."  POD Regulations §4(p), Exhibit L at p. 2

328.    The statement in Section 3 of the POD Regulations that the criteria for consideration "cannot be all inclusive" is a repudiation of the constitutional principles of due process and equal protection that laws not be unduly vague, that they be understandable to the persons they purport to regulate, and that they be capable of uniform application.

329.    On information and belief, the Planning Commission was well aware that the POD Regulations were vague, subjective and incomplete at the time the Planning Commission adopted them.  At the Planning Commission's April 20, 2010 meeting,

4472835                                        9

Commission Member Natalia Urtecho indicated that the standards for review of PODs needed more work. Chairman Alan Greenberger stated his view that "we cannot possibly define every circumstance that might come up narrowly so that we have an objective, so-called objective, measure to guide this." PlanPhilly website at http://planphilly.com/pcpc-3, "Plan of Development Approvals" video recording, at 50:00 to 52:05 minutes (visited on June 24, 2010).

330.   The POD Regulations place on the applicant the burden of proving that "the POD provides for development appropriate in scale, density, character and use for the surrounding community," without providing a complete list of submission requirements and without providing any objective standards by which an applicant may know what it is he must prove. POD Regulations §4 and §6(a), Exhibit L at p.2 and pp. 5-6.

### Constitutional Defects of the CRO and POD Regulations

331.   The CRO and the POD Regulations violate the principle of separation of powers and the Philadelphia Home Rule Charter because they empower the Planning Commission to disregard base zoning classifications and, in effect, to down-zone commercial properties within the boundaries of the CRO on a case-by-case basis in the absence of clear and definite legislative standards and thus constitute an improper delegation of legislative power to an executive body.

332.   The CRO and POD Regulations, by placing full discretion in the Planning Commission as to how, or whether, land may be used, have impermissibly delegated the City's zoning power and the City's police power to the Planning Commission.

333.   The CRO and the POD Regulations violate the principle of equal protection, because the standards for approval and disapproval of PODs are vague and

indefinite. The question of appropriate development for the surrounding community is to be determined by the Planning Commission as each case is presented, inviting both *ad hoc*, inconsistent zoning regulation, as well as impermissible discrimination in favor of some owners at the expense of others.

334.    The CRO and the POD Regulations violate the principle of substantive due process, because the POD review is (a) arbitrary and capricious, in that objective standards for evaluating PODs are lacking; (b) irrational, in that density of development (including scale, height, massing, and unit count) cannot reasonably be evaluated for consistency with a Civic Vision that the Planning Commission has not adopted as an official planning document, or with a Master Plan which the Planning Commission has not yet developed and translated into a new zoning map for enactment by City Council; and (c) unrelated to any legitimate planning purpose, in that the POD process derogates from existing zoning classifications on a parcel-by-parcel basis and does not constitute a comprehensive plan or an updated zoning map.

**Impermissible Delegation of Land Use Control to Civic Associations**

335.    The suspension of the 65' Height Limit does not restore the status quo that prevailed before the enactment of the March 2006 Ordinance. On the contrary, the suspension of the 65' height limit was coordinated with the issuance of POD Regulations which leave WRA without the ability to obtain a zoning permit "by right" and institutionalize the participation of civic associations in the issuance of zoning permits.

336.    Before the adoption of the POD Regulations, Councilman DiCicco proposed to down-zone WRA's property during the pendency of this lawsuit.

337.   On the same day that Councilman DiCicco introduced Bill 090170-A to create the CRO, he also introduced Bill 090169, to permanently down-zone five parcels in the River's Edge/Penn's Landing North neighborhood from C-4 to C-3, including WRA's property at Callowhill Street and North Delaware Avenue.

338.   On information and belief, the combined purpose of Bills 090169 and 090170-A was to prohibit high-rise development in the River's Edge/Penn's Landing North neighborhood except upon the consent of interested civic associations and Councilman DiCicco's office, similar to the purpose of the 65' height limit as alleged in Count 15 of this complaint.

339.   The C-3 zoning classification has much less generous FAR allowances and bonuses than C-4.  If passed, Bill 090170 would have restricted WRA's development rights in much the same way as the 65' height limit.  WRA would have been unable to proceed with its World Trade Center project without a variance, which it was unlikely to obtain without the consent of the Old City and River's Edge Civic Associations.

340.   After WRA and other property owners vigorously opposed the down-zoning, Councilman DiCicco left their C-4 zoning in place.

341.   On information and belief, Councilman DiCicco purposely delayed the suspension of the 65' height limit until the Planning Commission proposed the POD Regulations pursuant to the CRO.

342.   The CRO and the POD Regulations institutionalize the participation of neighborhood civic associations in the issuance of zoning permits for commercial projects within the boundaries of the CRO.  Section 4(b) of the POD Regulations requires an applicant for a zoning permit to discuss his proposal with "local residents at a meeting

where a member of the Commission staff was also present." Section 6(a) requires an applicant to prove that his proposal "provides for development appropriate in scale, density, character and use for the surrounding community."

343.    Mandatory consultation with local residents is not consistent with the issuance of zoning permits "by right."

344.    Requiring an applicant to demonstrate that his proposal "provides for development appropriate in scale, density, character and use for the surrounding community" is not consistent with the issuance of zoning permits "by right."

345.    On information and belief, the Planning Commission included Section 4(b) and Section 6(a) in the POD Regulations to give civic associations a large measure of control over commercial projects within the boundaries of the CRO, which can be enforced: (a) through the right to appeal the "appropriateness" of the proposed development, similar to the right of civic associations to oppose and appeal variances from the 65' height limit as alleged in Count 15; and (b) through the ability of Councilman DiCicco's office to pass ordinances down-zoning or up-zoning particular parcels within the First Councilmanic District in accordance with the custom of "councilmanic prerogative," as alleged in Count 15 of this complaint.

346.    On information and belief, the CRO and the POD Regulations do nothing to cure the problem of *ad hoc* zoning based on the custom of "councilmanic prerogative." Indeed they make the problem worse.

347.    Under Section 6(b) of the POD Regulations, the Planning Commission can significantly delay action on a POD by requesting additional items of information pursuant to Section 4(p), inasmuch as each request for an additional item renders the

existing submission "incomplete" for purposes of Section 6(b) and restarts the 75-day

period for rendering a decision on the applicant's plan of development.  Similarly, every

modification of a POD at the Planning Commission's request restarts the 75-day period.

348.    On information and belief, the CRO and the POD Regulations are

designed and intended to pressure applicants to seek the consent of civic associations and

not to build all that their base zoning classifications would otherwise allow in terms of

scale, density, character and use.

### Harm from the CRO and the POD Regulations

349.    As a result of the foregoing constitutional defects and the impermissible

delegation of a measure of land use control to civic associations, the CRO and the POD

Regulations eliminate "by right" zoning and "over-the-counter" permits in every

commercial zoning district between I-95 and the Delaware River.

350.    The elimination of "by right" zoning and "over-the-counter" zoning

permits impairs the developability and thus the value of all commercially zoned parcels

within the CRO, including WRA's site, because developers, buyers, lenders and potential

anchor tenants are unable to determine from the CRO and POD Regulations what can and

what cannot be built on a particular parcel, or to plan a multi-phase project requiring

multiple zoning permits.

351.    On information and belief, a number of waterfront property owners have

filed tax appeals on the ground that the CRO and the POD Regulations have substantially

impaired their property values.  WRA has also suffered substantial diminution of its

property value as a result of the CRO and the POD Regulations, but has not filed a tax

appeal due to the KOZ status of its property.

352.    Notwithstanding the current suspension of the 65' height limit, the CRO and the POD Regulations make it impossible for WRA to carry out a program of phased high-rise development on its site, as planned by WRA and encouraged by the City for almost twenty years before the enactment of the March 2006 Ordinance.

353.    Because the City has created a POD approval process having no uniform, objective standards, it is impossible for WRA and its potential lenders and tenants to know what can and what cannot be built on WRA's site.

354.    Because the City has created a POD approval process having no uniform, objective standards, it is impossible for WRA to know whether a development plan for which there is a market will be approved, or, conversely, whether there will be a market for whatever modified development plan the Planning Commission decides to approve.

355.    WRA continues to suffer the arbitrary impairment of its unrestricted C-4 development rights by facially invalid zoning ordinances and regulations that subject WRA to unlawful *ad hoc* zoning.

356.    Notwithstanding the current suspension of the 65' height limit, the CRO has prevented and will continue to prevent WRA from developing its World Trade Center Project.

### Impermissible Development Moratorium under Pennsylvania Law

357.    On information and belief, the CRO and the POD Regulations are designed to discourage large-scale commercial development along the Delaware Waterfront and to operate as a *de facto* development moratorium pending the adoption of a Master Plan and the zoning remapping of the area covered by the CRO.

358. Section 4 prohibits not only nuisance uses but also typical interim uses of commercial property, such as parking lots and self-storage facilities.

359. Sections 6, 7, and 8 purport to require waterfront property owners to allow public use of a 100' setback and construct a public recreational trail without compensation.

360. The POD Regulations create an expensive process for commercial PODs which can easily cost half a million dollars or more, without objective standards affording reasonable certainty as to what will be approved and without a definite timeline for obtaining a determination.

361. The Pennsylvania Supreme Court has held that "the power to suspend land development has historically been viewed as a power distinct from and not incidental to any power to regulate land development" and that "the power to impose a moratorium is not essential and necessary for the effectuation of a municipality's power to regulate land use." Thus, a municipality may not suspend development absent a specific grant of authority by the state legislature. Naylor v. Township of Hellam, 773 A.2d 770, 775-776 (Pa. 2001).

362. The state legislature has not granted the City of Philadelphia the power to suspend development.

363. To the extent that §14-1638 is designed to operate as a *de facto* moratorium on commercial development along the Central Delaware Riverfront, it is invalid and unenforceable under Pennsylvania law.

WHEREFORE, Plaintiff Waterfront Renaissance Associates demands relief declaring subsection 13 of §14-1648 of the Philadelphia Code and the Planning Commission's POD Regulations invalid, permanently enjoining their enforcement, and awarding plaintiff such other and further relief as this Court deems just and equitable, including monetary damages, costs and attorneys' fees.

Respectfully submitted,

OBERMAYER REBMANN MAXWELL &
HIPPEL, LLP

_____/S/_____

Thomas A. Leonard, Esquire
Richard P. Limburg, Esquire
John E. Ryan, Esquire
H. David Seidman, Esquire
One Penn Center, 19th Floor
1617 John F. Kennedy Blvd.
Philadelphia, PA 19103-1895

*Counsel for Plaintiff,*
*Waterfront Renaissance Associates*

Date: June 25, 2010

# EXHIBIT J

# EXHIBIT J

## § 14-1638. Central Delaware Riverfront Overlay District. <u>555.13</u>

(1)   *Legislative Findings.*

(a)   In 2006, Mayor John Street issued an Executive Order creating the Central Delaware Advisory Group (CDAG), chaired by the Philadelphia City Planning Commission, comprised of neighborhood groups and interested parties. PennPraxis, the non-profit, clinical consulting arm of the School of Design of the University of Pennsylvania, performed as the primary consultant to the Group. CDAG's goal was to create a vision for the future development of the Central Delaware riverfront. Over the following year, CDAG, Philadelphia's citizens, state and city government leaders, property owners, and experts from across the country, developed a "Civic Vision for the Central Delaware - 2007" for the Central Delaware River waterfront.

(b)   Along the Delaware Riverfront, there are a number of underutilized, vacant parcels that tend to contribute to the deterioration of the economics and aesthetics of the area.

(c)   Over the past several years, the public has taken a large interest in riverfront development and public access. The City must take steps to consider and protect the long-term future of the riverfront in order to support a mix of housing, retail, commercial activity, industry, port-related uses, parks and recreational activities.

(d)   The Delaware Riverfront is important to the economic vitality of the City. Encouraging a mixture of uses will drive new economic growth and bring life to the waterfront.

(e)   Developing a continuous recreational experience along the riverfront, allowing continuous public access, will enhance public space and the economic vitality of the area. The creation of public space and access along the riverfront must balance the property rights and development goals of landowners, protect the public interest, incorporate community values and subscribe to high standards of ecologically-responsible urban development.

(f)   The Delaware Riverfront is a resource available to development that will attract new families to the City, create permanent jobs and strengthen the tax base.

(g)   Retail shops, building lobbies, theaters, restaurants, galleries, exhibitions, churches, etc., give vitality to streets which, in turn, will benefit all of the workers and visitors to the riverfront. It is in the interest of the City to create and enhance a pleasant and active ambiance, thereby creating a vital public asset for the residents, users and visitors of the waterfront. It is important to require active street level usage of buildings and lots along these streets.

(h)   This District is established to protect the existing characteristics of the built and natural environment that are essential to achieving the working guidelines of the Civic Vision, adopted by the Philadelphia City Planning Commission on April 21, 2009, while a Master Plan for the area is developed. This section of the City presents a diverse collection of uses, ranging from the working port and large retail establishments in the southern portion to high-rise residential communities in the north. Special land use

controls and design guidelines will help promote long-term economic viability and to provide for a framework for future growth.

(2)   *Conflicting Provisions.* The provisions of this Section apply in addition to any underlying zoning provisions or overlays applicable to any property in this District. When the provisions of this Section are in irreconcilable conflict with any other provision of this Title, the provisions of this Section shall apply; provided, however, that, in the event of any development or use authorized by or any conflict with any provision of <u>Chapter 14-400</u>, the provision of <u>Chapter 14-400</u> shall apply; and provided further that the provisions of this Section shall not apply to any parking area permitted by Section <u>14-408</u>(1)(a)(.1)(A) or (B) (relating to off-site parking for gaming facilities).

(3)   *District Boundaries.* The Central Delaware Riverfront Overlay District shall consist of all properties located in the area bounded by the south curbline of Allegheny Avenue on the north, the Delaware River on the east, the north curbline of Oregon Avenue on the south and the east curbline of Interstate 95 on the west. Unless otherwise specified, the provisions of this Section shall apply to all properties in the Central Delaware Riverfront Overlay District.

(4)   *Prohibited Uses.* The following uses shall be prohibited in the Central Delaware Riverfront Overlay District:

(a)   Non-Accessory Signs;

(b)   Private bus terminals;

(c)   Buildings or structures with gross floor area in excess of 40,000 square feet, with a single retail store as a principal or predominant use;

(d)   East of Delaware Avenue or Columbus Boulevard: Parking garages as a main use, except for existing structures. West of Delaware Avenue or Columbus Boulevard: Parking Garages are prohibited except when approved by the Planning Commission as part of the approval of a Plan of Development as set forth in subsection (12) of this Section;

(e)   Parking lots as a main use;

(f)   Self-storage facilities;

(g)   Adult book stores;

(h)   Adult mini-motion picture theater;

(i)   Adult motion picture theater;

(j)   Cabaret;

(k)   Massage businesses as regulated by §§ <u>9-610</u> and <u>9-611</u> of The Philadelphia Code;

(l)     Drug paraphernalia stores;

(m)    Adult video stores;

(n)     Check Cashing Establishments;

(o)     Pawnshops;

(p)     Adult Modeling or Photography Studio;

(q)     Adult Spa or Health Club;

(r)     Adult Entertainment Store;

(s)     Penal and Correctional Institution (private);

(t)     Penal and Correctional Institution (public);

(u)     Payday Lenders;

(v)     Gun Shops.

(5)     *Active Use Requirements.* For buildings in commercially zoned districts with street frontage on either Delaware Avenue or Columbus Boulevard, at least seventy five percent (75%) of every ground floor street frontage shall be constructed of glass or other transparent material. Such buildings shall include the following uses, either individually or in any combination, on the ground floor of the building:

(a)     Retail sales areas and restaurants;

(b)     Office, hotel, residential and/or theater lobbies;

(c)     Libraries, museums, galleries and exhibition space;

(d)     Places of worship;

(e)     Enclosed public space, enclosed gardens, public rooms, through block connections; and

(f)     Entrances to public transit stations and/or a public transit concourse.

(6)     *Waterfront Setback.* An unencumbered setback shall be provided with the following conditions:

(a)     Such setback is determined from the western Bulkhead Line of the Delaware River as amended by the Secretary of War on September 10, 1940. If, due to erosion, accretion or human activity, the top of the west bank of the Delaware River has substantially moved away from the western Bulkhead Line, then an unencumbered setback shall be provided from the most easterly line of the property along the top of the

west bank. Any discrepancies between the physical top of the bank and Bulkhead Line along the west bank of the Delaware River shall be surveyed by the District Surveyor and the Board of Surveyors of the Department of Streets shall keep the survey on file and available for public inspection.

(b)   Except where not feasible as determined by the Commission, such setback shall be no less than 100 feet or 10 percent of the lot, whichever is less, not to include submerged land. The Commission shall not grant an exception based on infeasibility other than pursuant to objective standards adopted by regulation, which regulations shall be adopted within one hundred eighty (180) days of the effective date of this Section.

(c)   Such setback shall contribute to any open space, open area or yard requirements of the underlying zone.

(d)   No setback shall be required on existing piers. Nothing in this Section shall relieve the applicant from any requirements of the Pennsylvania Department of Environmental Protection or the United States Army Corps of Engineers.

(7)   *Recreational Trail.*

(a)   In commercially zoned districts, no construction, improvement or major alterations shall be permitted unless, in conjunction with such activity, the owner or developer creates a recreational trail within the waterfront setback which the Planning Commission approves as consistent with the Civic Vision for the Central Delaware 2007, amendments to this Civic Vision or any subsequent plan adopted by the Planning Commission for this District.

(b)   In lieu of developing a recreational trail, the owner of the waterfront setback may dedicate the waterfront setback to the City or the City's responsible agent. Upon dedication and acceptance, the City or its agent shall be responsible for maintaining the waterfront setback as well as constructing and maintaining a recreational trail. The City or its agent shall have care, custody and control of the waterfront setback and recreational trail. Dedication may be made in a deed of dedication, deed of easement or other similar transfer acceptable to the City. If the property owner does not dedicate the waterfront setback to the City or its agent, the property owner shall be responsible for maintaining the waterfront setback open to the public, constructing a recreational trail and maintaining the recreational trail.

(c)   The recreational trail may include one or any combination of benches, picnic tables, pedestrian lighting, bikeways, parks, decks, observation towers, piers, boat-launching ramps, transient moorage, interpretive centers, displays of maritime history, or other areas serving as a means of view and/or physical approach to public waters for the public.

(d)   The recreational trail shall be open twenty-four (24) hours a day, except where the Commission determines good cause exists for limited closures or limitations on the types of activities permitted.

(e)   Adjacent lots shall have access to said recreational trail. In instances where the trail has been dedicated to the City or the responsible agent of the City, adjacent lots

shall continue to have access to said trail. In no instance shall the creation or dedication of the trail diminish the right of the adjacent owner(s) of access to, from and over the trail.

(f)   In instances where the trail has been dedicated to the City or the responsible agent of the City, for purposes of calculating the allowable gross floor area of the site, the dedicated portion of the lot shall continue to be counted in the allowable gross floor area calculation for the retained portion of the lot.

(8)   *Regulated Public Access.* In commercially zoned districts, no construction, improvement or major alterations shall be permitted unless, in conjunction with such activity, the owner or developer provides one or more open air access paths to the waterfront setback. The cumulative width of all such access paths for any lot must be no less than twenty-five (25) feet. Each individual public access path shall be no less than twelve (12) feet wide and shall include an improved walkway of no less than five (5) feet in width. Public access paths shall be open twenty-four (24) hours a day, except where the Commission determines good cause exists for limited closures or limitations on the types of activities permitted. Adjacent property owners whose properties all share a common boundary line may share access via an easement agreement between the parties. Evidence of such an easement must be submitted to the Department prior to the issuance of any zoning permits. A legally open street which provides direct access to the waterfront setback, if such street includes an improved walkway, may substitute for other access requirements.

(9)   *Front Yard.* For all new construction on properties fronting on Delaware Avenue or Christopher Columbus Boulevard, front yards shall be permitted; provided, that such front yard is landscaped or accessible to pedestrians. However, in no case shall any building be constructed so that the front yard when combined with the width of the sidewalk exceeds 25 feet. Seventy-five (75) percent of the building line shall be occupied by the façade of the main building.

(10)   *Off-Street Parking.* Open-air accessory parking lots with five or more parking spaces shall comply with the provisions of Section 14-1403(6) regardless of the underlying zoning classification.

(11)   *Auto-Share.* Notwithstanding the provisions of Chapter 14-1400, the total number of required parking spaces for a property may be reduced through the addition of auto-share spaces. One auto-share space may replace four (4) required parking spaces. In no case may the number of auto-share spaces provided reduce the required number of parking spaces by more than forty (40) percent.

(13)   (12)   *Plan of Development.*

(a)   For all properties east of Columbus Boulevard/Delaware Avenue or adjacent to the Delaware River and for all other commercially zoned properties, no zoning permits shall be issued unless (i) the applicant shall have first submitted to the City Planning Commission, and the City Planning Commission shall have approved, a Plan of Development, which shall be approved by the Commission only if the Commission, in its discretion, has determined that the Plan of Development provides for development appropriate in scale, density, character and use for the surrounding community, and (ii)

the Planning Commission determines that the requested permits are in conformity with the approved Plan of Development. If the Commission fails to approve, disapprove, conditionally approve or table a proposed Plan of Development within seventy-five (75) days after submission of complete plans to the Commission, the approval of the Commission shall be presumed. Within one hundred eighty (180) days of the effective date of this Ordinance the Commission shall adopt regulations providing objective standards for such design review as may be necessary, prior to implementing the provisions of this subsection 12.

(b)     The approval or disapproval of a Plan of Development by the Commission shall constitute the final decision of the City on the proposal, and may be challenged by direct appeal to the Court of Common Pleas; provided that any applicant may pursue a request to the Zoning Board of Adjustment for a variance, pursuant to Section 14-1801(1)(c).

(14)     (13)     The provisions of this Section shall expire upon Council's adoption of an Ordinance enacting land use and zoning controls that includes the boundaries of this District consistent with a Master Plan adopted by the Philadelphia City Planning Commission.

555.13     Added, Bill No. 090170-A (approved August 17, 2009). Enrolled bill numbered this as Section 14-1636; renumbered by Code editor.

# EXHIBIT K

# EXHIBIT K

# City of Philadelphia



(Bill No. 100014)

AN ORDINANCE

Amending Section 14-1638, entitled "Central Delaware Riverfront Overlay District," by establishing no height limit and by making technical changes, all under certain terms and conditions.

*THE COUNCIL OF THE CITY OF PHILADELPHIA HEREBY ORDAINS:*

SECTION 1.  Section 14-1638 of The Philadelphia Code is hereby amended to read as follows:

§ 14-1638. Central Delaware Riverfront Overlay District.

\*          \*          \*

(7)     Recreational Trail.

(a)     In commercially zoned districts, no construction, improvement or major alterations shall be permitted unless, in conjunction with such activity, the owner or developer creates a recreational trail within the waterfront setback which the Planning Commission approves as consistent with the Civic Vision for the Central Delaware 2007, amendments to this Civic Vision or any subsequent plan adopted by the Planning Commission for this District.

(b)     In lieu of developing a recreational trail, the owner of the waterfront setback may dedicate the waterfront setback to the City or the City's responsible agent.  Upon dedication and acceptance, the City or its agent shall be responsible for maintaining the waterfront setback as well as constructing and maintaining a recreational trail.  The City or its agent shall have care, custody and control of the waterfront setback and recreational trail.  Dedication may be made in a deed of dedication, deed of easement or other similar transfer acceptable to the City.  [If the property owner does not dedicate the waterfront setback to the City or its agent, the property owner shall be responsible for maintaining the waterfront setback open to the public, constructing a recreational trail and maintaining the recreational trail.]

\*          \*          \*

*(12)     Height Regulations.  Except for parcels of land zoned residential or C-2 commercial, no height regulations shall apply to any parcel within the boundaries of this*

# City of Philadelphia

BILL NO. 100014 continued                                          Certified Copy

*District, including but not limited to the provisions of §14-1610 ("Old City Residential Area Special District Controls").*

([12]*13*)  Plan of Development.

(a)      For all properties east of Columbus Boulevard/Delaware Avenue or adjacent to the Delaware River and for all other commercially zoned properties, no zoning permits shall be issued unless (i) the applicant shall have first submitted to the City Planning Commission, and the City Planning Commission shall have approved, a Plan of Development, which shall be approved by the Commission only if the Commission, in its discretion, has determined that the Plan of Development provides for development appropriate in scale, density, character and use for the surrounding community, and (ii) the Planning Commission determines that the requested permits are in conformity with the approved Plan of Development.  If the Commission fails to approve, disapprove, conditionally approve or table a proposed Plan of Development within seventy-five (75) days after submission of complete plans to the Commission, the approval of the Commission shall be presumed.   Within [one hundred eighty (180)] *two hundred forty (240)* days of the effective date of this Ordinance the Commission shall adopt regulations providing objective standards for such design review as may be necessary, prior to implementing the provisions of this subsection 12.

\*            \*            \*

([13]*14*)  The provisions of this Section shall expire upon Council's adoption of an Ordinance enacting land use and zoning controls that includes the boundaries of this District consistent with a Master Plan adopted by the Philadelphia City Planning Commission.

\*            \*            \*

SECTION 2.  This Ordinance shall become effective immediately.

---

**Explanation:**

[Brackets] indicate matter deleted.
Italics indicate new matter added.

# City of Philadelphia

BILL NO. 100014 continued

Certified Copy

# City of Philadelphia

BILL NO. 100014 continued

Certified Copy

CERTIFICATION:  This is a true and correct copy of the original Bill, Passed by the City Council on March 4, 2010.  The Bill was Signed by the Mayor on March 17, 2010.

*Michael A. Decker*

Michael A. Decker
Chief Clerk of the City Council

# EXHIBIT L

# EXHIBIT L

CITY OF PHILADELPHIA
CITY PLANNING COMMISSION

**Regulations Regarding Approval of a Plan of Development Pursuant to § 14-1638 of The Philadelphia Code for Properties Located in the Central Delaware Riverfront Overlay District**

## Section 1. Preamble

These regulations implement the Central Delaware Riverfront Overlay District (Bill No.090170-A) that was signed into law on August 17, 2009 and codified in Section 14-1638 of The Philadelphia Zoning Code. The purpose of the Central Delaware Riverfront Overlay is to provide development guidance and controls during the period in which a public policy master plan is prepared for the Central Delaware riverfront. These regulations are not intended to take the place of a master plan, but to give developers and communities more certainty as to the expectations of the City as to both process and intent.

Given the sensitivity of development in the Central Delaware riverfront and the extraordinary attention planning along the riverfront has received in the last several years, the Central Delaware Riverfront Overlay calls for projects located east of Columbus Boulevard/Delaware Avenue or adjacent to the Delaware River and for all other commercially zoned properties in the Central Delaware Riverfront District to be subject to a Plan of Development. The Plan of Development process will require the approval of the Planning Commission for each project, even if the project is otherwise in conformance with the regulations of the base zoning for a given parcel. The purpose of the Plan of Development process is to help ensure that development proposals conform to the goals articulated in the Civic Vision for the Central Delaware - 2007. These goals were accepted by the Planning Commission on April 21, 2009 as the working guidelines for development and public policy planning in the area, now being developed in the master plan.

Plan of Development review is not intended to be an open-ended review of any aspect of the proposed development, but to be limited to certain key issues that are regarded as potentially having an impact on the quality and character of the surrounding community.

## Section 2.   Definitions

*"Commission":* The Philadelphia City Planning Commission

*"Executive Director":* Executive Director of the Philadelphia City Planning Commission

*"POD":* Plan of Development

## Section 3.  Scope

Pursuant to Subsection (12) of Section 14-1638 of The Philadelphia Zoning Code, entitled "Central Delaware Riverfront Overlay District," the City Planning Commission hereby adopts the following rules and regulations governing the review and approval of "Plans of Development."

Every new development or redevelopment has impacts on the immediate surroundings, the neighborhood, and the larger urban context. The responsibility of protecting this public realm falls on the City Planning Commission. The Plan of Development is an extension of this already existing charge.
In reviewing a proposed POD, the City Planning Commission will consider any item that will have an effect or impact on this public realm. Such items subject to the POD review will include:

1

     (a) The base zoning;
     (b) The proposed uses;
     (c) The density of the development, including the scale, height and massing of the structures as well as the unit count/composition;
     (d) The amenities included in the project, including the landscaping;
     (e) Any connections to neighborhood at large;
     (f) Street life activity/continuity;
     (g) Any proposed streetscape improvements;
     (h) Parking and traffic impacts, including where the buildings will be serviced;
     (i) The appearance of the building, including its form and materials;
     (j) The site layout/design; and
     (k) Any issues relating to sustainability.

While such a list obviously cannot be all-inclusive, it should serve as notice to developers bound by the POD, on what to expect from this review process.

### Section 4.   Submission Requirements

A complete POD submission shall include the following items; however, the Commission may in its discretion waive one or more of these requirements:

     (a) A narrative demonstrating how the project is "appropriate in terms of scale, density, character and use for the surrounding community";
     (b) A letter from the developer stating that he or she has met with local residents at a meeting where a member of the Commission staff was also present, to discuss the relevant proposal, or a letter indicating that substantial efforts have been made by the developer to hold such a meeting, but such a meeting never took place;
     (c) A Site Plan, including a survey, showing the boundaries, area, length and width dimensions of the site(s), including existing conditions;
     (d) The proposed maximum gross floor area;
     (e) The dimensions and heights of the proposed structures or existing structures to be retained, and the use or uses intended for each such structure;
     (f) The gross floor area and occupied area of all buildings on the property;
     (g) The dimensions and location of all parking areas, all driveways leading thereto, and all other private drives, ways or streets intended for use by automobile traffic;
     (h) The dimensions and location of all off-street loading facilities;
     (i) The dimensions and locations of all signs;
     (j) A landscaping plan, including the dimensions and characteristics of any open space;
     (k) A traffic study and mitigation plan for any POD which includes either a minimum of 25 new dwelling units or a minimum of 10,000 square feet of new retail space;
     (l) A parking management plan describing the proposed policy on and resources for parking for patrons, employees and managers, and anticipated traffic and parking management resources;
     (m) Building floor plans, elevations (which must indicate the location of all materials), sections and renderings, including a materials board;
     (n) Identification of all public and private areas;
     (o) A storm water management plan;
     (p) Any other information that the Commission deems necessary for a decision; and
     (q) To the extent applicable, a plan for a recreational trail along the waterfront, which shall include the following:

2

1) a minimum of twelve (12) foot wide trail surface with a three (3) foot shoulder, and is designed in such a manner as to accommodate emergency vehicle access;
2) plans for the connection of the trail to adjacent properties; and
3) compliance with all applicable ADA requirements.

## Section 5.  Hearings

(a) Hearings on POD proposals will be conducted at regularly scheduled Commission meetings, unless otherwise determined by the Commission in its discretion.  Except as otherwise provided in these regulations, there will be at least two public meetings of the Commission to consider each POD proposal. The first meeting will be an informational only meeting at which no Commission action will be taken. The Commission will set aside a reasonable amount of time at this meeting to take public comment on the POD proposal from anyone present at the meeting.  The second meeting will provide a formal hearing on the POD.  The Commission's decision will be taken at the conclusion of the formal POD hearing. Properties with a base zoning of "C1" or "C2" Commercial shall be exempt from the requirement of an informational only meeting.

(b) The Commission's decision on a proposed POD shall be by vote of a majority of the members present and constituting a quorum at a POD hearing.

(c) A POD hearing shall be open to the public, with reasonable notice and opportunity provided for public comment. Notice of a POD submission shall be posted on the property and on the Commission's website at least fourteen (14) days prior to the scheduled POD hearing.

(d) The staff of the Commission will present the POD proposal at the hearing with their recommendations.

(e) The Commission shall have the power to administer oaths for the testimony of witnesses at a POD hearing.

(f) The applicant shall be given reasonable notice of the hearing and an opportunity to present relevant evidence and testimony of witnesses in support of the POD.  Reasonable cross-examination shall be permitted.  The applicant may appear in person or by his attorney.

(g) The Commission may allow, in its discretion, persons demonstrating a direct interest in the decision a reasonable opportunity to present relevant evidence, to have witnesses testify on their behalf, and to cross-examine adverse witnesses.

(h) Testimony given at a POD hearing shall be recorded and a full and complete record shall be kept of the proceedings.

## Section 6.  Decisions of the Commission

(a) At a formal POD hearing, the Commission will either approve, conditionally approve, deny or table the POD for later action.  The Commission shall approve the POD only if it determines, based on its review of the submission and evidence presented, that the POD provides for development appropriate in scale, density, character and use for the surrounding community.  As required by Section 14-1638 of The Philadelphia Zoning Code, entitled "Central Delaware Riverfront Overlay District," the Commission will consider criteria including but not limited to the following:

3

(i)     <u>Uses</u>:  Section 14-1638 prohibits certain uses and requires other 'active uses' under certain conditions.  POD review will confirm that the proposed development is in conformance with Section 14-1638 and, in cases where the proposed use is not clearly defined in Section 14-1638, make a determination as to the appropriateness of the proposed use in relation to uses in the immediate area and the broader goals of enlivening the public environment at or near the riverfront.

(ii)    <u>Waterfront Setback</u>:  Section 14-1638 requires an unencumbered setback of certain dimensions for the purposes of public access by foot and bicycle.  The Commission, in its discretion, may decide that a waterfront setback is infeasible in certain locations.  Existing structures, topography, incompatible land use, and any negative impact on the health, safety, or welfare of the public may be considered in making this determination.  Recognizing that each site is different in dimension and that the required setback has implications for development on a given site, POD review will determine whether the required setback is feasible, and if not, establish the degree of setback that is feasible to ensure the potential for a continuous public path on or near the riverfront.

(iii)   <u>Waterfront Access</u>:  POD review will determine the adequacy and appropriateness of the location of any required public access to the riverfront and will also determine limitations on the public hours of access based on issues of public safety and public health.

(iv)   <u>Front Yard</u>:  POD review will determine whether the landscape and hardscape design in any setback from the property line is appropriately open and visible to building and public space entrances.

(v)    <u>Aesthetics</u>:  POD review will only comment on the overall aesthetics of a proposed development if, in the opinion of the Commission, specific proposals have a clear and definable adverse impact on the development potential and character of the surrounding area.

(b) The Commission shall render a decision within seventy-five (75) days of receiving a POD submission that complies with the requirements of Section 4 of these regulations.  If the Commission fails to render a decision within seventy-five (75) days of a complete POD submission, the approval of the Commission shall be presumed.  If any amendments are made to the POD, whether at the request of the Commission or the applicant, the Commission shall have seventy-five (75) days from the date of amendment to render a decision.

(c) A decision of the Commission on a POD shall be in writing, shall contain findings and conclusions supporting the decision, and shall be served upon the applicant and his or her attorney of record and on such other persons as have notified the Commission in writing of their interest in the matter.

(d) The approval (with or without conditions) or disapproval of a POD by the Commission shall constitute the final decision of the City on the POD proposal.

**Section 7.  Review of Zoning Permit Applications**

4

The Executive Director is hereby authorized to review any zoning permit applications issued on properties within the district, to determine whether or not such permits would be in conformity with the approved POD.

**Section 8.  Appeals**

Any person aggrieved by an approval (with or without conditions) or denial of a POD proposal by the Commission may appeal the decision to the Court of Common Pleas.

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

CMR D.N. CORP. AND MARINA TOWERS LTD.
T/A WATERFRONT RENAISSANCE
ASSOCIATES

     Plaintiff

        v.

CITY OF PHILADELPHIA, et al.

     Defendants

NO. 2:07-cv-01045-LS

## CERTIFICATE OF SERVICE

I, H. David Seidman, Esquire, hereby certify that on this 25th day of June 2010 a true and correct copy of the foregoing Motion for Leave was filed electronically, and made available for viewing and downloading from the ECF system, and served as follows:

**VIA ECF**

Benjamin M. Mather , Esquire
Robert D. Aversa, Esquire
City Solicitor's Office
1515 Arch Street, 17th Floor
Philadelphia, Pa 19102

*Counsel for Defendants, City of Philadelphia, City
Council of the City Of Philadelphia, and
Philadelphia City Planning Commission*

**VIA ECF**

Arthur W. Lefco, Esquire
Aaron E. Moore, Esquire
Marshall Dennehey Warner Coleman & Goggin
1845 Walnut Street, 17th Floor
Philadelphia, Pa 19103

*Counsel for Defendants,
River's Edge Civic Association, Old City Civic
Association, Andrew Sacksteder, Richard Thom,
Richard Horrow, and Elizabeth Whittater*

 

                                      /S/
                                  H. David Seidman

4468745