IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| CMR D.N. CORP. AND MARINA TOWERS LTD. t/a WATERFRONT RENAISSANCE ASSOCIATE, Plaintiff | : : : : : | CIVIL ACTION |
| v. | : : | NO. 07-1045 |
| CITY OF PHILADELPHIA, et al., Defendants | : : | |

MEMORANDUM OPINION

**Stengel, J.** March 10, 2011

Waterfront Renaissance Associates LLP owns a parcel of land located at the southwest corner of Delaware Avenue[1] and Noble Street, in Philadelphia, Pennsylvania. From 1987 through 1989, Waterfront Renaissance engaged in negotiations with the City of Philadelphia Planning Commission to re-zone the site to C-4 zoning.[2] In 1989, Waterfront Renaissance entered into a Covenant of Restrictions with the Old City Civic Association and the Rivers Edge Civic Association. Waterfront Renaissance has alleged the Civic Associations breached this Covenant of Restrictions because the Civic Associations failed "to refrain from doing anything to destroy or injure Waterfront

---

[1] This portion of "Delaware Avenue" is now known as "Columbus Boulevard." Because many of the events surrounding this litigation occurred prior to the name change, I will refer to the street as "Delaware Avenue."

[2] C-4 zoning permits "the type of high density commercial, entertainment, mixed-use and residential development generally found in the business core of large cities." Philadelphia Planning Commission, Zoning Remapping in Philadelphia at 26, http://www.philaplanning.org/plans/zoning.pdf (May 2000) (last visited Oct. 28, 2010).

Renaissance's development rights" and breached the covenant of good faith and fair dealing.

The Old City Civic Association and Rivers Edge Civic Association filed a motion for summary judgment pursuant to Federal Rule of Civil Procedure 56. For the reasons set forth below, I will grant the Civic Associations' motion.

I.   **Background**

   A.   **The Creation of the 1989 Restrictive Covenant**

In 1989, Waterfront Renaissance, the Rivers Edge Civic Association, and the Old City Civic Association entered into a Covenant of Restrictions. The covenant provides:

> Said Civic Associations also agree to support and assist [Waterfront Renaissance] in obtaining any and all permits and variances that may be necessary to use and/or develop said premises in accordance with the below listed restrictions and conditions.[3]

The restrictions and conditions included restrictions for the visibility of off-street parking and loading docks, location of off-street parking and loading docks, a forty-foot set back, and sidewalk improvements. The City of Philadelphia Planning Commission brokered the Covenant of Restrictions; and Waterfront Renaissance and the Civic Associations signed the Covenant of Restrictions.

In 1987, Waterfront Renaissance requested support from the Planning Commission

---

[3] Motion for Summary Judgment of Defendants, Old City Civic Association, and Rivers Edge Civic Association Pursuant to Federal Rule of Civil Procedure 56 at Exh. A, CMR D.N. Corp. and Marina Towers Ltd. v. City of Phila., No. 07-1045 (E.D. Pa. filed Mar. 24, 2010) [hereinafter Covenant of Restrictions]. The restrictions and conditions are fully stated at infra § III.A n.13.

to re-zone its site from G-2 industrial to C-4. It required C-4 zoning to develop a proposed mixed use, high-rise development known as the World Trade Center. At that time, the Planning Commission was working on re-zoning portions of the river front along the Delaware River to encourage development. According to Barbara J. Kaplan, Executive Director of the Planning Commission, in 1989 the Planning Commission engaged in the river front remapping project because C-3[4] zoning "was probably not enough" but "C-4 [was] probably too much."[5] Therefore, the interested parties discussed "providing C-4, accompanied by deed restrictions on certain parcels, so that not only was the density restricted, but . . . there were restrictions in terms of where [we] wanted to preserve use of the river, and the height in certain areas." Plaintiff's Opposition at Exh. 7 at 31. During the process the Planning Commission held meetings with people from the Civic Associations. Id.

Richard Lombardo, the Chief of the Division Projects for the Planning Commission in 1989 stated that, unlike parcels on Delaware Avenue south of Callowhill Street, certain parcels on Delaware Avenue north of Callowhill Street would receive C-4

---

[4] C-3 zoning districts "are considered as regional commercial districts. Wholesale and distribution type commercial as well as hotel and motel uses are permitted in C-3." Zoning Remapping in Philadelphia at 26, supra at 1 n.1.

[5] Plaintiff's Opposition to the Motion for Summary Judgment of Defendants Old City Civic Association and Rivers Edge Civic Association at Exh. 7 at 31, CMR D.N. Corp. and Marina Towers Ltd. v. City of Phila., No. 07-1045 (E.D. Pa. filed April 19, 2010) [hereinafter Plaintiff's Opposition].

zoning with no restriction of the floor area ratio.[6] The reasons were the parcels' larger size and proximity to wide arterial streets and public transportation. The sites on Delaware Avenue south of Callowhill Street would contain a floor area ratio limit.

The site's re-zoning was conditioned on the signing of the Covenant of Restrictions.[7] Ms. Kaplan stated the covenants were created because:

> C-3 wasn't enough, C-4 was too much, there wasn't any other category in between, and the developers wanted . . . to know what they could really build. They didn't want to have to go to the zoning board and apply for variances and be in this sort of never-never land of not knowing what was going to be appropriate and what wasn't. They wanted to negotiate ahead of time and put it into the form of the deed restrictions.

Plaintiff's Opposition at Exh. 7 at 42. She stated the "developer could get permits over-the-counter for development as long as they met the C-4 zoning with those covenant

---

[6] The floor area ratio "is the ratio of the total floor area of buildings on a certain location to the size of the land of that location, or the limit imposed on such a ratio. [It] is the total building square footage (building area) divided by the site size square footage (site area)." Reference.com, Floor Area Ratio, http://www.reference.com/browse/floor+area+ratio (last visited Jan 12, 2011). A floor area ratio of "2.0 would indicate that the total floor area of a building is two times the gross area of the plot on which it is constructed, as would be found in a multiple-story building." Id.

[7] Waterfront Renaissance claims C-4 zoning with only the restrictions contained in the Covenant of Restrictions was critical for its project, which was a fully integrated, multi-phased, high-rise development. Plaintiff's Opposition at 33. It required the unrestricted C-4 zoning because: (1) the site's development required multiple structures of varying uses "intended to form a coherent whole" that required "interlocking infrastructural elements which must be planned ahead of time;" (2) to complete the construction in phases, the developer must know the next building can be built in accordance with the plan and integrated into the existing facility; (3) the offices must be pre-leased because investors need to know tenants will lease the space and obtaining a variance at each stage would hinder negotiations with tenants; and (4) financing would be impossible without predictability because investors make decisions based on projected cash flows and need to know the required variances will not prevent the project's completion. Id.

4

restrictions." Id. at 158.[8]

Richard W. Thom, the Chair of the Old City Civic Association's Developments Committee and a member of the Old City Civic Association's board of directors stated at his deposition that he "believe[d] [the civic association] ha[d] a contractual obligation to support the project and to assist [Waterfront Renaissance] with any variances per the terms and conditions of the contract." See Plaintiff's Opposition at Exh. 17 at 241.[9]

B.   **The 2005 Height Limitation**

On December 15, 2005, Brian Abernathy, Councilman DiCicco's legislative assistant, emailed members of the Civic Associations. He wrote that Councilman DiCicco introduced legislation to extend the Old City Residential Area Special District Controls ("Old City overlay")[10] to the area between Callowhill Street and Spring Garden Street but had not included the height limitation.[11] He asked whether the associations would like Councilman DiCicco to amend the legislation to include the height limitation.

---

[8] Correspondence from the Civic Associations suggests the City Council changed the C-4 zoning restrictions in 1991, and these changes impacted the floor area ratio limit for Waterfront Renaissance's site. See Plaintiff's Opposition at Exh. 32.

[9] Waterfront Renaissance also presents additional evidence of the city's prior support for the proposed World Trade Center project.

[10] The Old City overlay is a zoning overlay district which provides: "[S]pecial land use and zoning controls providing for limitation on the height of new construction or additions to existing buildings as well as on the size and location of certain specific entertainment and commercial uses, are required to protect the historic, residential, cultural and economic vitality of [the Old City] section of the City." Phila. Code § 14-1610(h).

[11] The Old City Residential Area Special District Controls had a maximum height for any new building or addition to an existing building of 65 feet. Phila. Code § 14-1610(4)(a).

Plaintiff's Opposition at Exh. 19.

On December 16, 2005 Richard Harrow, President of the Old City Civic Association wrote:

> The issue of adding the height restriction to the overlay is a little more complex. Because of the existence of a substantial number of buildings that already exceed 65 feet, we are concerned that the overlay could be subject to challenges. With that being said, having the restriction does allow a measure of control over the larger projects, so we would be amenable to adding it . . .

Plaintiff's Opposition at Exh. 21.

On January 4, 2006, Mr. Abernathy informed the Civic Associations the legislation would be amended unless he "[heard] otherwise." Id. at Exh. 22. In a January 26, 2006 email, Mr. Abernathy informed the Civic Associations a hearing on the Old City overlay would be held on February 21, 2006, and that the bill would be amended to include the height limitation. Id. at Exh. 23. Mr. Abernathy attached to the email the bill delineating the affected area, which included Waterfront Renaissance's site. Id. On January 27, 2006 and January 28, 2006, Andrew Sacksteder of the Rivers Edge Civic Association responded to Mr. Abernathy stating the Rivers Edge Civic Association "would . . . prefer seeing the Delaware Avenue protections extended further south," see Plaintiff's Opposition at Exh. 25, and the proposed boundaries left "the area of Rivers Edge that is south of Wood Street, east of I-95 unprotected," id. at Exh. 26. On February 21, 2006, Mr. Thom testified before the Rules Committee in support of the extension.[12]

---

[12] The Civic Associations present evidence that they wanted the height restriction extended to areas west of I-95, which would not have included Waterfront Renaissance's site.

In March, 2006, the City of Philadelphia enacted legislation extending the overlay and height restriction. The extension included Waterfront Renaissance's site. On November 7, 2006, Waterfront Renaissance's counsel wrote a letter to Councilman DiCicco seeking legislative relief from the height restriction. See Plaintiff's Opposition at Exh. 30. This letter was faxed to the Civic Associations. On November 9, 2006, Mr. Sacksteder wrote a letter to Councilman DiCicco stating: "I sincerely hope that your office, the City Administration and the City Law Department will diligently respond to Mr. Leonard and bring . . . [this] to a quick conclusion by upholding the changes made . . . earlier this year." Id. at Exh. 32. The letter also stated the normal course of zoning changes, i.e., a request for a variance, is available to Waterfront Renaissance. Id.

## II.   Standard

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). An dispute is "genuine" when "a reasonable jury could return a verdict for the nonmoving party" based on the evidence in the record. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A factual dispute is "material" when it "might affect the outcome of the suit under the governing law." Id.

A party seeking summary judgment initially bears responsibility for informing the

---

See Reply Brief in Support of Motion for Summary Judgment of Defendants, Old City Civic Association and Rivers Edge Civic Association at 3, CMR D.N. Corp. and Mariana Towers LTD v. City of Phila., No. 07-1045 (E.D. Pa. filed May 27, 2010). They allege Mr. Abernathy made the decision to extend the boundary to include the area east of I-95. Id.

7

court of the basis for its motion and identifying those portions of the record that "it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). Where the non-moving party bears the burden of proof on a particular issue at trial, the moving party's initial Celotex burden can be met simply by demonstrating to the district court that "there is an absence of evidence to support the non-moving party's case." Id. at 325. After the moving party has met its initial burden, the adverse party's response must cite "particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials" Fed. R. Civ. P. 56(c)(1). Summary judgment is therefore appropriate when the non-moving party fails to rebut by making a factual showing that is "sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex, 477 U.S. at 322.

Under Rule 56 of the Federal Rules of Civil Procedure, the court must draw "all justifiable inferences" in favor of the non-moving party. Anderson, 477 U.S. at 255. The court must decide "not whether . . . the evidence unmistakably favors one side or the other but whether a fair-minded jury could return a verdict for the plaintiff on the evidence presented." Id. at 252. If the non-moving party has produced more than a "mere scintilla of evidence" demonstrating a genuine issue of material fact, then the court may not credit

the moving party's "version of events against the opponent, even if the quantity of the [moving party's] evidence far outweighs that of its opponent." Big Apple BMW, Inc. v. BMW of N. Am., Inc., 974 F.2d 1358, 1363 (3d Cir. 1992).

## III. Discussion

Waterfront Renaissance argues the Civic Associations breached the Covenant of Restrictions and relies on the doctrine of necessary implication and the implied covenant of good faith and fair dealing.

### A. The Doctrine of Necessary Implication

The doctrine of necessary implication provides:

> In the absence of an express provision, the law will imply an agreement by the parties to a contract to do and perform those things that according to reason and justice they should do in order to carry out the purpose for which the contract was made and to refrain from doing anything that would destroy or injure the other party's right to receive the fruits of the contract.

Murphy v. Duquesne Univ. of the Holy Ghost, 777 A.2d 418, 434 n.11 (Pa. 2001) (quoting Slater v. Pearle Vision Ctr., 546 A.2d 676, 679 (Pa. Super. Ct. 1988)); Stamerro v. Stamerro, 889 A.2d 1251, 1259 (Pa. Super. Ct. 2005) (quoting Palmieri v. Partridge, 853 A.2d 1076, 1079 (Pa. Super. Ct. 2004)). "Courts employ the doctrine of necessary implication as a means of avoiding injustice by inferring contract provisions that reflect the parties' silent intent." Stamerro, 889 A.2d at 1259 (quoting Palmieri, 853 A.2d at 1079). A court may imply a term missing from the contract "only when it is necessary to prevent injustice and it is abundantly clear that the parties intended to be bound by such

9

term." Melton v. Melton, 831 A.2d 646, 654 (Pa. Super. Ct. 2003) (quoting Kaplan v. Cablevision of Pa., Inc., 671 A.2d 716, 720 (Pa. 1996)). "[I]mplied duties cannot trump the express provisions of the contract." Stamerro, 889 A.2d at 1259.

The Pennsylvania Superior Court, in Slater v. Pearle Vision Center, Inc., 546 A.2d 676, 679 (Pa. Super. Ct. 1988), found a provision requiring Pearle Vision to occupy the space referenced in a lease contract was implied in the contract. The court found "ample evidence in [the] lease" that the parties contemplated and intended Pearle Vision to occupy and use the premises. Slater, 546 A.2d at 679-80. The lease required Pearle Vision to open the premises for business no later than "ninety (90) days after Landlord's approval of Tenant's plans and specifications." Id. at 680. It required Pearle Vision to conduct business on the entire premises and included "abandonment" as a default event, with an exception allowing vacancy for sixty days if the landlord is given ninety days notice and the vacancy is due to repairs or remodeling. Id. In addition, the lease provided that Pearle Vision had an affirmative obligation to refrain from conduct that "may damage, mar or deface the [p]remises or any other part of the [s]hopping [c]enter." Id. The court found the plaintiffs sufficiently pled a breach of contract claim based on an implied obligation to occupy and use the premises. The court also noted that if the lease was "completely silent on the tenant's duty to occupy . . . [it] would conclude that the tenant had no duty to occupy because the landlord failed to include such a condition in the lease." Id. at 681. Obviously, the implied term, i.e., the tenant will actually occupy the

10

leased premises, was left out of the text of the contract.

Waterfront Renaissance attempts to imply a term which does not have support in the text of the Covenant of Restrictions.[13] The pertinent section of the Covenant of

---

[13] The full text of the Covenant of Restrictions is as follows:

WHEREAS, Waterfront Renaissance Associates, hereinafter called "Covenantor," is the registered owner of a certain tract of ground located at the Southwesterly corner of Delaware Avenue and Noble Street, Philadelphia, Pennsylvania, . . . and

WHEREAS, Covenantor considers it necessary and desirable for the general good and welfare of the community to impose certain restrictions and conditions on the use of said premises for the mutual benefit of the Covenantor and the surrounding land owners and occupiers, and

WHEREAS, Covenantor recognizes . . . it is desirable to impose certain restrictions and conditions on the use and development of said premises that are consistent with the objectives of the City Planning Commission's "Central Riverfront District Plan," and

WHEREAS, Covenantor has agreed to impose the following listed restrictions with the concurrence of the Rivers Edge Civic Association . . . , with the concurrence the Penn's Landing North Civic Association . . . , with the concurrence of the Old City Civic Association . . . and with the acknowledgment of the City Planning Commission. Said Civic Associations . . . agree that the below listed restrictions and conditions on the use and development of said premises are for the mutual benefit of the Covenantor and surrounding land owners and occupiers. Said Civic Associations also agree to support and assist the Covenantor in obtaining any and all permits and variances that may be necessary to use and/or develop said premises in accordance with the below listed restrictions and conditions.

NOW, THEREFORE, on this Thirteenth day of September 1989, . . . the Covenantor does hereby declare, make known and covenant . . . that it hereby subjects the aforesaid described tract of ground to the following restrictions, conditions and covenants:

(1) Portions of the premises used for off-street parking and/or off-street loading shall not be visible from Delaware Avenue. Architectural treatment of garage facades will be used to screen parking from Delaware Avenue and to make garages less obtrusive. Plantings, beams, walls and/or opaque fencing may also be used to screen parking

Restrictions states:

> Said Civic Associations also agree to support and assist [Waterfront Renaissance] in obtaining any and all permits and variances that may be necessary to use and/or develop said premises in accordance with the below listed restrictions and conditions.

<u>See</u> Covenant of Restrictions. The restrictions and conditions included restrictions for the visibility of off-street parking and loading docks, the location of off-street parking and

---

> areas. . . . .
>
> (2) Portions of the premises used for off-street parking and/or off-street loading shall not be located within fifty (50) feet of the westerly street line of Delaware Avenue.
>
> (3) There shall be a set back of at least forty (40) feet for all buildings to be erected on the north side of Callowhill Street between Front Street and Delaware Avenue.
>
> (4) Covenantor agrees to install at their own expense, at the time of development or redevelopment of the premises, sidewalk improvements to the westerly sidewalk of Delaware Avenue. Said improvements shall be of a level and quality of materials as to be compatible with the improvements to be installed along the easterly sidewalk of Delaware Avenue and to be known as the "Delaware River Walk". . . .
>
> (5) That the above-mentioned covenants, restrictions and conditions shall run with the land, and shall be binding on the Covenantor, its successors and assigns, for a period of twenty (20) years from the date hereof.
>
> (6) With the prior permission of the Planning Commission, the Covenantor, its successors or assigns, may after the execution of this document apply to have any of the above-mentioned covenants, restrictions and conditions deleted or amended by the Planning Commission. The Planning Commission may decline to consider such an application. Any and all amendments or deletions considered by the Planning Commission shall only be for the purposes of easing the burden this covenant places upon the Covenantor. . . . .
>
> (7) The Planning Commission shall have no standing or duty to enforce this covenant of restrictions.

<u>See</u> Covenant of Restrictions.

loading docks, a forty-foot set back, and sidewalk improvements. Id.

Waterfront Renaissance argues the Covenant of Restrictions implies an obligation to the Civic Associations to "refrain from doing anything that would destroy or injure [Waterfront Renaissance's] development rights which were established by the combination of C-4 zoning and the [Covenant of Restrictions]." Plaintiff's Opposition at 25. Waterfront Renaissance alleges the Civic Associations breached this obligation "by advocating and seeking the extension of the Old City Overlay beyond its original boundaries to include the [Waterfront Renaissance] [s]ite." Id. at 26. It argues the Civic Associations "violated the purpose of the Covenant and its necessary implied obligations." Id.

Waterfront Renaissance supports its suggestion that the Civic Associations had a responsibility to support its project with statements and letters from the Planning Commission, which drafted the Covenant of Restrictions, testimony from the chairman of the Old City Civic Association's Developments Committee, and a letter detailing the Rivers Edge Civic Association's dealings with another developer.

First, Waterfront Renaissance relies on the Planning Commission's statements of support for re-zoning Waterfront Renaissance's site to C-4 as part of a special use district with no height limit. See Plaintiff's Opposition at Exh. 7 at 42. The Planning Commission intended certain parcels north of Callowhill Street on Delaware Avenue to be zoned C-4 with no restriction of the floor area ratio. Id. at Exh. 6. At the same time,

13

the Planning Commission placed floor area ratio limits on other sites that were re-zoned to C-4. In addition, Ms. Kaplan stated the re-mapping project was to allow the developers to "get permits over-the-counter for development as long as they met the C-4 zoning with those covenant restrictions." Id. at 158.

Second, Waterfront Renaissance provides the deposition testimony of Richard W. Thom, who testified that the Old City Civic Association had a "contractual obligation to support the project and to assist [Waterfront Renaissance] with any variance per the terms and conditions of the contract." See Plaintiff's Opposition at Exh. 17 at 241. Mr. Thom also testified that when he supported the height restriction he had assumed Waterfront Renaissance had obtained a permit for the site. Id. at 148. If a permit had been obtained, its rights would have vested and the height restriction would not have impacted it. Id.

Third, Waterfront Renaissance references a Covenant of Restrictions which the Rivers Edge Civic Association entered in 1989 with Summer/Delaware Associates, L.P. As in the agreement with Waterfront Renaissance, the Rivers Edge Civic Association agreed to "support and assist [Summer/Delaware Associates, L.P.] in obtaining any and all permits and variances that may be necessary to use and/or develop said premises in accordance with the below listed restrictions and conditions." See Plaintiff's Opposition at Exh. 17A. In 2005, the developer sent to the Rivers Edge Civic Association plans for high-rise condominium buildings on the site.

In connection with the Summer/Delaware Associates project, the Rivers Edge

14

Civic Association sent a letter to its neighbors and the community. The letter detailed the chronology of the developer's planning and the civic association's discussions with the developer. It then stated:

> [T]o uphold the agreement created during the re-mapping process [Rivers Edge Civic Association] could not legitimately object to the project based simply on physical size. In consideration of relief from zoning based deed restrictions that were not [floor area ratio] or building mass related, the developer has agreed to undertake significant design detail modifications and undertake additional construction expenses at Rivers Edge Civic Association's request to mitigate, where possible, the impact of his development on the community.

Plaintiff's Opposition at Exh. 17B. Summer/Delaware Associates was seeking assistance based on a plan submitted to the civic association. Unlike Waterfront Renaissance, it was not seeking general relief from a height restriction that impacted the entire area.

The Civic Associations presented evidence the Covenant of Restrictions required that they support Waterfront Renaissance only in obtaining required permits and variances in accordance with the restrictions, which addressed parking and loading docks, setbacks, and sidewalk improvements. Waterfront Renaissance presents some evidence that the negotiations surrounding the signing of the Covenant of Restrictions concerned unlimited C-4 zoning and no height limit on the property. To say this evidence supports the insertion of a term or requirement into the Covenant of Restrictions because it is obvious and necessary for the Covenant to make sense is a real stretch. This is not adding a term that the tenant must occupy the building. This is a significant extrapolation from the Covenant of Restrictions's language. It is much more than "filling in" by implication

15

a term that was so obviously missed. Waterfront Renaissance's "evidence" fails to establish it is now <u>necessary</u> to imply a requirement that the Civic Associations "refrain from doing anything to destroy or injure [Waterfront Renaissance's] development rights which were established by the combination of C-4 zoning and the Covenant of Restrictions." In addition, Waterfront Renaissance fails to establish the parties intended to be bound by the term. See <u>Melton</u>, 831 A.2d at 654 (quoting <u>Kaplan</u>, 671 A.2d at 720). The Covenant of Restrictions does not address C-4 zoning or a height limitation.

The intent of the restriction placed on the Civic Associations in the Covenant of Restrictions was to commit the Civic Associations to support Waterfront Renaissance in the process of obtaining permits and variances, which necessarily would be obtained under the then existing zoning code. It would burden the wording of the covenant to require the Civic Associations to take affirmative steps to change the zoning of the property. To interpret this promise to support Waterfront Renaissance in the permit and variance process as a legal duty to do nothing which could in any way "destroy or injure" Waterfront Renaissance's development rights is terribly over-broad and unsupported by the text of the Covenant of Restrictions. The Civic Associations were committing themselves to supporting, i.e., refraining from opposing, Waterfront Renaissance's effort to obtain permits and variances under existing zoning law for the project as contemplated in 1989. Applying the "doctrine of necessary implication" as Waterfront Renaissance urges would stretch the text, meaning, and purpose of the Covenant of Restrictions. The

Covenant of Restrictions was not Waterfront Renaissance's opportunity to buy the Civic Associations' complete silence on any topic affecting or relating to any possible development plan.

No fair minded jury would imply a seemingly limitless obligation to refrain from doing anything to destroy, injure, impact, or affect Waterfront Renaissance's development rights, however broad the Covenant of Restrictions might be interpreted. The doctrine of necessary implication does not apply.

### B. <u>Duty of Good Faith and Fair Dealing</u>

"Every contract in Pennsylvania imposes on each party a duty of good faith and fair dealing in its performance and its enforcement." <u>Donahue v. Fed. Express Corp.</u>, 753 A.2d 238, 242 (Pa. Super. Ct. 2000) (quoting <u>Kaplan</u>, 671 A.2d at 722). "Good faith performance or enforcement of a contract emphasizes faithfulness to an agreed upon common purpose and consistency with the justified expectations of the other party." <u>Herzog v. Herzog</u>, 887 A.2d 313, 317 (Pa. Super. Ct. 2005) (quoting Restatement (Second) of Contracts, § 205, comment a). Actions that constitute bad faith include: "evasion of the spirit of the bargain, lack of diligence and slacking off, willful rendering of imperfect performance, abuse of a power to specify terms, and interference with or failure to cooperate in the other party's performance." <u>Somers v. Somers</u>, 613 A.2d 1211, 1213 (Pa. Super. Ct. 1992) (quoting Restatement (Second) of Contracts, § 205(d)).

Waterfront Renaissance maintains the spirit of the bargain was that its site would

have C-4 zoning with only the restrictions delineated in the Covenant of Restrictions. Waterfront Renaissance alleges "the Civic Associations' position that they could freely impair [Waterfront Renaissance's] development rights as long as they were prepared to support a variance amounts to 'evasion of the spirit of the bargain' embodied by the C-4 zoning and the [Covenant of Restrictions]." See Plaintiff's Opposition at 31. It alleges the Civic Associations violated the duty of good faith and fair dealing by supporting, and advocating for, the enactment of a height restriction that impacted Waterfront Renaissance's site. Id. at 32. Waterfront Renaissance again relies on statements from members of the Planning Commission and Mr. Thom in support of this contention. In addition, it relies on the statements from members of the Civic Associations and a letter from Mr. Sacksteder to Councilman DiCicco.

It alleges the Civic Associations supported the extension of the height limit in emails to Mr. Abernathy. Mr. Abernathy wrote to the Civic Associations seeking the Civic Associations' input on whether the Old City overlay's height restriction should be extended to the area north of Old City. The Old City Civic Association stated it "would be amenable" to the extension of the height restriction. See Plaintiff's Opposition at Exh. 21. Rivers Edge Civic Association wrote it would like the "protections extended further south" and "the proposed boundaries left the area of Rivers Edge that is south of Wood Street, East of I-95 unprotected." Id. at Exh. 25-26. The Civic Associations saw the area to which the extension would apply, and knew Waterfront Renaissance's site was in the

18

area.  Id. at Exh. 17.

In addition, Waterfront Renaissance presents a letter sent from Mr. Sacksteder to Councilman DiCicco.  When Waterfront Renaissance wrote a letter to Councilman DiCicco requesting legislative relief from the height restriction, the Rivers Edge Civic Association, through Mr. Sacksteder, wrote a letter responding to Waterfront Renaissance's letter.  Mr. Sacksteder's letter concluded:

> I sincerely hope that your office, the City Administration and the City Law Department will diligently respond to Mr. Leonard and bring . . . this to a quick conclusion by upholding the changes made . . . earlier this year.

Plaintiff's Opposition at Exh. 32.  The letter does not state the association would oppose a variance.  It states Waterfront Renaissance could request a variance for its site.  Id.

Even if a jury were able to determine the Civic Associations advocated for an extension of the height restriction, Waterfront Renaissance fails to prove this was a violation of the Civic Associations' duty of good faith and fair dealing.  Waterfront Renaissance fails to establish the common purpose of the Covenant of Restrictions, which mentions neither C-4 zoning nor height restrictions, was to permit C-4 zoning without a height restriction.  In addition, Mr. Sacksteder's letter does not constitute a failure to cooperate or an evasion of the spirit of the bargain.

No fair minded jury could find the Civic Associations' actions in supporting legislation helpful to their respective communities violated the Covenant of Restrictions merely because the new restriction would apply to Waterfront Renaissance's property.

The Covenant of Restrictions dealt with permits and variances, and the restrictions dealt with parking, setbacks, and sidewalks. A fair minded jury could not find the Civic Associations acted against an "agreed upon common purpose" or that their actions were inconsistent "with the justified expectations of the other party." No reasonable jury could find the Civic Associations breached the covenant of good faith and fair dealing.

## IV. Conclusion

The Covenant of Restrictions requires the Civic Associations to support Waterfront Renaissance in obtaining permits and variances. It does not require the Civic Associations provide their support in everything Waterfront Renaissance proposes for its site. Waterfront Renaissance argues that the purpose of the restrictive covenant was to provide the site with C-4 zoning limited only by the restrictions set forth in the Covenant of Restrictions. There are no written signed documents confirming this assertion.

Waterfront Renaissance failed to establish a genuine issue of material fact. It failed to establish a reasonable jury could find implied in the contract an obligation to refrain from doing anything to destroy or injure Waterfront Renaissance's development rights. In addition, it failed to present sufficient evidence from which a jury could find the Civic Associations violated their duty of good faith and fair dealing. Therefore, I will grant the Civic Associations' motion for summary judgment.

An appropriate order follows.