## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| CMR D.N. CORP. AND MARINA | : | |
| TOWERS LTD. T/A WATERFRONT | : | CIVIL ACTION |
| RENAISSANCE ASSOCIATES, | : | |
| Plaintiffs | : | |
| | : | No. 07-1045 |
| v. | : | |
| | : | |
| CITY OF PHILADELPHIA, et al., | : | |
| Defendants | : | |

## M E M O R A N D U M

**STENGEL, J.**                                              **November 4, 2011**

      This case involves a private real estate developer's efforts to build a World Trade Center along the Delaware River in Philadelphia. The developer, Waterfront Renaissance Association ("WRA"), contends the City thwarted the project by changing its zoning laws and by imposing certain unfair requirements through its Planning Commission. Several claims have already been dismissed. The parties filed cross motions for summary judgment on Count XVI, which alleges the City's Central Delaware Riverfront Overlay District and plan of development regulations are unconstitutional. The City also seeks summary judgment on WRA's promissory estoppel and detrimental reliance claims (Count III and IV) and WRA's claim for Unjust Enrichment (Count VIII). For the reasons discussed in this memorandum opinion, I will grant the City's motions and deny the Plaintiff's.

I.        BACKGROUND

Waterfront Renaissance Associates is a Pennsylvania limited partnership seeking to develop a "major World Trade Center" located at 400-456 North Columbus Boulevard, Philadelphia, Pennsylvania.  From 1987 through 1989, Waterfront Renaissance negotiated with the City of Philadelphia Planning Commission to re-zone the site to C-4 zoning.  In 1989, WRA met with three civic associations, which led to an agreement whereby the Civic Associations would support re-zoning the site to C-4 to enable the development of the WRA project in return for a twenty-year Zoning Covenant from WRA.  Under the Zoning Covenant, WRA agreed to certain design specifications to address concerns raised by the Civic Associations.  In return, the Civic Association Defendants agreed to "support and assist the Covenanter [WRA] in obtaining any and all permits and variances that may be necessary to use and/or develop said premises in accordance with the below listed restrictions and conditions."  (Doc. #211[1] at ¶ 48).

In March 2001, after a series of cooperative efforts involving the Delaware River Port Authority (DRPA), WRA and the City, the Pennsylvania Department of Community and Economic Development granted Keystone Opportunity Zone ("KOZ") status to WRA's site, and eleven and a half (11.5) acres of City-owned property around it.  KOZ status confers tax abatements at the state and local levels for qualified businesses that lease real property in the KOZ.  The KOZ distinction made the property more valuable and would, presumably, attract new businesses to the site.  WRA expended resources to

---

[1] Plaintiff's Third Amended Complaint, <u>CMR D.N. Corp. and Marina Towers Ltd. v. City of Phila.</u>, No. 07-1045 (E.D. Pa. filed April 4, 2011).

obtain the application, including hiring a lobbyist, Steven Wojcik and Associates, to promote the granting of KOZ status.  (Oral Argument Transcript Doc. #239 at 34 ¶¶ 17-25).

On March 5, 2009, Philadelphia City Councilman Frank DiCicco introduced Bill 090170-A, which the City Council approved, to create a zoning overlay ("CRO") for the Central Delaware Riverfront Overlay District.[2]  WRA's site is within this overlay district and the requirements of the overlay district complicated the RA project.  On April 20, 2010, the Planning Commission adopted regulations to implement the Plan of Development process (the "POD Regulations").  (Doc. #211 at ¶ 180e).  The POD is submitted in order that the Planning Commission can ensure accordance with the overall planning strategy for the Central Delaware Riverfront.

On September 16, 2010, the Planning Commission filed the revised POD Regulations with the Philadelphia Department of Records.  The revised POD Regulations became effective at midnight on September 27, 2010 pursuant to Section 8-407 of the

---

[2] The Central Delaware Riverfront Overlay District is codified at Section 14-1638 of the Philadelphia Code.  The Central Delaware Riverfront Overlay District provides:

> For all properties east of Columbus Boulevard/Delaware Avenue or adjacent to the Delaware River and for all other commercially zoned properties, no zoning permits shall be issued unless (i) the applicant shall have first submitted to the City Planning Commission, and the City Planning Commission shall have approved, a Plan of Development, which shall be approved by the Commission only if the Commission, in its discretion, has determined that the Plan of Development provides for development appropriate in scale, density, character and use for the surrounding community, and (ii) the Planning Commission determines that the requested permits are in conformity with the approved Plan of Development. If the Commission fails to approve, disapprove, conditionally approve or table a proposed Plan of Development within seventy-five (75) days after submission of complete plans to the Commission, the approval of the Commission shall be presumed. Within one hundred eighty (180) days of the effective date of this Ordinance the Commission shall adopt regulations providing objective standards for such design review as may be necessary, prior to implementing the provisions of this subsection 12.

Phila., Pa., The Philadelphia Code § 14-1638(12)(a) (2010).

Philadelphia City Charter.  (Doc. #211 at ¶ 304).  Subsection 13 of the CRO states that

the Planning Commission shall approve a POD "only if the Commission has determined,

in its discretion, that the Plan of Development provides for development appropriate in

scale, density, character and use for the surrounding community."  (Doc. #211 at ¶ 311;

Exhibit J at 5-6).  The parties' main contention is whether the CRO and POD Regulations

are overly vague or result in arbitrary and capricious application.

## II.        PROCEDURAL HISTORY

WRA commenced this civil action in February 2007 by filing a fourteen-count

complaint in the Court of Common Pleas of Philadelphia County against the City of

Philadelphia, the Civic Associations for the surrounding neighborhoods, and a number of

individual defendants.  The defendants removed the case to this court on March 15, 2007.

The original Complaint challenged a March 2006 ordinance that extended a 65 foot

height restriction to the area north of Old City, which included property owned by

Waterfront Renaissance.

The individual defendants were dismissed on 12(b)(6) motions, which left only the

claims against the Civic Association and the City.  Waterfront Renaissance Assocs. v.

City of Philadelphia, 2008 U.S. Dist. LEXIS 25868 (E.D. Pa. Mar. 31, 2008).  In 2011,

the Civic Associations' Motion for Summary Judgment was granted.  CMR D.N. Corp. v.

City of Phila., 2011 U.S. Dist. LEXIS 25392 (E.D. Pa. Mar. 10, 2011).  Additionally, in

2011, the constitutional challenge to the March 2006 ordinance was dismissed as moot.

CMR D.N. Corp. v. City of Phila., 2011 U.S. Dist. LEXIS 25387 (E.D. Pa. Mar. 10,

2011).

WRA has since filed an amended complaint solely against the City of Philadelphia challenging the new ordinance and the POD and maintaining claims for promissory estoppel and unjust enrichment. (Doc. #211). The City then filed a motion for summary judgment on July 29, 2011 (Doc. #223[3]). That same day WRA filed a partial motion for summary judgment on Count XVI (Doc. #224[4]). The motions are well and fully briefed and I had the benefit of hearing oral argument on the motions from counsel.

## III.      STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). A dispute is "genuine" when "a reasonable jury could return a verdict for the nonmoving party" based on the evidence in the record. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A factual dispute is "material" when it "might affect the outcome of the suit under the governing law." Id.

A party seeking summary judgment initially bears responsibility for informing the court of the basis for its motion and identifying those portions of the record that "it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). Where the non-moving party bears the burden of proof on a particular issue at trial, the moving party's initial Celotex burden can be met simply by demonstrating to the district court that "there is an absence of evidence to

---

[3] Defendant's Motion for Summary Judgment, CMR D.N. Corp. and Marina Towers Ltd. v. City of Phila., No. 07-1045 (E.D. Pa. filed July 29, 2011).

[4] Plaintiff's Partial Motion for Summary Judgment on Count 16 of the Third Amended Complaint, CMR D.N. Corp. and Marina Towers Ltd. v. City of Phila., No. 07-1045 (E.D. Pa. filed July 29, 2011).

support the non-moving party's case." <u>Celotex</u>, 477 U.S. at 325.  After the moving party

has met its initial burden, the adverse party's response "must – by affidavits or as

otherwise provided in this rule – set out specific facts showing a genuine issue for trial."

FED. R. CIV. P. 56(e)(2).  Summary judgment is therefore appropriate when the non-

moving party fails to rebut by making a factual showing that is "sufficient to establish the

existence of an element essential to that party's case, and on which that party will bear

the burden of proof at trial." <u>Celotex</u>, 477 U.S. at 322.

Under Rule 56 of the Federal Rules of Civil Procedure, the court must draw "all

justifiable inferences" in favor of the non-moving party.  <u>Anderson</u>, 477 U.S. at 255.  The

court must decide "not whether . . . the evidence unmistakably favors one side or the

other but whether a fair-minded jury could return a verdict for the plaintiff on the

evidence presented." <u>Id.</u> at 252.  If the non-moving party has produced more than a

"mere scintilla of evidence" demonstrating a genuine issue of material fact, then the court

may not credit the moving party's "version of events against the opponent, even if the

quantity of the [moving party's] evidence far outweighs that of its opponent." <u>Big Apple</u>

<u>BMW, Inc. v. BMW of N. Am., Inc.</u>, 974 F.2d 1358, 1363 (3d Cir. 1992).

## IV.        DISCUSSION

### A.  <u>Constitutional Claims</u>

The plaintiff contends the Central Riverfront Overlay District ("CRO") regulations

and the Planning Commission's Plan of Development ("POD") provisions are

unconstitutional.  Specifically, WRA alleges the CRO and the POD regulations violate

the principles of substantive due process and equal protection.  The City contends that these claims are not ripe and have no merit.

The ripeness doctrine "serves to determine whether a party has brought an action prematurely[.]"  Khodara Envtl. Inc. v. Blakey, 376 F.3d 187, 196 (3d Cir. 2004).  In land-use cases, a property owner's constitutional claim will not be ripe until the zoning authorities have had an opportunity to arrive at a final, definitive position regarding the application of the regulations at issue.  See Sameric Corp. of DE v. City of Philadelphia, 142 F.3d 582 (3d Cir. 1998); Acierno v. Mitchell, 6 F.3d 970, 975 (3d Cir. 1993); Hoehne v. Cnty of San Benito, 870 F.2d 529, 533 (9th Cir.1989).  Under this "finality rule," a plaintiff property owner must prove that a "final decision has been reached by the agency before it may seek compensatory or injunctive relief in federal court on federal constitutional grounds."  Acierno, 6 F.3d at 975.  The finality rule, however, does not apply to facial challenges because a facial challenge argues "any application of the regulation is unconstitutional."[5]  Cnty Concrete Corp., 442 F.3d at 164; See also Cornell

---

[5] In Cornell Cos. v. Borough of New Morgan, 512 F. Supp. 2d 238, 256 (E.D. Pa. 2007),  this Court outlined the appropriate analysis for applying the finality rule to constitutional claims in zoning cases:

> The ripeness of a claim alleging a constitutional violation in the land-use and zoning arena depends upon whether the plaintiff is raising (1) an "as-applied" challenge or (2) a facial attack on a zoning ordinance.  In an as-applied case, the plaintiff is contending that the defendant municipal agency violated his or her constitutional rights in the manner in which an ordinance was applied to his or her property.  The finality rule can bar an as-applied challenge because "only once a '[local] decision maker has arrived at a definitive position on the issue' has a property owner been inflicted with 'an actual, concrete injury.'"  Cnty Concrete, 442 F.3d 159 (quoting Williamson Cnty Regional Planning Com. v. Hamilton Bank, 473 U.S. 172, 192 (1985)).

> Facial attacks on a zoning ordinance, on the other hand, do not implicate ripeness concerns or the fear of a federal court overstepping its jurisdiction into local matters.  The finality rule does not apply "to facial attacks on a zoning ordinance, i.e., a claim that the mere enactment of a regulation either constitutes . . . a substantive violation of due process or equal protection.  A 'final decision' is not necessary in that context because when a landowner makes a facial challenge he or she

Cos. v. Borough of New Morgan, 512 F. Supp. 2d 238, 256 (E.D. Pa. 2007) (stating that "[f]acial attacks on a zoning ordinance[s] … do not implicate ripeness concerns"). Additionally, in Cnty Concrete, the Third Circuit held that when a plaintiff facially attacks an ordinance the cause of action is ripe, even if the plaintiff did not seek a variance from the zoning ordinance.  Cnty Concrete, 442 F.3d at 256.

WRA asserts a claim against a provision of the ordinance, which requires developers to submit a POD to the Planning Commission for approval.[6]  WRA alleges that the language in the ordinance results in ad hoc application and that the approval process acts as a bar to development.  (Doc. #211 at ¶ 334).  Plaintiffs also challenge the ordinance facially, i.e., they allege that, in all of its possible applications the ordinance is arbitrary, capricious, and not rationally related to any legitimate government interest. The City argues that the finality rule should apply in this case because "unlike the ordinances in Cornell and Cnty Concrete, there is nothing on the face of the CRO that prohibits WRA from proceeding with its development."[7]  (Doc #223 at 8).

---

argues that any application of the regulation is unconstitutional . . . ." Cnty Concrete, 442 F.3d at 164 (internal quotations and citations omitted).

Id. at 256.

[6] To obtain the Planning Commission's approval, the applicant must demonstrate that "the Plan of Development provides for development appropriate in scale, density, character, and use for the surrounding community."  Section 14-1638(13).

[7] The City alleges that if a developer's project is in accordance with the zoning code and within the parameters of the overall zoning plan for the riverfront, the project will be approved.  Therefore, the bases of the finality rule are implicated by the fact that the CRO does not directly prohibit a developer's ability to execute a project.  Id.  Plaintiff argues that the approval from the Planning Commission is, in fact, a bar to development and not a "mere formality." (Doc.#229 at 3).  Stating that approval is "a condition to the issuance of a zoning permit, without which no commercial development can occur in the Central Delaware Riverfront District."  Id.

The fact that WRA asserts a facial challenge to the ordinance meets the basic test to withstand summary judgment on this issue because the Third Circuit has held that facial challenges to ordinances ripen at the time of enactment.  See County Concrete Corp., 442 F.3d at 164.  Even if WRA did not seek a variance from the zoning ordinance, the Third Circuit has maintained that this type of facial attack is ripe for adjudication. See Id. at 256.  Accordingly, the finality rule does not apply to plaintiff's substantive due process challenge to the zoning ordinance asserted on the theory that the law as a whole is arbitrary, capricious, and unreasonable, and Count XV is ripe for federal court review.

1.      Substantive Due Process

The Fourteenth Amendment to the United States Constitution prohibits deprivations "of life, liberty, or property, without due process of law."  U.S. Const. amend. XIV, § 1.  To prevail on a substantive due process claim, a Plaintiff must demonstrate that an arbitrary and capricious act deprived him of a protected property interest. [8]  Cnty Concrete Corp., 442 F.3d at 165 (citing Taylor Inv., Ltd. v. Upper Darby Twp, 983 F.2d 1285, 1292 (3d Cir. 1993)).  Additionally, the Plaintiff must show that the law is not rationally related to a legitimate state interest.  Pace Resources, Inc. v. Shrewsbury Twp, 808 F.2d 1023, 1034 (3d Cir. 1987).  In the context of constitutional challenges to land use laws, the Third Circuit has held that "unless defendants' actions

---

[8] Nicholas v. Pennsylvania State Univ., explained the standard for violating substantive due process stating: "typically, a legislative act will withstand substantive due process challenge if the government 'identifies the legitimate state interest that the legislature could rationally conclude was served by the statute.'"  227 F.3d 133, 139 (3d Cir. 2000).  On the other hand, non-legislative or executive action violates substantive due process if "arbitrary, irrational, or tainted by improper motive," or if "so egregious that it 'shocks the conscience.'"  Id.  In a land-use controversy, official conduct will not be deemed to "shock the conscience" absent allegations of corruption or self-dealing, bias against an ethnic group, interference with constitutionally-protected activity or a virtual "taking" of property. Eichenlaub v. Twp. of Indiana, 385 F.3d 274, 285-86 (3d Cir. 2004).

were 'completely unrelated in any way to a rational land use goal' there is no [substantive due process] violation."  <u>Corneal v. Jackson Township</u>, 94 Fed. Appx. 76, 2004 WL 790315 (3d Cir. 2004) (citing <u>Cnty of Sacramento v. Lewis</u>, 523 U.S. 833, 846 (1998)).

A second way to prevail on a claim that an ordinance is unconstitutional requires a plaintiff to demonstrate that that an enactment is void for vagueness.  It is a basic principle of due process that an enactment is void for vagueness if its prohibitions are not clearly defined.[9]  <u>Grayned v. City of Rockford</u>, 408 U.S. 104, 108-09 (1972).  However, the Supreme Court has held that regulations are not unconstitutionally vague where one "may have the ability to clarify the meaning of a regulation by [his] own inquiry, or by resort to administrative process."  <u>Hoffman Estates v. Flipside, Hoffman Estates</u>, 455 U.S. 489, 497-99 (1982).  <u>See also</u> <u>Price v. Smith</u>, 416 Pa. 560, 566 (1965) (the phrase

---

[9] <u>But see</u> <u>Kissell v. Ferguson Twp. Zoning Hearing Bd.</u>, 729 A.2d 194, 197 (Pa. Commw. 1999) (finding that when a word or term is undefined in a zoning ordinance, it is to be given its plain and ordinary meaning).  Additionally, in the criminal context, vagueness implicates a number of concerns.  For instance, "laws must give the person of ordinary intelligence a reasonable opportunity to know what is prohibited," and laws must provide explicit standards to "avoid resolution on an ad hoc and subjective basis, with the attendant dangers of arbitrary and discriminatory application."  <u>Grayned v. City of Rockford</u>, 408 U.S. 104, 108-09 (1972).  In the zoning context, however, this argument does not have as much force.  <u>Adhi Parasakthi Charitable v. Twp. of W. Pikeland</u>, 721 F. Supp. 2d 361, 380 (E.D. Pa. 2010).  The United States Supreme Court has further detailed the appropriate review for vagueness challenges to statutes:

> The degree of vagueness that the Constitution tolerates--as well as the relative importance of fair notice and fair enforcement–depends in part on the nature of the enactment.  Thus, economic regulation is subject to a less strict vagueness test because its subject matter is often more narrow, and because businesses, which face economic demands to plan behavior carefully, can be expected to consult relevant legislation in advance of action.  Indeed, the regulated enterprise may have the ability to clarify the meaning of the regulation by its own inquiry, or by resort to an administrative process.  The Court has also expressed greater tolerance of enactments with civil rather than criminal penalties because the consequences of imprecision are qualitatively less severe....  Finally, perhaps the most important factor affecting the clarity that the Constitution demands of a law is whether it threatens to inhibit the exercise of constitutionally protected rights.  If, for example, the law interferes with the right of free speech or of association, a more stringent vagueness test should apply.

<u>Hoffman Estates v. Flipside, Hoffman Estates</u>, 455 U.S. 489, 498-99 (1982).

"the character of the neighborhood" was "not so vague and indefinite that uniform application could not be assured.").

WRA alleges that the CRO and POD regulations violate the principle of substantive due process because the review is impermissibly vague, is arbitrary and capricious, and is unrelated to any legitimate planning purpose.[10] (Doc. #233 at 9-10).[11] WRA argues that the CRO fails to explain how the scale, density, character, and use that are appropriate for the surrounding community differ from the scale, density, character, and use that are permitted by a property's base zoning. Additionally, WRA alleges that, although the City states it does not add additional restrictions outside of the existing zoning, the CRO includes regulations, such as the terms "appropriateness"[12] for the

---

[10] WRA makes a facial attack on the City's use and application of zoning ordinances as arbitrary, capricious, and unreasonable. WRA alleges that terms "existing characteristics of the built and natural environment that are essential to achieving the working guidelines of the Civic Vision" and "appropriate in scale, density, character and use" are not defined. It maintains the regulations do not provide quantitative or qualitative standards or guidelines for evaluation of the factors, and, therefore, provide no guidance for which developments will be approved. See Plaintiff's Memorandum of Law in Support of Motion for Leave to Supplement Complaint at 7-9, CMR D.N. Corp. and Marina Towers Ltd. v. City of Phila., No. 07-1045 (E.D. Pa. filed June 25, 2010); Plaintiff's Motion at Exh. 1 at ¶¶ 315-316. Additionally, WRA relies upon the opinion of Mr. William Alesker, the architect who designed the World Trade Center project, who avers that he is unable to differentiate between the surrounding community' and what the planning commission will approve because of the lack of objectivity. See Plaintiff's Reply Brief in Support of the Motion for Summary Judgment on Count 16 at 3, CMR D.N. Corp. and Marina Towers Ltd. v. City of Phila., No. 07-1045 (E.D. Pa. filed Sept. 1, 2011).

[11] Reply Brief in Support of Motion for Summary Judgment on Count 16, CMR D.N. Corp. and Marina Towers Ltd. v. City of Philadelphia, No. 07-1045 (E.D. Pa. filed Sept. 1, 2011).

[12] The City argues that "appropriateness" is effectively defined by the POD, which states: "'Appropriateness' is determined by reference to the 'surrounding community' and the 'goals articulated in the Civic Vision for the Central Delaware.'" See Defendant's Response in Opposition to Plaintiff's Motion for Partial Summary Judgment at 9, CMR D.N. Corp. and Marina Towers Ltd. v. City of Phila., No. 07-1045 (E.D. Pa. filed Aug. 19, 2011) (citing Philadelphia Code, § 14-1638(1)(h)).

"surrounding community," which it fails to define using any objective criteria.[13]  (Doc. #229 at 3).[14]

The City alleges that WRA has no vested property interest and, therefore, cannot allege a substantive due process violation.[15]  Moreover, the City argues that even if WRA could allege a substantive due process claim, it would fail on the merits because the ordinance did not deprive WRA of all economically viable use of its property.  See Hodel v. Virginia Surface Mining & Reclamation Assn., Inc., 452 U.S. 264, 297 (1981).  The City argues that the Civic Vision[16] read in conjunction with the zoning ordinance, the

---

[13] Plaintiff also alleges that the CRO is a de facto moratorium on commercial development that is permitted by the zoning plan.  Third Amended Complaint at ¶ 358, CMR D.N. Corp. and Marina Towers Ltd. v. City of Phila., No. 07-1045 (E.D. Pa. filed April 5, 2011).  However, the City states that it does allow development.  See WRA's Counter-Statement of Facts at ¶¶ 318-19, CMR D.N. Corp. and Marina Towers Ltd. v. City of Phila., No. 07-1045 (E.D. Pa. filed Aug. 19, 2011); Memorandum in Support of the City of Philadelphia's Motion for Summary Judgment at 11, CMR D.N. Corp. and Marina Towers Ltd. v. City of Phila., No. 07-1045 (E.D. Pa. filed July 27, 2011).  A de facto moratorium forecloses all development in an overlay area.  See Currier Builders, Inc. v. Town of York, 2001 U.S. Dist. LEXIS 10268 (D. Me. July 20, 2001).  Here, the City can point to a number of developers who have succeeded in beginning development in the area.  Additionally, WRA concedes that fact by stating that the CRO "permits some degree of commercial development."  Plaintiff's Memorandum in Opposition to Defendant's Motion for Summary Judgment at 9, CMR D.N. Corp. and Marina Towers Ltd. v. City of Philadelphia, No. 07-1045 (E.D. Pa. filed Aug. 19, 2011).  Therefore, it cannot be deemed a de facto moratorium.  See Currier Builders, Inc. 2001 U.S. Dist. LEXIS 10268.

[14] Plaintiffs Memorandum of Law in Opposition to Defendant's Motion for Summary Judgment,  CMR D.N. Corp. and Marina Towers Ltd. v. City of Philadelphia, No. 07-1045 (E.D. Pa. filed Aug. 19, 2011)

[15] The City relies on Appeal of Dunlap, 87 A.2d 299, 301 (Pa. 1952), arguing Waterfront Renaissance does not have a property interest because a property interest "vests upon securing a building permit and thereafter expending substantial sums in reliance on such building permit."  Memorandum in Support of the City of Philadelphia's Motion for Summary Judgment at 8, CMR D.N. Corp. and Marina Towers Ltd. v. City of Phila., No. 07-1045 (E.D. Pa. filed July 27, 2011).  The City essentially argues a person does not have a property interest, and, therefore, cannot allege a substantive due process challenge to a zoning ordinance, until he or she secures a building permit.  This would preclude not only plaintiffs such as Waterfront Renaissance, who have not yet applied for a building permit or variance, but also plaintiffs who applied for, but were denied, a building permit.

[16] The Civic Vision was prepared by Penn Praxis, the consulting arm of the School of Design of the University of Pennsylvania, as part of the Central Delaware Riverfront Planning Process.  City of Philadelphia's Motion for Summary Judgment on Count 16 at ¶ 37, CMR D.N. Corp. and Marina Towers Ltd. v. City of Phila., No. 07-1045 (E.D. Pa. filed July 29, 2011).  Although §14-1638(1)(h) of the Philadelphia Code indicates that the Planning Commission "adopted" the Civic Vision, Planning Commission Chairman Alan Greenberger has stated publicly that the Planning Commission did not "adopt" the Civic Vision (as an official planning document), but only "accepted" the Civic Vision (as a working guideline for the development of a Master Plan).  Id. at ¶ 38.  The CRO is the interim

POD standards, and the legislative findings and definitions[17]  is not vague and that those

documents provide constitutionally valid guidance to property owners.[18] (Doc. #228 at

10).[19]  An approved POD is one that is consistent with the site's underlying zoning and

its surrounding community within the CRO boundaries, and does not conflict with the

goals and purposes of the Civic Vision.  (Doc. #228 at 35).  Finally, the City argues that

"it is patently rational for the City to require developers to submit their plans to the

---

zoning overlay that the Civic Vision recommended. It was introduced on March 5, 2009 and was signed into law on June 11, 2009, less than one month after the Planning Commission "accepted" the Civic Vision. Id. at ¶ 45.

The Civic Vision identifies certain goals for Movement Systems, Parks and Open Space, and Land Development, such as increasing opportunities for public access to the riverfront, improving riverfront life and promoting water quality and extending Philadelphia's urban neighborhoods to the river's edge.  Id. at ¶ 43 (citing the Civic Vision, pp. 72-74 (Exhibit K)).  The Civic Vision also makes recommendations, such as ensuring public access to the Riverfront through zoning, conservation easements and acquisition of public spaces, improving the quality of development through the creation of both an interim zoning overlay and a long-term riverfront zoning classification, and ensuring that short term gain does not preclude achieving long term goals.  Id. at ¶ 44 (citing the Civic Vision, pp. 30-31 (Exhibit K)).

[17] For example, legislative finding 1(h) states:

> This District is established to protect the existing characteristics of the built and natural environment that are essential to achieving the working guidelines of the Civic Vision, adopted by the Philadelphia City Planning Commission on April 21, 2009, while a Master Plan for the area is developed.  This section of the City presents a diverse collection of uses, ranging from the working port and large retail establishments in the southern portion to high-rise residential communities in the north.  Special land use controls and design guidelines will help promote long-term economic viability and to provide for a framework for future growth.

Philadelphia Code, § 14-1638(1)(h).

[18] Additionally, the City argues it is cannot simply make ad hoc determinations for approval.  "In ascertaining and giving effect to the intent of City Counsel, the Planning Commission will consider such factors as the "occasion and necessity for the overlay, the circumstances under which it was enacted," the issue to be remedied and the objectives to be obtained by the overlay, the consequences of a particular interpretation, and the contemporaneous legislative history.  See Defendant's Response in Opposition to Plaintiff's Motion for Partial Summary Judgment at 14, CMR D.N. Corp. and Marina Towers Ltd. v. City of Phila., No. 07-1045 (E.D. Pa. filed Aug. 19, 2011) (citing 1 Pa.C.S. § 1901(c)).

[19] Defendant's Response in Opposition to Plaintiff's Motion for Partial Summary Judgment, CMR D.N. Corp. and Marina Towers Ltd. v. City of Philadelphia, No. 07-1045 (E.D. Pa. filed Aug. 19, 2011).

Planning Commission to ensure the integrity and consistency of the pending Plan."[20] (Doc. #223 at 8).

The City's ordinance appears to be rationally related to the goal of the integrity and consistency of appropriate development.  WRA has failed to produce any evidence to the contrary.  Its only argument is that the structure of the CRO would allow for nothing other than arbitrary and subjective approval because the ordinance does not define its terms using objective criteria.  There is simply no merit to the "impermissible discretion" argument.  It would be impossible for a zoning ordinance to identify specifically each and every permitted use.  A degree of discretion is necessary and is entirely consistent with the long history of land use law in Pennsylvania.  Such discretion does not render the zoning ordinance unconstitutionally vague. [21]

WRA had fair notice that the property was subject to a zoning ordinance.  The ordinance in question contains standards and uses which are appropriately delineated in commonplace terms and categories.  The POD also references specific legislative findings that further clarify those standards.  WRA has not alleged actions taken by the City for reasons unrelated to land use planning, nor have they provided evidence of any bad motives that suggest the City's actions were unrelated to land use.  Further, the CRO

---

[20] The City cites Pace Resources, Inc. v. Shrewsbury Township, 808 F.2d 1023, 1034-1035 (3d Cir. 1987) (quoting Rogin v. Bensalem Township, 616 F.2d 680, 689 (3d Cir. 1980) (stating "the federal courts largely defer to legislative judgment on such matters as zoning regulation…unless the local legislative judgment is without a plausible rational basis")).

[21] See Cnty Concrete, 442 F.3d at 167 (citing the Supreme Court's rule in Williamson as "respond[ing] to the high degree of discretion characteristically possessed by land-use boards"); and Grayned v. City of Rockford, 408 U.S. 104 (1971) (holding that statute need only give fair warning of the types of conduct proscribed in light of common understanding and practices).

does not place any restrictions on WRA as to the use of its property outside of its zoning ordinance.  (Doc. #223 at 10).  While WRA's use of the property is limited by the zoning code, it certainly is not deprived of all economically viable use for its property.

i.        Delegation to Planning Commission

Generally, the Fourteenth Amendment protects individuals only against government action, unless the state has delegated authority to a private party, thereby making the actor a "state actor" and implicating the Due Process Clause.  See Nat'l Collegiate Athletic Ass'n v. Tarkanian, 488 U.S. 179, 195 (1988).  The Due Process Clause limits the manner and extent to which a state legislature may delegate legislative authority to a private party acting as a state actor.  See, e.g., Yick Wo v. Hopkins, 118 U.S. 356, 373-74 (1886); West v. Atkins, 487 U.S. 42, 56 (1988).  Only if the state legislature imposes sufficient limitations is the exercise of authority by the private party constitutional.  See, e.g., Seattle Title Trust Co. v. Roberge, 278 U.S. 116, 121-22 (1928) (concluding that the delegation of zoning power to individual landowners violated the due process clause because the ordinance allowed no opportunity for review and left the private parties free to withhold consent for selfish or arbitrary reasons based on will or caprice), but see Gilligan v. Pa. Horse Racing Comm'n, 422 A.2d 487, 489 (Pa. 1980) (quoting Belovsky v. Redevelopment Authority, 54 A.2d 277, 284 (Pa. 1947) (stating the legislative body "may establish primary  standards and impose upon others the duty to carry out the declared legislative policy in accordance with the general provisions of the act.").

Such delegated authority includes the ability to disseminate regulations so long as "(1) the basic policy choices [are] made by the Legislature; and (2) the 'legislation [contains] adequate standards which will guide and restrain the exercise of the delegated administrative functions.'" Gilligan, 422 A.2d 489 (quoting Chartiers Valley Joint School Dist. v. Cnty Board of School Dirs., 211 A.2d 487, 493 (Pa. 1965)).

WRA argues that nothing in the City Charter authorizes the Planning Commission to make zoning decisions. (Doc. #229 at 10). It argues that the CRO requires the Planning Commission to "second-guess" the zoning established by the City Council based on vague and undefined criteria. Id. at 12-13. The City argues the improper delegation claim fails because the POD standard was set by City Council and the ordinance at issue expresses only basic policy decisions and provides eight "Legislative Findings" that address the specific objectives of the overlay. (Doc. #228 at 36). (Doc. #223 at 15); Section 14-1638(1)(a)-(1)(h). Furthermore, the City argues that the ordinance provides standards because the Plan must "provide[] for development appropriate in scale, density, character and use for the surrounding community." Id.; Section 14-1638(12)(a).

WRA fails to supply evidence demonstrating that the Planning Commission was delegated impermissible power or that the statute is void of ascertainable standards against which a court may measure the Commission's exercise of discretion. The limitations on a legislative body's ability to delegate do not mean that each and every detail must be enumerated. See Hospital Ass'n of Pennsylvania v. MacLeod, 410 A.2d 731 (Pa. 1980). The ordinance sets forth eight findings that address the purpose of the

16

overlay area.  The stated objectives and purpose of the overlay area, including

maintaining the City's vision, encouraging a variety of uses, and driving economic

growth, are set forth in detail in the ordinance.  See Philadelphia Code, § 14-1638(1)(a)-

(1)(h).  Accordingly, there is no evidence that the Planning Commission is creating

zoning legislation.

    2.    Equal Protection

The Equal Protection Clause of the Fourteenth Amendment provides that "[n]o

state . . . shall deny any person within its jurisdiction equal protection of the laws."  U.S.

Const. amend. XIV.  "To bring a successful claim under 42 U.S.C. § 1983 for a denial of

equal protection, plaintiffs must prove the existence of purposeful discrimination.  To the

extent Plaintiffs allege discrimination by Defendants solely by treating similarly situated

individuals more favorably, they must demonstrate that they 'received different treatment

from that received by other individuals similarly situated.'"  Keenan v. City of Phila., 983

F.2d 459, 465 (3d Cir. 1992) (citing Andrews v. City of Phila., 895 F.2d 1469, 1478 (3d

Cir. 1990)); and Cnty Concrete, 442 F.3d at 167 (stating the test for a facial equal

protection challenge to land-use regulations is the arbitrary differential treatment of

similarly situated property owners).

Thus, the "first inquiry a court must make in an equal protection challenge to a

zoning ordinance is to examine whether the complaining party is similarly situated" to

other uses that are permitted.  Congregation Kol Ami v. Abington Twp., 309 F.3d 120,

137 (3d Cir. 2002).  If the entities are similarly situated, then the City must justify its

different treatment of the two under the rational basis test.  Rogin v. Bensalem Twp., 616

F.2d 680, 6898 (3d Cir. 1980).  Under rational basis, the burden is on the party

challenging the validity of the ordinance to establish that the statute is unconstitutional.

FCC v. Beach Communs, Inc., 508 U.S. 307, 314-15 (1993).  The party defending the

constitutionality of the action need only demonstrate some legitimate justification that

motivated the action.  Id. at 315.[22]

     WRA alleges that the CRO and POD regulations violate equal protection because

the standards are impermissibly vague and indefinite and invite ad hoc regulation and

impermissible discrimination.[23]  WRA claims that the City sought to deprive them of the

use of their property, by arbitrarily and selectively extending the Overlay to target their

development, but not other similarly situated properties.[24]  (Doc #211 at ¶ 15).

     There is simply no evidence that Defendants targeted WRA for disparate

enforcement of the ordinance.  Additionally, WRA has not met the burden to establish

there is no rational basis for the City's actions.  The City contends that the ordinance "is

established to protect the existing characteristics of the built and natural environment that

are essential to achieving the working guidelines of the Civic Vision, adopted by the

Philadelphia City Planning Commission on April 21, 2009, while a Master Plan for the

---

[22] The Third Circuit has articulated that the arbitrary and irrational standard is "doubtless difficult for a plaintiff to meet in a zoning dispute." Eichenlaub v. Twp. of Indiana, 385 F.3d 274, 287 (3d Cir. 2004).  The Court concluded that "[i]t may be very unlikely that a claim that fails the substantive due process test will survive under an equal protection approach." Id.

[23] WRA cites to Horton v. California, 496 U.S. 128 (1990), to discuss the vagueness of the statute; however, Horton addressed the fourteenth amendment in the criminal procedure context rather than an equal protection claim for vagueness.  See Supra note 8 (discussing vagueness in the zoning context).

[24] The Overlay extension omits the eastern half of the KOZ, which is owned by the City and is currently leased to the Riverwalk group for casino development.  In addition, the Overlay extension omits two (2) similarly situated sites to the south of WRA's Site which are much closer to Old City (one of which is also owned by the City).

area is developed."  Additionally, the City articulated that "The purpose of the Central

Delaware Riverfront Overlay is to provide development guidance and controls during the

period in which a public policy master plan is prepared for the Central Delaware

Riverfront."[25]  These reasons are certainly rationally related to a legitimate state interest.

B.        Promissory Estoppel and Detrimental Reliance

"The doctrine of promissory estoppel allows a party, under certain circumstances,

to enforce a promise even though that promise is not supported by consideration."

Shoemaker v. Commonwealth Bank, 700 A.2d 1003, 1006 (Pa. Super. Ct. 1997).  In

Pennsylvania, the doctrine of promissory estoppel involves three elements: (1) the

promisor made a promise that he should have reasonably expected to induce action or

forbearance on the part of the promisee; (2) the promisee actually took action or refrained

from taking action in reliance on the promise; and (3) injustice can be avoided only by

enforcing the promise.  Jodek Charitable Trust, R.A. v. Vertical Net Inc., 412 F. Supp. 2d

469, 478 (E.D. Pa. 2006).

Under Pennsylvania law, plaintiff need not allege the exact, express "promise" in

order to state a cause of action for promissory estoppel.  See, e.g., Cornell Cos, Inc. v.

Borough of New Morgan, 512 F. Supp. 2d 238, 266 (E.D. Pa. 2007); Straup v. Times

Herald, 283 Pa. Super. 58, 423 A.2d 713, 720 (Pa. Super. 1980) (describing promissory

estoppel as "a flexible doctrine, to be applied . . . as the equities between the parties

preponderate").  However, a broad and vague implied promise is not enough to satisfy the

first element.  Ankerstjerne v. Schlumberger Ltd., 2004 U.S. Dist. LEXIS 9927, *14

---

[25] POD Regulations, Section 1. Preamble. (Exh. R.).

(E.D. Pa. 2004) (citing <u>C & K Petroleum Prods., Inc. v. Equibank</u>, 839 F.2d 188, 192 (3d Cir. 1988)).

WRA claims that over a period of almost 20 years, the City encouraged and materially supported WRA's Project, by brokering the Zoning Covenant,[26] re-zoning the Site to C-4 without height restrictions, applying to the Commonwealth alongside WRA to include the Site in a KOZ, and promoting a public/private partnership between WRA and DRPA.[27] (Doc #229 at 17-20). WRA further alleges that it incurred substantial expenses in reliance on the City's representations, including designing, engineering, and promoting the project and transferring its exclusive World Trade Center license. <u>Id.</u> at 19. These actions were well known to and often in conjunction with the City, in an effort to advance development of the Site.

The City contends that its "mere encouragement" is not sufficient to support a promissory estoppel claim.[28] It alleges there are no genuine issues of material fact that the City "clearly expressed an intention to be bound" by its actions. (Doc. # 223 at 21). The City also notes that WRA's reliance on the City's support was not justified because

---

[26] Under the Zoning Covenant, WRA agreed to design certain elements of the Project to satisfy a number of concerns raised by the Civic Associations, such as parking for the Project, view corridors so as to not block the Delaware River, the appearance of the Project and other similar issues. As part of the Zoning Covenant, the Civic Associations agreed to support and assist the permitting for the Project. Specifically, the Zoning Covenant provides as follows: [The] Civic Associations also agrees to support and assist the Covenanter [WRA] in obtaining any and all permits and variances that may be necessary to use and/or develop said premises in accordance with the below listed restrictions and conditions. (Doc. #211 at ¶¶ 61-68) Zoning Covenant (Exh. H).

[27] The City argues that none of these actions can be considered actions or promises sufficient to sustain a promissory estoppel action because they were not specific or made by those with actual authority.

[28] The City argues that the City can act only through its officers and agents and that WRA fails to identify any City official who made the alleged promises to support the World Trade Center project. Defendant's Motion for Summary Judgment at 18, <u>CMR D.N. Corp. and Marina Towers Ltd. v. City of Phila</u>., No. 07-1045 (E.D. Pa. filed July 29, 2011). The City thus contends that WRA failed to meet its evidentiary burden for a promissory estoppel claim by offering specific "promises" by a City official. <u>Id.</u> at 20.

WRA had notice of required procedures for development approval and WRA made no effort to inquire.  Id. at 23-24.

The Plaintiff has been unable to articulate a valid and enforceable promise.[29]  I find there is insufficient evidence in the record of a promise to support a promissory estoppel claim.  WRA insists that it never alleged the actionable promise was to enforce C-4 zoning in perpetuity, as the City argues.  Certainly the City could not promise, and WRA could not expect a promise, to maintain a specific zoning classification "in perpetuity."  WRA characterizes the City's "promise" as a broad, amorphous commitment to "not enact an unconstitutional law."  We can assume the converse of that also to be true:  that the City will consider itself obligated to pass only constitutional laws.  For the plaintiff to suggest the City would intentionally pass a law that it knows will be held unconstitutional is unrealistic.  As the plaintiff well knows, the constitutionality of a law is for the courts and it is sometimes difficult for a legislative body, say for example the Philadelphia City Council, to always predict whether a particular ordinance will pass constitutional muster.  A promise to always pass constitutional laws is at worst unreliable and at best unreasonable and unenforceable.  No such promise could be made and no such promise was made in this case.  I find that the CRO and POD regulations in this case are, in fact, constitutional and thus the City did not "break a promise" by enacting unconstitutional laws.  The City's "promise" to support

---

[29] At oral argument, the parties articulated each of their versions of the alleged "promise" made by the City.  The City characterizes the alleged promise as "C-4 zoning in perpetuity" and that this promise is outside the City's authority to make.  (Doc. #239 at 4-5 ¶ 20-22).  The City then referenced WRA's response to the City's Motion for Summary Judgment and explained that in that document, the alleged promise was "not to destroy a long-term project by arbitrary and unconstitutional ordinances."  Id. at 6, ¶¶  20-22.  WRA claimed that the promise was that the City agreed to "support the project."  Id. at 25, ¶¶ 8-9.  WRA added that this support only required the City to act in good faith.  Id. at 37, ¶¶ 3-4.

WRA's site development, cannot constitute a promise that a court is capable of enforcing. Therefore, I will grant the City's Motion for Summary Judgment as to Counts III and IV of Plaintiffs' Complaint.

C. Unjust Enrichment

Under Pennsylvania law, a claim of unjust enrichment must allege the following elements: (1) plaintiff conferred a benefit on the defendant; (2) the defendant appreciated the benefit; and (3) acceptance and retention by the defendant of the benefits, under the circumstances, would make it inequitable for the defendant to retain the benefit without paying for the value of the benefit.  Com. ex. rel. Pappert v. TAP Pharm. Prods., Inc., 885 A.2d 1127 (Pa. Commw. 2005).  See also Torchia v. Torchia, 499 A.2d 581, 582 (Pa. Super. 1985) ("[T]o sustain a claim of unjust enrichment, a claimant must show that the party against whom recovery is sought either wrongfully secured or passively received a benefit that it would be unconscionable for her to retain.").  However, Pittsburgh Baseball v. Stadium Auth., 630 A.2d 505, 510 (Pa. Commw. Ct. 1993) narrows the application of an unjust enrichment claim, holding that a party who bestows an indirect benefit on another is not entitled to a quasi-contract remedy.[30]

WRA alleges that the City combined eleven and a half (11.5) acres of City-owned property with WRA's Site to establish the minimum fifteen (15) acres required for a KOZ, a status which the City would not otherwise have obtained.  (Doc. #211 at ¶¶ 69-78).  WRA alleges that it bore the expense of hiring a lobbyist, Steven Wojcik and

---

[30] The court found that Pittsburgh Associates' argument relied on a false premise when it claimed that it conferred enormous benefits on the City because the Pirates' fans, and not Pittsburgh Associates, paid the taxes on ticket sales and made the other expenditures.  Pittsburgh Baseball, 630 A.2d 505 (Pa. Commw. Ct. 1993).

Associates, without whom the KOZ status would not have been granted.  (Doc. #239 at 34 ¶¶ 17-25).  Specifically, WRA alleged that it paid the Wojcik firm "approximately one-hundred and fifty thousand dollars to achieve this result[,]" and the City benefitted from WRA's efforts, which resulted in the KOZ status.  Id. at 34-35 ¶¶ 24-25, 1-5. There is an element of cynicism inherent in this argument.  For sure, WRA hired the lobbyist and the lobbyist likely assisted the effort by advocating for the parties' joint request for KOZ status.  But to say the hiring of the lobbyist secured the result totally diminishes the parties' integrity in the application process.  The "my lobbyist created your result" position completely dismisses the Commonwealth of Pennsylvania's independent review of the application and the ultimate granting of the KOZ designation through the analysis of objective criteria, precedent and standards.  Plaintiff's pompous pronouncement that it conferred a benefit on the City by obtaining the KOZ status ignores the City's cooperative effort, the Commonwealth's exercise of discretion, and the fact that WRA's portion of the property, which is substantial, is more valuable today than it was before it was designated for the KOZ.

The City is correct that the KOZ status was an indirect benefit bestowed upon the City by the Commonwealth and was not due to entirely to WRA's actions.  (Doc. #223 at 29).  Even if the City did receive a benefit from WRA, it would not be unjust because WRA also received a benefit from the transaction.  Id. at 28.  WRA has failed to produce evidence that it conferred a direct benefit upon the City.  Much like the Pittsburgh Baseball case, WRA did not bestow the benefit of KOZ status on the City.  The status was granted by the Commonwealth of Pennsylvania and, therefore, WRA makes no

showing that it is entitled to a quasi-contract remedy where it conveyed no benefit upon the City.

## V.          CONCLUSION

For the reasons set forth in this memorandum, I will grant the City of Philadelphia's motion for summary judgment, any deny the plaintiff's motion.


An appropriate order follows.